USDC SCAN INDEX SHEET

















HMR   12/11/98   7:29

3:98-CV-02234   SOUTHWEST CENTER V. BERG

*6*

*P/A.*

1   Neil Levine (Calif. Bar No. 163557)
    EARTHLAW
2   Univ. of Denver-Forbes House
    1714 Poplar Street
3   Denver, CO 80220
    Telephone: (303)-871-6996
4   Telecopier: (303)-871-6991

5   Daniel J. Rohlf (Colo. Bar No. 016748)
    PACIFIC ENVIRONMENTAL ADVOCACY CENTER
6   10015 S.W. Terwilliger Blvd.
    Portland, OR 97219
7   Telephone: (503)-768-6707
    Telecopier: (503)-768-6671

8
    Tara Mueller (Calif. Bar No. 161536)
9   ENVIRONMENTAL LAW FOUNDATION
    1736 Franklin St. 8th Floor
10  Oakland, CA 94612
    Telephone: (510)-208-4555
11  Telecopier: (510)-208-0555

12  Attorneys for Plaintiffs

13                 UNITED STATES DISTRICT COURT

14        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15                                    Case No: '98 CV 2234 IEG

16  SOUTHWEST CENTER FOR
    BIOLOGICAL DIVERSITY,

17                  Plaintiff,       MEMORANDUM IN SUPPORT OF EX
    vs.                              PARTE APPLICATION FOR
18                                   TEMPORARY RESTRAINING ORDER
    KEN BERG, Carlsbad Field         AND PRELIMINARY INJUNCTION
19  Supervisor; ANNE BADGLEY,
    Acting Regional Director;        Date:
20  BRUCE BABBITT, Secretary of      Time:
    the Interior; MICHAEL            Courtroom:
21  UBERUAGA, San Diego City
    Manager; ROBERT DAVIS,
22  District Engineer; and COUSINS
    MARKETCENTERS INC.,

23                  Defendants.

24

25                       INTRODUCTION

26      Plaintiffs seek a temporary restraining order and

27  preliminary injunction to restrain Defendant Cousins

28  MarketCenters (Cousins) from destroying 66 vernal pools, or

Memo in Support                         1

1   seasonal wetlands, which are occupied with endangered species.

2   Defendant Cousins MarketCenters (Cousins) is about to commence

3   grading the 70-acre property located on Mira Mesa, San Diego.

4   On or about Wednesday, December 9, 1998, the City of San Diego

5   issued grading permits which allow Cousins to destroy the

6   wetland habitat.  Plaintiffs file this application to preserve

7   the status quo until the Court is able to resolve the merits of

8   the case or rules on a preliminary injunction.  This destruction

9   will occur in violation of the Endangered Species Act, Clean

10  Water Act, and the National Environmental Policy Act.

11                            ARGUMENT

12  I.   PLAINTIFFS WILL SUFFER IRREPARABLE UNLESS THIS COURT STOPS
         THE BULLDOZERS

13

14  A.   STANDARDS FOR TRO AND PRELIMINARY INJUNCTION

         Typically, the Ninth Circuit employs a sliding scale for

15
    determining whether a court should grant a temporary restraining
16
    order and  preliminary injunction.  First, a moving party can
17
    demonstrate that (1) they are likely to succeed on the merits
18
    and (2) there is a possibility of irreparable injury. Goldie's
19
    Bookstore, Inc. v. Superior Court, 739 F.2d 466, 470 (9th Cir.
20
    1984).  Alternatively, the court may issue a preliminary
21
    injunction when (1) the motion raises serious questions on the
22
    merits and (2) the balance of hardships tips decidedly in favor
23
    of the moving party. Los Angeles Memorial Coliseum Commission v.
24
    National Football League, 634 F.2d 1197, 1202 (9th Cir. 1980).
25
    These are not two separate tests, but rather extremes of a
26
    single continuum. Id. at 1201.
27
    B.   IRREPARABLE HARM UNDER THE ENDANGERED SPECIES ACT
28
         In ESA cases, Congress has removed the courts' traditional

1  equitable powers in fashioning a remedy.  Thus, upon finding

2  that a federal agency has violated a statutory duty under the

3  ESA, courts do not balance the competing equities.  "Congress

4  has spoken in the plainest of words, making it abundantly clear

5  that the balance has been struck in favor of affording

6  endangered species the highest of priorities." Tennessee Valley

7  Authority v. Hill, 437 U.S. 153, 173 (1978); Sierra Club v.

8  Marsh, 816 F.2d 1376, 1383 (9th Cir. 1987)("the Supreme Court

9  held that Congress had explicitly foreclosed the exercise of

10  traditional equitable discretion by courts faced with a

11  violation of section 7"); National Wildlife Federation v.

12  Burlington Northern, 23 F.3d 1508, 1510 (9th Cir. 1994)("In

13  cases involving the ESA, Congress removed from courts their

14  traditional equitable discretion in injunction proceedings of

15  balancing the parties' interests").

16  C.   IRREPARABLE HARM IN ENVIRONMENTAL LITIGATION

17       As a general proposition in environmental cases,

18       environmental injury, by its nature, can seldom be
         adequately remedied by money damages and is often permanent
19       or at least of long duration, i.e., irreparable.  If such
         injury is sufficiently likely, therefore, the balance of
20       harms will usually favor the issuance of an injunction to
         protect the environment.
21
    Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545
22
    (1987).  "When environmental injury is sufficiently likely, the
23
    balance of harms will usually favor the issuance of an
24
    injunction to protect the environment." Save the Yaak Committee
25
    v. Block, 840 F.2d 714, 722 (9th Cir. 1988). See e.g., Portland
26
    Audubon Society v. Babbitt, 998 F.2d 705 (9th Cir. 1993);
27
    Northern Cheyenne Tribe v. Hodel, 851 F,2d 1152, 1158 (9th Cir.
28
    1988); Connor v. Burford, 836 F.2d 1521, 1541 (9th Cir. 1988).

D.  PLAINTIFFS' INTEREST IN PROTECTING ENDNAGERED SPECIES AND
THEIR VERNAL POOL HABITAT WILL SUFFER IRREPARABLE HARM IF
THE GRADING PROCEEDS

An injunction is needed to preserve remaining vernal pool habitat and the species which depend on these wetlands for their survival. California's vernal pools and the species dependent upon them are among the most threatened habitats of all of California's natural ecosystems. 62 Fed.Reg at 4926.  Vernal pools in Southern California provide the only habitat for the San Diego fairy shrimp. 62 Fed.Reg. 4925 (February 3, 1997).[1] Over 95 percent of this habitat has already been destroyed and additional losses are unacceptable. 62 Fed.Reg. 4925, 4926 (February 3, 1997). Dec. of Bauder at ¶ 6; Dec. of Simovich at ¶ 4.  Thus, any additional losses of vernal pools is irreparable in San Diego. Declaration of Ellen Bauder at ¶¶ 5,6,7. Declaration of Marie Simovich at ¶ 6.

Moreover, vernal pool destruction is permanent. 62 Fed.Reg. at 4931. Dec. of Bauder at ¶ 6.  The FWS has opined that efforts to recreate vernal pools have failed. Id.  According to the FWS, "the only known vernal pool creation experiment conducted in southern California that specifically investigated fairy shrimp was a failure." Id.("no conclusive data exist to substantiate the hypothesis that vernal pools can be restored or created"). Given the state of the science of the shrimp and its habitat, "the Service maintains that transplanting target species [San Diego fairy shrimp] into artificial pools cannot be considered

---

[1]  Vernal pools also provide the only habitat for six other listed species: Riverside fairy shrimp, Otay mesa mint, California orcutt grass, San Diego button-celery, San Diego mesa mint, and navarretia fossalis. See 58 Fed.Reg. 41384; (August 3,

1 adequate replacement for the loss of occupied vernal pool

2 habitat." Id. at 4931. As stated,

3       The Service concludes that the continued survival and
        recovery of the San Diego fairy shrimp can only be assured
4       at this time by the preservation and enhancement of the
        extant [those still in existence] vernal pools and their
5       associated watersheds.

6 Id. See also Bauder Dec. at ¶¶ 9,10. According to Dr. Ellen

7 Bauder, destruction of the remaining vernal pool preclude the

8 survival and recovery of the many listed species dependent upon

9 vernal pools. Bauder Dec. at 5.

10      The Cousins project results in impacts to vernal pools and

11 the listed fairy shrimp which are irreparable. The Cousins

12 project will destroy all 66 vernal pools on the project site and

13 an entire vernal pool complex (groupings of vernal pools). Corps

14 June 10, 1998 General Permit (Attached as Exhibit 1 to Levine

15 Dec.); Dec. of Bauder at ¶ 5. EPA also recognized the

16 significant impacts of the Cousins project: "The proposed

17 project would result in 100 percent loss of vernal pools,

18 wetlands, and other sensitive resources onsite." EPA Second

19 Objection Letter (Attached as Exhibit 2 to Levine Dec.).

20 According to Dr. Ellen T. Bauder declaration, the destruction of

21 vernal pool habitat on the Cousins' site will be irreparable.

22 Bauder Dec. at ¶ 5.[2] After her recent visit to the project

23 site, she indicates that the "Cousins project will significantly

24 impacts vernal pools on the southwest quadrant of the

25 intersection of Mira Mesa Boulevard and I-25." Id. at 5.

26 ────────────────────────────

1993); 58 Fed.Reg. 41384 (August 3, 1993); 43 Fed.Reg. 44812
27 (September 28, 1978); 63 Fed.Reg. 54975 (October 13, 1998).

28 [2]   Dr. Bauder is the expert on vernal pool habitat in southern
California, having work in this area since 1981 and assisting

1 Several vernal pools on the site are occupied by San Diego fairy

2 shrimp and the shrimp are likely to occur in the remaining

3 pools. Dec. of Simovich at ¶ 4.  Thus, impacting the 66 vernal

4 pools at this will result in irreparable losses of the shrimp

5 and its habitat.

6     Dr. Marie Simovich is an expert on San Diego fairy shrimp.

7 Dec. of Simovich at ¶¶ 1-3.  The FWS cites to Dr. Simovich's

8 studies extensively in the Final Rule listing the San Diego

9 fairy shrimp. See 62 Fed.Reg. 4925.  According to Dr. Simovich

10 California's vernal pools are a unique and finite biological

11 resource which warrant protecting all the remaining pools from

12 development activities. Dec. of Simovich at ¶ 5.  Dr. Simovich

13 states that the proposed mitigation considered by the Corps is

14 inadequate to protect the San Diego fairy shrimp and offset the

15 loss on the Cousins property. Id. at 6. See also EPA Second

16 Objection Letter ("do not adequately off-set for the permanent

17 loss of aquatic resources at the project site").[3]

---

the FWS in preparing a vernal pool recovery plan. Bauder Id. at
¶ 1-2.

[3]    The All Writs Act authorizes this Court to order Cousins to
cease all operations in connection with the project pending
trial on the merits.  The All Writs Act provides for the courts'
issuance of "all writs necessary or appropriate in aid of their
respective jurisdictions and agreeable to the usages and
principles of law." 28 U.S.C. § 1651(a).  The court's authority
under the All Writs Act "extends, under appropriate
circumstances, to persons, who though not parties to the
original action or engaged in wrongdoing, are in a position to
frustrate the implementation of a court order." United States v.
New York Telephone Co., 434 U.S. 159, 174 (1977). See also Save
Our Dunes v. Pegues, 642 F.Supp. 393, 406 (M.D. Ala. 1985),
rev'd on other grds, 834 F.2d 984 (11th Cir. 1987)("The
plaintiffs may . . . obtain an injunction against the state
officials and the private developer if the circumstances of this
case warrant the court's taking steps to preserve the status
quo, and state officials and the private developer are in any
way impeding the court's ability to do so.").  Thus, the Court's
authority under the All Writs Act extends to Cousins, or for

1  V.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

2  A.    The Corps Should Never Have Issued A General Permit

3      On June 10, 1998, the Corps granted Cousins a Nationwide

4  Permit 26 (NWP 26), a type of general permit. Cousins NWP

5  (Attached as Exhibit 1 to Levine Dec.).  The Corps should have

6  undertaken a more extensive review of the Cousins project

7  through the section 404 "individual" permitting process and not

8  reviewed the permit application through the streamlined general

9  permitting process.  By do so, the Corps violated the

10 requirements of section 404 of the CWA. 33 U.S.C. § 1344(e).

11     Section 301 of the CWA prohibits the discharge of any

12 pollutant into waters of the United States. 33 U.S.C. §§ 1311,

13 1362.  Under section 404 of the CWA, however, the Corps may

14 permit the disposal of dredged or fill material into wetlands.

15 33 U.S.C. § 1344(a).  The Corps may issue individual permits, on

16 a case-by-case basis, or general permits, on a state, regional,

17 or nationwide basis. 33 U.S.C. § 1344(a) & (e).  The

18 Environmental Protection Agency (EPA) has concurrent

19 jurisdiction over the section 404 permitting process. 33 U.S.C.

20 § 1344(c).

21     The Corps' process for reviewing general permit

22 applications is streamlined as compared to "individual" permit

23 applications.  General permit applications undergo minimal

24 regulatory review and no public review.  The general permits

25 allow the Corps to circumvent the process of specific approval.

26 Conversely, individual permits for discharges issue only after

27

28 that matter any other party whose actions could frustrate the
   Court's maintenance of the status quo.  By grading the project
   site, Cousins would frustrate the purpose of this court's
   injunction pending compliance by the federal agencies.
   Memo in Support                    7

1  notice, public hearings, and a case-by-case evaluation of a

2  specific project. See 33 C.F.R. § 323.3(g); 33 U.S.C. § 1344(a).

3  However, the Corps retains discretionary authority to require an

4  individual permit application even when the subject activity may

5  qualify for a general permit. 33 C.F.R. § 325.2(e)(2).

6      Because the permitted activities will have significant

7  impacts, the Corps violated the CWA by issuing Cousins a general

8  permit.  The Corps may only grant general permits provided the

9  activities permitted have minimal adverse environmental effects,

10  individually and cumulatively. 33 U.S.C. § 1344(e) (emphasis

11  added). See also 40 C.F.R. § 230.7(a)("(2) The activities in

12  such category will have only minimal adverse effects when

13  performed separately; and (3) The activities in such category

14  will have only minimal cumulative adverse effects on water

15  quality and the aquatic environment").

16      Notably, the Corps acknowledge that nationwide general

17  permits are inappropriate when the proposed actions impact

18  vernal pools.  The Corps recently stated the following in a

19  public notice:

20        For that portion of the Los Angeles District (LAD) within
      the State of California, LAD is proposing that no

21        nationwide permit can be used to authorize the discharge of
      dredged or fill material into any vernal pool. It is the

22        position of LAD Regulatory Branch that vernal pools are
      sufficiently rare [that] the loss of any vernal pool should

23        require site specific review under section 404(b)(1)
      Guidelines and public interest review factors and values.

24

25  Corps' August 3, 1998 Public Notice (Attached as Exhibit 4 to

26  Levine Dec.).  In complete contradiction of the statement, the

27  Los Angeles District of the Corps issued Cousins a nationwide

28  general permit.

1    EPA, the agency with concurrent jurisdiction with the Corps

2 over the wetlands permitting process, strongly objected to the

3 issuance of a general permit.  EPA stated on two occasions that

4 since the impacts of the proposed project are significant, a

5 general permit should not be issued.  First, on March 2, 1998,

6 EPA concluded that

7        [T]he proposed project does not meet the minimization of
        adverse individual and cumulative impacts criteria required
8        for authorization under the Nationwide Permit program.

9 EPA First Object Letter (Attached as Exhibit 2 to Levine Dec.).

10 This conclusion was based on two concerns.  First, EPA

11 recognized the imperiled status of vernal pools.  "It is

12 estimated that San Diego county has lost between 95 to 97

13 percent of its historic acreage of vernal pool habitat." Id.

14 Second, EPA states that "while the projected impacts of this

15 project are below 0.5 acres, the applicant has not minimized on-

16 site impacts."  Here, EPA points out the unreasonable nature of

17 this project:

18        of the 70-acre site, only 10 to 20 acres are necessary for
        a viable preserve, which still leaves over 2/3 of the site
19        unencumbered. Instead, the proposed Cousin's MarketCenter
        project will eliminate the entire C27 complex of vernal
20        pools. . .  Given that the vernal pools are clustered on
        the site and that other, smaller projects have found it
21        possible to avoid vernal pools, we do not believe that the
        proposed project has minimized its impacts.
22
   Id.  EPA continues its critique of the Corps' use of a
23
   nationwide general permit:
24
        due to cumulative impacts to vernal pools and the failure
25        to meet the minimization threshold required for Nationwide
        Permit, we strongly urge you to exert your discretionary
26        authority and require an Individual Permit for this
        project.
27

28

1 <u>Id</u>. (emphasis added). EPA indicated that Cousins could qualify

2 for a nationwide permit if Cousins "provide[d] on-site avoidance

3 and restoration of vernal pools." <u>Id</u>.

4  When the Corps ignored EPA's concerns, EPA sent a second

5 objection letter to the Corps, noting that it and the FWS

6 believed an "individual" permit was necessary. EPA Second

7 Objection Letter (Attached as Exhibit 3 to Levine Dec.).  On May

8 18, 1998, EPA stated its "object[ion] to authorizing this

9 project under a nationwide permit because it does not appear

10 that the project impacts would be minimal and the impacts may be

11 avoidable." <u>Id</u>. EPA maintains that the Corps should deny this

12 application for a nationwide general permit.

13  Further, the Cousins project does not comply with wetland

14 regulations.  Section 404 regulations, applicable to individual

15 and general permits, require avoidance of wetlands and where the

16 filling of wetlands cannot be avoided, then "appropriate and

17 practicable steps" must be taken to minimize the potential

18 adverse impacts of the discharge on wetlands. 40 C.F.R. §

19 230.10.  According to EPA, Cousins could avoid vernal pools on-

20 site. EPA Second Objection Letter.  Moreover, EPA, determined

21 that the Cousins' alternative analysis violated wetland

22 regulations. EPA First Objection Letter.  In particular, EPA

23 stated

24    First, the project purpose is overly broad and has not been
      sufficiently narrowed to evaluate the "basic" project
25    purpose. Second, the off-site alternatives analysis fails
      to fully evaluate portions of the project being located
26    off-site but in proximity to each other. Finally the
      analysis appears to demonstrate that on-site avoidance is
27    not practicable because of the extremely high purchase of
      the property. As we discovered in reviewing the
28    alternatives analysis for the Bolsa Chica project, the
      404(b)(1) analysis does not consider sunk costs nor does
      [sic] is it based solely upon what the applicant's

1   negotiated purchase price is.  Instead, the practicability
    threshold is measured across the market and considers
2   whether other projects with similar purposes and in a
    reasonable geographic area have been able to support.
3   Therefore, rather than evaluating what might be an extreme
    purchase price within the market,, the 404(b)(1) determines
4   more of an average estimate.

5   Id.[4]

6       In sum, the Corps violated the criteria for issuing a

7   general permit under section 404(e) of the CWA.  Because the

8   impacts to vernal pools are not minimal, but instead are

9   significant (see Dec. of Bauder and Simovich), the Corps must

10  process the Cousins project as an "individual" permit

11  application.

12  B.  The Corps Did Not Follow Required Procedures Under The
        Clean Water Act And National Environmental Policy Act Prior
13      To Issuing The Permit

14      The Corps failed to follow procedures under section 401(a)

15  of the CWA before issuing Cousins a nationwide general permit.

16  Section 401(a)(1) of the CWA precludes federal agencies from

17  issuing or granting a permit or license for any activity which

18  may cause discharges into navigable waters until the applicable

19  _____

20  [4]    The FWS sums up the problems with the nationwide general
    permit process as a means to provide protection for vernal pools
21  in the final rule listing the shrimp species.  According to the
    FWS, the Corps' general permitting process has contributed
22  significantly to the destruction of vernal pools and San Diego
    fairy shrimp. 62 Fed. Reg. at 4931, 4934.  The FWS noted that
23  "significant areas of vernal pool habitat continue to be
    destroyed in spite of the U.S. Army Corps of Engineers
24  jurisdictional authority to regulate these wetlands under the
    Clean Water Act." 62 Fed.Reg. at 4931. See also 63 Fed. Reg.
25  54975, 54987 ("even if the Corps establishes jurisdiction under
    the Clean Water Act over vernal pools, this does not ensure
26  their protection").  Under the Corps' permitting system, filling
    wetlands less than one-third of an acre need not go through
27  regulatory review. Id. at 4934.  Since most all vernal pools in
    San Diego containing San Diego fairy shrimp are less than one
28  acre, the Corps' streamlined review process is "not adequate to
    assure the survival of the San Diego fairy shrimp." Id. at 4931,
    4934.

1  State certifies that the activity will comply with state water
2  quality standards. 33 U.S.C. § 1341(a). An applicant for a
3  federal permit must submit State certification to the federal
4  agency considering a permit application.

5      The Corps issued the NWP 26 permit to Cousins before the
6  State of California certified that the activities under the
7  permit would comply with state water quality standards. Absent
8  such certification, a federal agency cannot grant a permit. Id.
9  The Corps' own wetlands regulations recognize the mandatory
10 nature of section 401(a) in the nationwide general permit
11 context. "State 401 water quality certification pursuant to
12 section 401 of the Clean Water Act, or waiver thereof, is
13 required prior to the issuance or reissuance of NWPs authorizing
14 activities which may result in a discharge into waters of the
15 United States." See also 33 C.F.R. § 330.4(c)(1). The wetlands
16 regulations state specifically "NWPs numbered 12, 15, 16, 17,
17 25, 26, and 40 involve activities which would result in
18 discharges and therefore 401 water quality certification is
19 required." Id. By failing to comply with section 401(a), the
20 Corps' Cousins permit was illegally issued.

21     Similarly, the Corps failed to prepare an environmental
22 impact statement before issuing the section 404 permit to
23 Cousins. NEPA requires all federal agencies to prepare and
24 circulate for public review and comment a detailed environmental
25 impact statement (EIS) for "major federal actions significantly
26 affecting the quality of the human environment." 42 U.S.C. §
27 4332(2)(C). NEPA regulations provide that a major federal
28 action includes those actions which may have a significant

effect on the environment. 40 C.F.R. § 1508.18. Council on

1  Environmental Quality NEPA regulations define "action" as "new

2  and continuing activities, including projects and programs . . .

3  regulated, or approved by federal agencies." Id. An EIS must be

4  prepared prior to initiating any major federal action so that

5  the environmental impacts can be considered during the

6  decisionmaking process. 40 C.F.R. §§ 1501.2, 1502.5.

7      The Corps prepared no environmental review document under

8  NEPA for the Cousins' project. As described above, activities

9  under the permit, however, will have significant impact to

10 vernal pools and endangered species. CEQ regulations define

11 significant impacts as including effects on endangered species,

12 40 C.F.R. § 1508.27(b)(9), and wetlands 40 C.F.R. §

13 1508.27(b)(3). Further, EPA opined that the development will

14 cause significant impacts "because of impacts to aquatic

15 resources and the cumulative impacts to vernal pools in the

16 region." EPA May 18, 1998 Letter (Attached as Exhibit 1 to

17 Levine Declaration). Nonetheless, the Corps chose to disregard

18 these impacts and issued the section 404 general permit in

19 violation of NEPA.

20 C.    The Corps And The FWS Have Violated The ESA

21     The Corps must comply with two substantive duties under the

22 ESA. Under section 7, the Corps cannot "jeopardize" a listed

23 species. 16 U.S.C. § 1536(a)(2). Under section 9, the Corps

24 cannot "take" listed species. 16 U.S.C. § 1538(a)(1)(B). By

25 issuing general permit to Cousins, the Corps violated both

26 mandates. The Corps has jeopardized and taken the San Diego

27 fairy shrimp.

28     The Corps is not excepted from this mandates through a

consultation process. The consultation process between the

Memo in Support                    13

1 Corps and the FWS on the Cousins project was meaningless and
2 predetermined. The FWS's biological opinion on the Cousins'
3 Project could not require mitigation measures beyond those
4 included in the City of San Diego's 1997 "incidental take
5 permit." As dictated by the City's permit, the FWS is precluded
6 from requiring or recommending additional protective measures in
7 the future. Thus, when the Cousins permit necessitated
8 consultation, the FWS could not require or recommend mitigation
9 measures beyond those found in the City's 1997 permit regardless
10 of the projects' impacts on the vernal pool species.

11     Nonetheless, as demonstrated in the declarations of Dr.
12 Simovich and Dr. Bauder, the impacts to the vernal pools at the
13 Cousins development site will result in jeopardy to the San
14 Diego fairy shrimp and "take," by destroying a significant
15 amount of remaining vernal pool habitat. Dec. of Bauder at ¶ 5;
16 Dec. of Simovich at ¶ 7-8. The off-site mitigation sites do not
17 contain vernal pools where San Diego fairy shrimp are known to
18 exist. Consequently, since vernal pools cannot be created and
19 translocation of shrimp is not an acceptable means of
20 mitigation, the Cousins project violates these two substantive
21 requirements. In facts, the FWS believes that the "shrimp may
22 be adversely impacted as a result of actions taken to create
23 and/or restore vernal pools." 62 Fed.Reg. at 4931. As the FWS
24 has stated, "transplanting [shrimp] into artificial pools cannot
25 be considered adequate replacement for the loss of occupied
26 vernal pool habitat." 62 Fed.Reg. at 4931. Thus, as the FWS
27 stated in the final rule listing the shrimp as endangered,

28       The FWS concludes that the continued survival and recovery
      of the San Diego fairy shrimp can only be assured at this

time by the preservation and enhancement of extant
[remaining] vernal pools and their associated watersheds.

Id. at 4931. In the FWS opinion, therefore, any losses, like
that on the 70-acre Cousins site, result in jeopardy to the
species.

Lastly, under the ESA, all federal agencies must take
actions to conserve and recover listed species. Section 7(a)(1)
provides in relevant part:

> All other federal agencies shall . . . utilize their
> authorities in the furtherance of the purposes of this
> chapter by carrying out programs for the <u>conservation</u> of
> endangered species and threatened species listed pursuant
> to section 1533 of this title.

16 U.S.C. § 1536(a)(1)(emphasis added); <u>Sierra Club v. Glickman</u>,
1998 WL 658678 (5th Cir 1998). <u>See also</u> <u>Pyramid Lake Paiute</u>
<u>Tribe of Indians v. United States Dep't of the Navy</u>, 898 F.2d
1410, 1417 (9th Cir. 1990)(agencies have affirmative obligation
to conserve under section 7(a)(1)). This mandate requires the
Corps to provide for the recovery of the San Diego fairy shrimp
through its section 404 permitting process. In <u>Sierra Club v.</u>
<u>Glickman</u>, the court held that the agency violated this mandate
by taking no action to help conserve the listed species. 1998 WL
658678. Similarly, in our case, through the Cousins' permit,
the Corps has exacerbated the harm to the species and authorized
additional losses of shrimp and their habitat. As a result, the
Corps has violated its duty under section 7 to conserve
endangered species.

VI. <u>PLAINTIFFS REQUEST THAT THE COURT WAIVE ANY BOND REQUIRMENTS</u>

Plaintiffs request that the Court waive any bond
requirement. Although Federal Rule of Civil Procedure 65(c)
provides that no preliminary injunction shall issue "except upon

1  the giving of security by the applicant," it is well settled
2  that the Court has discretion to waive the bond requirement, or
3  to set nominal security in certain circumstances. Wilderness
4  Society v. Tyrrel, 701 F.Supp. 1473, 1492 (E.D. Cal. 1988),
5  rev'd on other grds, 918 F.2d 813 (9th Cir. 1990), quoting
6  Natural Resources Defense Counsel v. Morton, 337 F.Supp. 167,
7  168 (D.D.C. 1971), mot for sum. rev. dismissed, 458 F.2d 827
8  (D.C. Cir. 1972). See, e.g., People of the State of California
9  v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1325 (9th Cir.
10 1985), amended on other grds, 775 F.2d 998 (9th Cir. 1985);
11 Friends of the Earth v. Brinegar, 518 F.2d 322, 323 (9th Cir.
12 1975).  The Ninth circuit has held that a waiver is particularly
13 appropriate "where requiring security would effectively deny
14 access to judicial review." Tahoe Regional Planning Agency, 766
15 F.2d at 1325.  Other circuits have followed similar paths of
16 waiving the bond requirements in special circumstances.  See,
17 e.g., Scherr v. Volpe, 466 F.2d 1027, 1035 (7th Cir.
18 1972)(excusing a security when a strong likelihood of success on
19 the merits has been shown); Pharmaceutical Society of State of
20 New York v. New York State Dept. of Social Services, 50 F.3d
21 1168, 1174-75 (2nd Cir. 1995)(exception for enforcement of
22 "public interests" arising out of comprehensive federal health
23 and welfare statutes).  Moreover, the Ninth Circuit has stated
24 that "special precautions to ensure access to the courts must be
25 taken where Congress has provided for private enforcement of a
26 statute" such as is the case with NEPA, the ESA, and the CWA.
27 Tahoe Regional Planning Agency, 766 F.2d at 1325; Friends of the
28 Earth, 518 F.2d at. 323.

1    Plaintiffs here are unable to post a substantial bond. All
2  the plaintiff organizations are nonprofit corporations that have
3  brought suit to ensure that the federal government complies with
4  federal environmental laws. Requiring such a bond would
5  "seriously undermine the mechanisms in NEPA, [the ESA, and the
6  CWA] for private enforcement" of these environmental laws and
7  would effectively deny access to judicial review. See Friends of
8  the Earth, 518 F.2d at 323. Despite potential economic costs to
9  certain defendants, courts have been unwilling to condone such
10 an outcome. See Wilderness Society, 701 F.Supp. at 1492; Friends
11 of the Earth, 518 F.2d at 323. In Wilderness Society v. Tyrrel,
12 the court stated that it is "unwilling to close the courthouse
13 door in public interest litigation by imposing a burdensome
14 security requirement" even when the Court recognized that the
15 government and a private, third-party might have a "significant
16 economic stake" in a proposed sale. Wilderness Society, 701
17 F.Supp. at 1492. Likewise, the Court should waive the bond
18 requirements and allow NEPA, the CWA, and the ESA's mechanisms
19 for private enforcement to function as Congress intended, and to
20 ensure that governmental agencies are held to account when they
21 fail to discharge statutory obligations.

22 VI.   CONCLUSION

23    For the foregoing reasons, Plaintiffs respectfully request
24 that the Court order Defendants to refrain from taking any
25 action which destroy vernal pools on the Cousins 70-acre site.
26 Plaintiffs also request that the Court order all Defendants to
27 comply with all applicable laws.

28

1  DATED: _12-9-98_

2

3

Respectfully submitted,

Neil Levine
4  Earthlaw

5  Daniel J. Rohlf
Pacific Environmental Advocacy
6  Center

7  Tara Mueller
Environmental Law Foundation
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo in Support                              18

1 | Neil Levine (Calif. Bar No. 163557)
   | EARTHLAW
2 | Univ. of Denver-Forbes House
   | 1714 Poplar Street
3 | Denver, CO 80220
   | Telephone: (303)-871-6996
4 | Telecopier: (303)-871-6991

5 | Daniel J. Rohlf (Colo. Bar No. 016748)
   | PACIFIC ENVIRONMENTAL ADVOCACY CENTER
6 | 10015 S.W. Terwilliger Blvd.
   | Portland, OR 97219
7 | Telephone: (503)-768-6707
   | Telecopier: (503)-768-6671

8 |
   | Tara Mueller (Calif. Bar No. 161536)
9 | ENVIRONMENTAL LAW FOUNDATION
   | 1736 Franklin St. 8th Floor
10 | Oakland, CA 94612
   | Telephone: (510)-208-4555
11 | Telecopier: (510)-208-0555

12 | Attorneys for Plaintiffs

13 | UNITED STATES DISTRICT COURT

14 | FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15 |

| | |
|---|---|
| SOUTHWEST CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No: |
| Plaintiffs, | CERTIFICATE OF SERVICE |
| vs. | |
| KEN BERG, Carlsbad Field Supervisor; ANNE BADGLEY, Acting Regional Director; BRUCE BABBITT, Secretary of the Interior; MICHAEL UBERUAGA, San Diego City Manager; ROBERT DAVIS, District Engineer; and COUSINS MARKETCENTERS INC., | |
| Defendants. | |

25 |

26 | I am employed in Denver, Colorado and not a party to the within action. On December 10, 1998, I personally delivered Plaintiffs' APPLICATION FOR TRO AND PRELIMIANRY INJUNCTION, MEMORANDUM IN SUPPORT, DELCARATIONS OF ELLEN BAUDER, MARIE SIMOVICH and NEIL LEVINE, and [PROPOSED] ORDER in the action on the below-named persons:

Thomas Stahl
Assistant U.S. Attorney
Southern District of Calfiornia
880 Front Street Room 6293
San Diego, CA 92101

John Mullen
Assistant City Attorney
City of San Diego
202 C Street, 9th Floor
San Diego, CA 92101

Allen Haynie
LATHAM & WATKINS
701 B Street Ste. 2100
San Diego, CA 92101


     I declare that the foregoing is true and correct and executed on December 10, 1998 at Denver, Colorado.


                              _____
                              Neil Levine

Ceritficate of Service                    2