FILED

06 OCT 13 PM 3: 46

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                          DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHWEST CENTER FOR BIOLOGICAL DIVERSITY, et al., | CASE NO. 98-CV-2234-B(JMA) |
| Plaintiffs, | DECISION AND INJUNCTION |
| vs. | [Doc. Nos. 174, 181, 189, & 197] |
| JIM BARTEL, ANNE BADGLEY, and GALE NORTON, | |
| Defendants, | |
| and | |
| BUILDING INDUSTRY LEGAL DEFENSE FOUNDATION, et al., | |
| Intervening Defendants. | |

BUILDING INDUSTRY LEGAL
DEFENSE FOUNDATION, et al.,

                        Cross-Complainants,
        vs.

UNITED STATES FISH AND
WILDLIFE SERVICE; et al.,
                        Cross-Defendants,

and

SOUTHWEST CENTER FOR
BIOLOGICAL DIVERSITY, et al.,
                        Intervening Defendants.

- 1 -

1    In this Endangered Species Act ("ESA," 16 U.S.C. §§ 1531-1544) case, fourteen

2    national, state, and local conservation and environmental groups[1] (hereinafter "Plaintiffs")

3    challenge the decision of the United States Fish and Wildlife Service[2] (hereinafter "FWS" or

4    "Federal Defendants") to issue an incidental take permit ("ITP") under § 10 of the ESA to

5    the City of San Diego[3] based upon its conservation plan.  This Court has jurisdiction under

6    the citizen suit provision of the ESA.  § 1540(g).  Though the City's ITP governs 85 species,

7    Plaintiffs lawsuit is limited to seven vernal pool species – two small aquatic crustacean

8    species (San Diego fairy shrimp and Riverside fairy shrimp) and five plant species (Otay

9    mesa mint, California Orcutt grass, San Diego button celery, San Diego mesa mint, and

10   spreading navarretia (also known as prostrate navarretia) – which are listed as "endangered"

11   or "threatened."  Third Amended Complaint ¶ 41-42 ("TAC").

12       A construction company and four building associations intervened (hereinafter

---

[1] Southwest Center for Biological Diversity, California Native Plant Society, Wetlands Action Network, Save Our Forests and Ranchlands, Carmel Mountain Conservancy, Preserve Wild Santee, Ramonans for Sensible Growth, San Diego Audubon Society, Sierra Club, Horned Lizard Conservation Society, San Diego Herpetological Society, Earth Media, Inc., and Preserve South Bay.  These thirteen plaintiffs are represented by the same attorneys.  Counsel for plaintiffs withdrew from representation of the fourteenth plaintiff, Iron Mountain Conservancy, but the party itself was not dismissed from the action [Clerk's Doc. No. 90].

[2] The "Federal Defendants" were named in their official capacities, and pursuant to Rule, the names of the current office holders have been substituted in the caption. Fed. R. Civ. P. 25(d).  [Doc. No. 241]  The Court refers to the defendants by their agency.  The Secretary of the Interior delegated responsibility for the ESA to the Fish and Wildlife Service.  The three levels of federal officials include the Field Supervisor for the Carlsbad Field Office of the United States Fish and Wildlife Service (originally Ken Berg, now Jim Bartel), as the official directly responsible for the ESA consultations with San Diego; the Regional Director of Region One of FWS (Anne Badgley); and the Secretary of the Interior, the department in Washington, D.C. that is responsible for FWS (originally Bruce Babbitt, now Gale Norton).
    Similarly, the complaint named the City Manager for San Diego (Michael Uberuaga) as the holder of the ESA permit.  The Court refers to this party as the City of San Diego.
    The State of California, through its Department of Fish and Game (CDFG), was also a party to the negotiations and agreements.  The State is not a party to this litigation.

[3] Plaintiffs voluntarily dismissed the City Manager and its Sixth Cause of Action because the City of San Diego stipulated that its ITP did not authorize take of the seven vernal pool species.  [Doc. No. 134]  The Builder Intervenors, however, named the City as a defendant in its Cross Complaint.  Cross Compl. ¶ 12.
    As the holder of the ITP, the City's interests are clearly at stake in this litigation.  The City elected not file legal briefs, except to state that it does not contest FWS's conclusion that the ITP did not grant take authority for the vernal pool species.  City's Resp. to Mo. for Summ. J. at 3; City's Resp. to Fed. Defs.' Mo. for Summ. J. at 3.

98cv2234

1  "Builder Intervenors") and filed a cross-complaint against the Federal Defendants and the

2  City of San Diego to challenge the scope of the ITP provisions on those same seven vernal

3  pool species. *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820-22 (9th Cir.

4  2001); Cross Compl. ¶ 9-12; *see* Order Resolving Subject Matter Jurisdiction at 4-5 (filed

5  Sept. 8, 2004).

6        Having considered the administrative record, the legal briefs, and the relevant case

7  law, it appears to this Court that the ITP would permit monumental destruction of the vernal

8  pool species, which are extremely sensitive to their environment and were virtually extinct in

9  1995.  The Court finds that FWS overlooked an important aspect of the operation of the

10 Assurances because the malleable standard – to avoid the pools when "practicable" –

11 virtually guarantees development and the ersatz mitigation measures run counter to the

12 realistic needs of these dwindling vernal pool species and may hasten their extinction.  It is

13 undisputed that the fairy shrimp cannot be transferred by human transplant from one area to

14 another with any measure of reliability or survivability.  Yet, a close examination of the

15 record reveals that FWS has authorized extensive development of lands containing vernal

16 pools that would destroy essential habitat for these rare species under the guise of obtaining

17 promises for "mitigation" in other areas.  The ostensible "mitigation" is inadequate to ensure

18 that the fairy shrimp will survive and recover to the point where they need not be listed for

19 protection of the ESA.  In short, while vigorous development is certain, the purported

20 mitigation is unlikely to conserve the listed species.  Moreover, the record does not support

21 FWS's finding that the City of San Diego would fund its share of the conservation plan.  The

22 Court finds that this plan violates both the spirit and letter of the ESA.

23        More specifically, the Court finds that FWS must re-initiate consultation proceedings

24 on the City's ITP because the avenue of seeking permits from the United States Army Corps

25 of Engineers ("ACOE") is no longer available for vernal pools, and the remaining

26 conservation measures are inadequate to protect these fragile species.  FWS concedes that it

27 did not examine the impact of the City's plan on the vernal pool species because FWS did

28 not anticipate any impact on those species; instead, FWS expected to evaluate any impact on

1   particular sites in *future* permit procedures.  That structure violates the ESA as to the vernal

2   pool species in this case because FWS has locked in any mitigation that could be

3   recommended or would be required to the measures delineated in the City's conservation

4   plan – the very plan that FWS did not assess for adequate protection of the vernal pool

5   species because it deferred that evaluation to future proceedings *and* that uses mitigation

6   measures that FWS had previously concluded are ineffective, experimental, and inadequate

7   given the strict needs of the imperiled vernal pool species.  The position of FWS thus circles

8   back onto itself, and the species are left in a "heads I lose, tails you win" position that

9   substitutes inadequate conservation measures in the place of the strict conservation and

10   recovery standards of the ESA.  Consequently, the Court finds that the Assurances in the

11   Implementing Agreement ("IA"), as applied to the vernal pool species, violate the ESA

12   because they are inconsistent with the governing statutory command to conserve the vernal

13   pool species to bring them to the point at which protection by the ESA is no longer

14   necessary.  § 1523(3).

15        One might ask, when all is said and done, "who cares about the fairy shrimp and the

16   other vernal pool species?"  Fairy shrimp, when they manage to survive to adulthood, are

17   one-quarter inch fully grown.  For the most part, they are hard to see by the naked eye.  There

18   are not many left, and if gone, who would miss them?  Surely, the casual observer passing

19   through the Southern California landscape would not notice one way or the other.  The

20   biologists tell us that every species has an essential and unique roll to play in the food chain

21   that supports us all.  If the fairy shrimp ultimately become extinct in the San Diego region,

22   they will cease to be a devourer of lower forms of life in the food chain, such as bacteria and

23   micro algae on clay particles, which could impact control on the species below.  Similarly,

24   the fairy shrimp would not be available food for creatures above in the chain, such as

25   waterfowl and toads, who look to them for their diet.  In the microscopic view, the fairy

26   shrimp may make little identifiable difference.  But if this type of destruction is treated on a

27   case-by-case basis as an unimportant loss, it does not take long before life on this planet is in

28   jeopardy.  Congress saw that threat when it enacted the ESA.  § 1531(b).  Congress

1  demonstrated foresight by realizing that the country's present understanding of the value of a

2  myriad of life forms was not yet known, and that extinction should be prevented by

3  protecting both the individual species and the ecosystems upon which those species depended

4  for survival. *Id.*

5       It is not for this Court to be sympathetic or unsympathetic to the vernal pool species,

6  but it is the Court's obligation to interpret and follow the law as written. This permit, with its

7  massive development of vernal pool habitat and highly questionable mitigation techniques

8  for a species that cannot be simply gathered and moved to another location, violates the

9  fundamental objective of the ESA to conserve listed species to bring them to the point at

10 which statutory protection is no longer necessary. The Court declines to approve it.

11 I. Endangered Species Act

12      The ESA, enacted by Congress and signed by the President, reflects a national

13 concern for the preservation and replenishment of a rapidly growing list of species who are

14 threatened or endangered with extinction. "The plain intent of Congress in enacting [the

15 ESA] was to halt and reverse the trend toward species extinction, whatever the cost."

16 *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 175, 184 & n.29 (1978). "Congress has

17 spoken in the plainest of words, making it abundantly clear that the balance has been struck

18 in favor of affording endangered species the highest of priorities, thereby adopting a policy

19 which it described as 'institutionalized caution.'" *Id.* at 194. "Congress was concerned about

20 the *unknown* uses that endangered species might have and about the *unforeseeable* place such

21 creatures may have in the chain of life on this planet." *Id.* at 178-79.

22      The statute clearly states that the purpose is to protect and preserve endangered

23 species. The stated purposes of the ESA "are to provide a means whereby the ecosystems

24 upon which endangered species and threatened species depend may be conserved, to provide

25 a program for the conservation of such endangered species and threatened species," and to

26 comply with international treaties to protect wildlife, birds, fish, and plants. § 1531(b); §

27 1531(c)(1); § 1536(a)(1); § 1537; § 1539(a)(2)(A). Congress broadly defined "conserve" as

28 "the use of all methods and procedures which are necessary to bring any endangered species

98cv2234

1    and threatened species to the point at which the measures provided [by the ESA] are no

2    longer necessary." § 1532(3). "[T]he ESA was enacted not merely to forestall the extinction

3    of species (*i.e.*, promote a species survival), but to allow a species to recover to the point

4    where it may be delisted. . . . [I]t is clear that Congress intended that conservation and

5    survival be two different (though complementary) goals of the ESA." *Gifford Pinchot Task*

6    *Force v. United States FWS*, 378 F.3d 1059, 1070 (9th Cir. 2004) (invalidating FWS's

7    interpretation of a regulation that narrowed scope of protection commanded by clear

8    language in ESA).[4]  As aptly stated by one district court, "[t]he whole purpose of listing

9    species as 'threatened' or 'endangered' is not simply to memorialize species that are on the

10   path to extinction, but also to compel those changes needed to save the species from

11   extinction." *Oregon Natural Resources Council v. Daley*, 6 F. Supp. 2d 1139, 1152 (D. Or.

12   1998).  Congress imposed this mandatory duty to conserve endangered species on all federal

13   agencies.  *Tennessee Valley*, 437 U.S. at 180 (citing § 1531(c)(1)); *see also Defenders of*

14   *Wildlife v. United States EPA*, 420 F.3d 946, 965 (9th Cir. 2005) (concluding that sections

15   7(a)(1) and 7(a)(2) imposed separate and distinct requirements to mandate and authorize all

16   federal agencies to conserve endangered species and their ecosystems).

17   II.  Standard of Review

18        "Because ESA contains no internal standard of review, section 706 of the

19   Administrative Procedure Act, 5 U.S.C. § 706, governs review of the Secretary's actions."

20   *Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984); *Friends of Endangered*

21   *Species v. Jantzen*, 589 F. Supp. 113, 118 (N.D. Cal. 1984) (summary judgment is

22   appropriate vehicle to review administrative action), *aff'd*, 760 F.2d 976 (9th Cir. 1985).

23

24        [4]"When Congress's intent is clear, the courts, not the agency, are charged with the basic
     responsibility for statutory interpretation.  A contrary agency interpretation is entitled to no

25   deference."  *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994)
     (applying *Tennessee Valley*, 437 U.S. 153, to § 7 of ESA).  "[W]hile reviewing courts should

26   uphold reasonable and defensible constructions of an agency's enabling act, they must not
     'rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory

27   mandate or that frustrate the congressional policy underlying a statute.'" *Arizona Cattle
     Growers' Ass'n. v. United States FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001) (citations

28   omitted). When Congress had a clear intent, the court must give effect to that intent as law.
     *Wilderness Society v. United States FWS*, 353 F.3d 1051, 1059-60 (9th Cir.2003) (en banc).

1  Agency decisions cannot be inconsistent with the governing statute. *Defenders of Wildlife*,

2  420 F.3d at 959; 5 U.S.C. § 706(2)(A) ("arbitrary, capricious, an abuse of discretion, or

3  otherwise not in accordance with law"). "Although this inquiry into the facts is to be

4  searching and careful, the ultimate standard of review is a narrow one. The Court is not

5  empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton*

6  *Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v.*

7  *Sanders*, 430 U.S. 99 (1977). The Court must determine whether the agency "considered the

8  relevant factors and articulated a rational connection between the facts found and the choice

9  made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87,

10  105 (1983). In other words, whether the agency "entirely failed to consider an important

11  aspect of the problem, offered an explanation for its decision that runs counter to the

12  evidence before the agency, or is so implausible that it could not be ascribed to a difference

13  in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*

14  *Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

15       The Court has conducted a "thorough, probing, in-depth review." *Citizens to*

16  *Preserve*, 401 U.S. at 415. The Court has carefully read and laboriously studied the AR

17  submitted by the parties,[5] and will not repeat that extensive factual background. Instead, the

18  Court has cited the sections of the Record that informed the Court's decision and

19  incorporates by reference those passages into this Order.

20  / / /

21

22  [5]The parties did not file the voluminous AR because this lawsuit is limited to seven of
species discussed in the administrative proceedings. *See* Notice of Filing Index & Supp.

23  [Doc. Nos. 26 & 43] Instead, the parties submitted relevant excerpts as exhibits to their
motions. *E.g.*, Compendium of Cross-Compl.'s AR Cites [Doc. No. 205]; Fed. Defs.'
Excerpt from AR. [Doc. No. 254]; Pls.' Record Excerpts [Doc. No. 255].

24       At the Court's request, the City submitted its annual reports which describe its
implementation of the conservation plan and its compliance with the permit. City's Notice of

25  Lodging Supp. to Admin. R. [Doc. No. 254]. Under Ninth Circuit law, however, the Court is
not permitted to consider these documents unless they fit within four exceptions. *Southwest*

26  *Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th
Cir.1996); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988). The Court

27  finds that none of the four exceptions applies, and therefore, has not relied on these
documents. For the same reason, the Court has not considered several declarations. *E.g.*,

28  Decl. Rikki Alberson; Decl. Leonard Frank. Finally, the Court did not refer to FWS's
handbook. Fed. Defs.' Tab O.

98cv2234

III.  The Vernal Pool Species are on the Brink of Extinction

The Riverside fairy shrimp, San Diego fairy shrimp, California Orcutt grass, Otay Mesa mint, San Diego button celery, San Diego mesa mint, and spreading navarretia are listed as "endangered" or "threatened" species.  63 Fed. Reg. 54975-93 (1998); 62 Fed. Reg. 4925-38 (1997); 58 Fed. Reg. 41384-91 (1993); 43 Fed. Reg. 44812 (1978).  The Court incorporates by reference the entirety of those detailed descriptions of their particular vulnerabilities and precise needs.  *E.g.*, AR 26257, 28862-64, 31491, 31506, 32463-81, 32472, 32880-94.  Here, the Court briefly highlights the critical attributes of the two fairy shrimp.  The San Diego fairy shrimp and Riverside fairy shrimp inhabit vernal pools – a fragile, strict, narrow, and unique habitat – that form in shallow depressions on hard-clay mesas.  Vernal pools are seasonal – the pools contain water in the short winter months but can be difficult to discern in the landscape during the long dry months.  The fairy shrimp hatch, mature, reproduce, and inhabit the pools during their short life cycle.  Fairy shrimp eggs lie dormant during the dry season, and may hatch in the next wet season.  These fragile species are extremely sensitive to their environment (including a specific amount of water; a narrow range of water temperature; the water quality, chemistry, and salinity; the length of time the pool holds water before it percolates into the clay soil).

Only Southern California's Mediterranean climate supports this specific habitat, and 97% of the habitat has been irrevocably destroyed.[6]  The fairy shrimp are extinct in Los Angeles and Orange counties, and close to extinction in nearby Riverside and Ventura counties.  Of the remaining acres, the Record rarely indicates whether and how many fairy

---

[6]The estimates vary depending on the definition of the area, for example, whether upland acres or watershed acres are included.  In 1995, FWS estimated that 898 acres of vernal pool habitat in San Diego county is extant.  AR 32464.  FWS found the San Diego fairy shrimp *occupied* vernal pools in less than 200 acres of habitat in this county.  62 Fed. Reg. at 4929; *accord id.* at 4926.  Conversely, the City's conservation plan encompassed 1,183 acres of vernal pool habitat.

The majority, 72%, of the remaining vernal pool habitat in San Diego occurs on lands owned by the military and cannot be designated as a permanent preserve.  *E.g.*, 62 Fed. Reg. at 4929-30 ("the protection of the San Diego fairy shrimp at the two bases containing the largest blocks of extant vernal pools within the range of the species *is not assured*.") (emphasis added); AR 32674 (measuring 3,254 acres including upland and watershed acres, and calculates that 2,071 of those are owned by military).

98cv2234

1  shrimp actually inhabit the pools, or assesses the quality in the vernal pool complexes. *E.g.,*

2  AR 30094-95, 31905-06, 32478; 58 Fed. Reg. at 41385.

3      Vernal pools cannot be "created" and there is no known method to replace destroyed

4  pools. *E.g.,* 62 Fed. Reg. at 4931; AR 32472; Fed. Defs.' Answer to TAC ¶ 44. As applied

5  to the vernal pool species, the "creation" of off-site vernal pools is ineffective and

6  unacceptable mitigation. 62 Fed. Reg. at 4931 (attempts to collect and move vernal pool

7  species failed; and re-introducing species into other pools risks hybridization); AR 23724,

8  24435 (because creation of vernal pool habitat is not successful, "the wildlife agencies do not

9  accept creation as mitigation for vernal pool impacts"); AR 32472 (FWS concludes that

10  efforts to "create" vernal pools by transporting the soil are unsuccessful, unscientific, and

11  unmonitored; and transplanting species had not been tested or proven successful).

12  IV.  The City's Application for a Regional § 10 Incidental Take Permit and FWS Findings

13      The ESA makes it unlawful to "take" or harm a listed species. § 1532(19); *Forest*

14  *Conservation Council v. Rosboro Lumber Co.,* 50 F.3d 781, 784 (9th Cir. 1995) (harm is

15  "defined in the broadest possible manner to include every conceivable way in which a person

16  can 'take' or attempt to 'take' any fish or wildlife."); *National Wildlife Fed'n v. Burlington*

17  *N. R.R., Inc.,* 23 F.3d 1508, 1513 (9th Cir. 1994) (includes habitat degradation that prevents

18  or possibly retards recovery of species); *see also* § 1538(a)(1) (endangered species); 50

19  C.F.R. § 17.31 (extending take prohibition to threatened species); *Babbitt v. Sweet Home Ch.*

20  *of Communities,* 515 U.S. 687, 696-701 (1995).

21      Section 10 of the ESA provides a narrow exception of a "regulated kill."  §

22  1539(a)(1)(B); *National Wildlife Fed'n v. Norton,* 306 F. Supp. 2d 920, 926 (E.D. Cal. 2004).

23  In specially-controlled situations, Congress allows the sacrifice of a certain number of

24  creatures provided that adequate steps are taken to minimize the detriment in a manner that

25  ensures the continued vitality of the species involved underline. *Sierra Club v. Babbitt,* 15 F.

26  Supp. 2d 1274, 1278 n.3 (S.D. Ala. 1998) (an applicant for an ITP must submit an HCP "that

27  will – as the name plainly connotes – help 'conserve' the entire species by facilitating its

28  survival and recovery.").

1    To apply for a § 10 permit, the property owner or developer must prepare a detailed

2    application.  Known as a Habitat Conservation Plan ("HCP"), it must contain specific

3    information, analysis, and plans (including financial support) that specify how the applicant

4    will "minimize and mitigate" the adverse impact on the protected species.  § 1539(a)(2)(A).

5    This litigation concerns the issuance of an ITP on a regional scale.  60 Fed. Reg.

6    12246, 12247 (March 6, 1995); *e.g.,* AR 40-48, 5523, 15079-80, 25595-600, AR 39464,

7    39477, 39614-16, 39498, 39683-88.  An important purpose of this regional approach was to

8    streamline the permit process so that the City would issue ESA take permits directly to

9    developers (known as "Third Party Beneficiaries").  AR 6300, 13624, 19308, 23210, 24679,

10   39477.  The City obtained an "umbrella" permit from the FWS to kill species with

11   mitigation, and developers seeking approval of specific projects obtain authorization *from the*

12   *City* rather than going through their own cumbersome application and review process with

13   the FWS.  AR 23210; AR 15080; AR 25639; AR 26583-85 (IA § 17.0).

14   The ITP covers 543,243 acres within San Diego county.  AR 39482; *see generally* AR

15   6780-82; AR 23189-90.  The City of San Diego's HCP consisted of two documents.[7]  The

16   MSCP provided general, regional framework plan.  The Subarea Plans contained specific

17   components of each jurisdictions' *portion* of the entire MSCP area, and the City of San

18   Diego prepared its local Subarea Plan.[8]  AR 19617; *see* AR 26548 (IA § 2.12).  The Court

19

20   [7]The MSCP was revised throughout the planning and permitting process.  The first
     draft, dated May 1995, was not filed as an exhibit.  The Builder Intervenors provided
21   portions of the second draft, dated April 1996.  AR 15079 (Builder Intervenors' Ex. 19); *see*
     *also* AR 20614 (Pls.' Ex. 16) (in September 1996 FWS evaluated differences between May
22   1995 and April 1996 versions).  The AR also contains an August 1996 draft; and portions of
     Revisions dated December 1996.  AR 19296 (Pls.' Ex. 13 & Builder Intervenors' Ex. 25);
23   AR 22437 (Pls.' Ex. 12 & Builder Intervenors' Ex. 31).  The earlier versions are relevant
     because FWS relied upon that *August 1996 draft with its revisions* to assess whether the
24   City's conservation plan complied with the ESA.  AR 26194 & 26197 (listing the record
     upon which FWS relied to prepare the BiOP and specifying the MCSP documents dated and
25   revised in 1996).  The MSCP was not finalized until a year *after* FWS issued the ITP.  *See*
     AR 26960-69 (ITP dated July 18, 1997); AR 39462-738 (MSCP dated Aug. 1998) (Fed.
26   Defs.' Ex. J).

27   [8]This local document, like the regional MSCP, was revised over time, and FWS relied
     on an early August 1996 draft and its revisions to decide whether to issue the ITP.  *See* AR
28   26194 & 26197 (BiOp identifies Subarea plan dated August 1996 and revised December
                                                                                     (continued...)

1  will not repeat the factual background of the regional and local conservation plans, but

2  incorporates the substance of those provisions into this Order.  FWS must scrutinize the

3  proposed HCP and determine if it satisfies the specific legal and biological requirements of

4  the ESA.  § 1539(2)(B).

5          In addition to the specific standards in § 10, FWS has an overarching duty to conserve

6  listed species by maintaining a viable population.  §§ 1532(3), 1536(a)(1), (a)(2).  FWS is

7  obligated to use its authority to further the purpose of the ESA to conserve listed species to

8  the point that the substantive and procedural protections of the ESA are no longer required.

9  § 1536(a)(1); *see* §§ 1532(6), (20) (defining threatened and endangered listings); *Gifford*,

10  378 F.3d at 1070.  FWS must ensure that its issuance of an ITP "is not like to jeopardize the

11  continued existence of any endangered species." § 1536(a)(2); *Turtle Island Restoration*

12  *Network v. National Marine Fisheries Serv.*, 340 F.3d 969, 974 & n.9 (9th Cir. 2003); *see*

13  *generally Defenders of Wildlife*, 420 F.3d at 963-67 (describing mandatory duty to guarantee

14  "an *additional*, do-no-harm obligation"); *National Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d

15  1274, 1286 (E.D. Cal. 2000).  Thus, the City's permit application must satisfy the ESA goal

16  of conservation, which will allow the species to recover in order to "reverse the trend to

17  extinction." *Tennessee Valley*, 437 U.S. at 153; *Sierra Club v. Babbitt*, 15 F. Supp. 2d at

18  1278 n.3 ("Pursuant to section 10, the FWS may issue a permit for the 'incidental take' of

19  some members of the species, if the applicant for the permit submits a 'conservation plan'

20  that will – as its name plainly connotes – help 'conserve' the entire species by facilitating its

21  survival and recovery.").  "The overall effect of a project can be beneficial to a species even

22  though some incidental taking may occur." *Friends of Endangered Species, Inc. v. Jantzen*,

23  760 F.2d 976, 982 (9th Cir. 1985).

24          The opportunity for further review by the ACOE, with consultation with the FWS, for

25  the issuance of a CWA § 404 permit was a central component of the planned protection for

26  the vernal pools.  The City's HCP set forth other protections, and these protections are set

27

28  [8](...continued)
1996).  The final Subarea Plan was prepared in March 1997, though it is unclear if FWS
relied on that version.  AR 24846 (Fed. Defs.' Ex. N).

1   forth in detail in the AR, including "avoidance, minimization, and mitigation measures," AR

2   22446; incorporating the "no net loss" policy from the federal CWA standard, AR.19348,

3   19627, 22446, 39517-18, 39524-25, 39527; and enacting the Environmentally Sensitive

4   Lands Ordinance ("ESLO") to avoid impacts, to minimize unavoidable impacts, and to

5   mitigate unavoidable impacts to vernal pools. AR 19671, 25727-32, 25735, 25738-39 &

6   Table 1; *see* AR 13622, 25735.

7        The centerpiece of the City's proposed mitigation for the destruction of sensitive

8   species, and a critical component of the regional conservation plan, was to create a

9   permanent natural preserve.[9] AR 39498 (MSCP § 3.1), 39592-95 (MSCP § 4.0), 39598,

10  39611; *see* AR 3219-23, 5523-24. The "Multi-Habitat Planning Area" will eventually be a

11  171,917 acre Preserve ("MHPA" or "Preserve"). Eventually, the Preserve will accumulate a

12  contiguous area of vacant land with rich biological diversity that will maximize the

13  protection of the native wildlife and plant species, and possibly, prevent further listings of

14  endangered species. *E.g.*, AR 39483; AR 39525 (MSCP § 3.5, ¶ 4(b)); AR 18654 (if City

15  declined to adopt MSCP and instead let each development project apply for its own ITP, the

16  Preserve would be the same size, but would be less effective because of fragmentation, poor

17  design, and absence of linkages "resulting in increasing risk of species decline and

18  endangerment"); 60 Fed. Reg. 12246, 12247 (describing goals and comparing the "no action"

19  alternative); 61 Fed. Reg. 45983, 45984. The MSCP does not *establish* the Preserve; rather,

20  it roughly delineates target boundaries. The actual acreage will be dedicated over the next

21  fifty years. 62 Fed. Reg. 14938, 14939. Certain activities would be permitted within the

22  Preserve, including passive recreation such as birdwatching, hiking, and horseback riding;

23  utility lines including repair; low density residential uses; brush management; and limited

24  agriculture. *E.g.*, AR 19421, 19702-03, 24894. Other activities, while not endorsed, would

25  inevitably occur, such as vehicle and foot traffic by the United States Border Patrol, illegal

26  immigrants, and itinerant populations. *E.g.*, AR 19677, 39644.

27

28
    ────────────────
    [9]Builder Intervenors rely on the San Diego National Wildlife Refugee, but the record
    shows that this *separate proposed* project is "beyond the scope of the MSCP." AR 24435.

1    When issuing a § 10 ITP, the FWS makes its required findings in a Biological

2    Opinion ("BiOp").  Here, FWS issued its BiOp, made its Findings, issued a Record of

3    Decision, entered into a contract (the IA) with the City to complete the project and offered

4    "No Surprises" Assurances, and issued the ITP with Condition I.  AR 26194-320 (June 6,

5    1997 BiOp) (Pls.' Ex. 11 & Fed. Defs.' Ex. B); AR 26892-936 (July 18, 1997 Findings)

6    (Pls.' Ex. 9 & Fed. Defs.' Ex. F); AR 26937-43 (ROD) (Pls.' Ex. 10); AR 26540-639 (IA

7    July 16, 1997); 61 Fed. Reg. 45983, 45984; AR 26960-69 (ITP July 18, 1997).  The Court

8    has throughly read these documents and does not repeat their content in this Order.

9    V.  Analysis and Decision

10        A.  FWS Must Re-Initiate Consultation on the Vernal Pool Species

11            1.  The Supreme Court's Decision Eliminates ACOE Jurisdiction

12    The Court agrees with Plaintiffs that FWS must reinitiate review of the City's ITP for

13    the vernal pool species in the aftermath of the Supreme Court's *Solid Waste Agency of*

14    *Northern Cook County v. United States ACOE*, 531 U.S. 159 (2001) ("*SWANCC*") decision.

15    To supplement the statutory duty to revoke an ITP when the terms have been violated,

16    § 1539(a)(2)(C), FWS promulgated a regulation to retain control over the implementation of

17    the ITP's conservation measures.  The regulation authorizes FWS to reinitiate the

18    consultation process when the "amount or extent of taking specified in the incidental take

19    statement is exceeded" or when "[n]ew information reveals effects of the action that may

20    affect listed species or critical habitat in a manner or to an extent not previously considered."

21    50 C.F.R. § 402.16.

22    During the time that the City drafted its habitat conservation plan and when FWS

23    reviewed the application pursuant to the ESA, it was generally understood that vernal pools

24    would be protected as "wetlands" under the CWA.[10]  The MSCP expressly stated that any

25    development that would impact a vernal pool would require a separate § 404 permit from the

26    ─────────────────

27    [10]The CWA provides independent protection to waters within the jurisdiction of the
     United States.  *United States v. Riverside Bayview Homes*, 474 U.S. 121, 133-39 (1985).  The
     CWA, like the ESA, is structured to prohibit any harmful action underline unless the responsible

28    agency concludes that certain ecological standards have been met to minimize and mitigate
     for that harm.  33 U.S.C. §§ 1251, 1311, 1344; *e.g.*, 33 C.F.R. Pts. 323, 325.

1    ACOE, and that, pursuant to § 7 of the ESA, the Corps would consult with FWS to establish

2    the mitigation measures.  AR 19348, 39517-18 (MSCP § 3.2.1), 39524-25.  By regulation,

3    the ACOE had extended its jurisdictional reach to include "isolated wetlands."  33 C.F.R. §

4    323.2(a)(5) (1978).  FWS issued the City's ITP on the understanding that vernal pools fell

5    within this regulatory definition, thus, any disturbance of a vernal pool that equated with

6    filling its basin would also require a CWA permit.  AR 26269-71, 26284-88 (BiOp), 26960-

7    61 (ITP ¶¶ D, F, & G), 26966-69.  The ITP set forth that explicit requirement in Condition I.

8    AR 26964.[11]  That assumption was subsequently extinguished by the Supreme Court.

9         In 2001 – three years after the FWS issued the City's ITP – the Supreme Court

10   announced a decision that defeats the assumption that the ACOE would participate in any

11   regulation of the vernal pools in Southern California.  In *SWANCC*, 531 U.S. at 171, the

12   Supreme Court held that the ACOE did not have authority to regulate abandoned sand and

13   gravel pits that seasonally filled with water and were physically isolated within a single state

14   merely because migratory birds used such waters.  After *SWANCC*, the precise contours of

15

16   ---

[11]The wetland species list incorrectly omits two of the vernal pool species.  The
17   Federal Defendants and Plaintiffs assert that San Diego button celery and the spreading
navarretia were omitted by a clerical error.  The Court agrees.  The entirety of the record, and
18   in particular, FWS's BiOP, discusses all seven vernal pool species.  AR 26235-41.  The
Court rejects the Builder Intervenors' suggestion that the list is definitive and therefore the
19   MSCP and Subarea plans control these two species without the restrictions in Condition I.
Builder Intervenors' Summ. J. Br. at 19 n.17; Builder Intervenors' Opp. Br. to Fed. Defs.'
20   Mot. to Dismiss at 11 n.6.  Such an interpretation would create an undeserved windfall in
violation of the ESA.  Because the Court agrees that this was a clerical error, the Court will
21   refer to the Condition I list as if it contained all seven of the vernal pool species involved in
this lawsuit.  On remand, FWS should avail itself of the opportunity to correct the omission.
22        The term "wetlands" referred to the "jurisdictional wetlands" that were within the
regulatory control of the ACOE.  The first sentence of Condition I makes it clear that the
23   City's ITP *excludes* wetland species and expressly places a special restriction on wetland
species.  The "wetland species" (*i.e.*, species associated with or dependent upon wetlands)
24   includes the seven vernal pool species, thus, these terms are interchangeable.  The rest of
Condition I further defines the restriction by distinguishing between wetlands/vernal pools
25   either "within" or "outside" ACOE jurisdiction – as that term was understood for
purposes of the CWA.  The second sentence states that wetlands/vernal pools *within* ACOE
26   jurisdiction, the level of take, if any, would be authorized through *future* agency
consultations between FWS and ACOE.  The § 404 permit process would require the ACOE
27   to independently assess the impact of the development and determine the level of mitigation
under the CWA standards.  In addition, ACOE would also consult with FWS in compliance
28   with § 7 of the ESA.  The third sentence addresses wetland/vernal pools located *outside* the
jurisdictional reach of the CWA, as that term was understood, and stated that development
and mitigation would be governed by the provisions of the MSCP and City's Subarea Plan.

98cv2234

1    federal jurisdiction over wetlands in general and vernal pools in particular remain unclear.

2    *E.g.*, *United States v. Rapanos*, 339 F.3d 447, 450-53 (6th Cir. 2003) (applying *SWANCC* and

3    concluding the wetlands at issue had a sufficient nexus and hydrological connection to

4    navigable waters so as to fall within CWA jurisdiction). But it is clear to this Court that the

5    ACOE will not undertake review through its CWA permit process of impacts to isolated

6    vernal pools that seasonally fill with water on San Diego's mesas. *Borden Ranch*

7    *Partnership v. United States ACOE*, 261 F.3d 810, 816 (9th Cir. 2001) (ACOE withdrew its

8    claim that it had regulatory authority over one isolated vernal pool), *aff'd by an equally*

9    *divided court* 123 S. Ct. 599 (2002) (per curiam). Therefore, the essential mechanism

10    through which the impacts to vernal pools species in this case would be assessed, scrutinized,

11    and mitigated has been removed.

12       Condition I was imperative to protect the vernal pool species. The AR is undisputed

13    in that regard. *E.g.*, AR 12802-03, 12833-34, 22446, 23721-22, 26285-88, 35680. FWS's

14    decision to issue the ITP was predicated upon future agency review; however, the Supreme

15    Court's *SWANCC* decision has closed the door to those essential future proceedings for

16    vernal pools. The Court holds that the elimination of the anticipated future proceedings, at

17    which time FWS would evaluate the impact of a particular project on the fate of the vernal

18    pool species, requires the agency to re-initiate review of the substantive protections for the

19    vernal pool species in San Diego. § 1539; 50 C.F.R. § 402.16. On remand, FWS shall

20    evaluate the impacts of the City's HCP on the seven vernal pool species. The Court agrees

21    with the Federal Defendants' position that, "[d]uring or after that reinitiated consultation, the

22    Service can consider whether it needs to seek modification or withdrawal of the MSCP,

23    Subarea Plan, or ITP, with regard to covered vernal pool species, in accordance with

24    applicable laws." Fed. Defs.' Cross Mot. for Summ. J. Br. at 50.

25       The Federal Defendants argue that the language of the re-initiation regulation does not

26    apply in this situation because the regulation applies when *facts* concerning the *species* have

27    changed, and here, the *law* has changed. The Court does not accept this characterization.

28    The Supreme Court's *SWANCC* decision closed the ACOE's door to the vernal pool species.

1    The City's ITP dictated that adverse affects on vernal pool species must be considered during

2    the CWA permit process. But, under the rule announced by the Supreme Court, the ACOE

3    will not exercise its jurisdiction over the vernal pools, and the applicant will be turned away.

4    The CWA § 404 permit process, with its scientific review and assessment of the biological

5    needs of the wetlands, will not be conducted. The facts have changed because the CWA

6    protection route is closed. This constitutes new information that had not previously been

7    considered that absolutely will effect the treatment, agency oversight, and implementation of

8    mitigation and conservation measures of the vernal pools.

9        Alternatively, the regulations require § 7 consultation to be re-initiated when the

10   action is modified in a manner that causes effects to listed species or critical habitat that were

11   not previously considered. 50 C.F.R. 402.16. Here, the City's action to implement its HCP

12   has been significantly altered because it will no longer require development projects

13   affecting isolated wetlands to pursue a § 404 CWA permit. The City cannot seek the expert

14   advice of the ACOE when deciding how to handle isolated wetlands that support vernal

15   pools. *SWANCC* has resulted in a modification of the implementation of the HCP and

16   compliance with the ITP. The absence of future consultations under the CWA, as well as the

17   companion consultation with FWS, will absolutely affect the vernal pool species and its

18   critical habitat. The Court finds that this regulation also supports the conclusion that FWS

19   must re-initiate consultation on the City's ITP for the vernal pool species.

20       The Court rejects the Federal Defendants' related argument that the *SWANCC*

21   decision eliminated the ACOE/CWA process but now, by default, development projects must

22   go through the ESA § 10 permit process. While courts should defer to reasonable

23   interpretations by the agency that issued the permit, the Federal Defendants' position is

24   unreasonable because it would require the Court to re-write the permit to insert this provision

25   into the ITP.

26       Conversely, the Court rejects the Builder Intervenors' untenable argument that

27   *SWANCC* means that developers may effect the vernal pool species by complying with the

28   measures in the MSCP and Subarea Plan. Those vague and porous protections are absolutely

1   inadequate to minimize and mitigate harm to the vernal pool species.  As construed by the

2   Court, the City's ITP expressly stated that vernal pool wetland species, as that jurisdictional

3   line was then-understood, would be the subject of the permit process of § 404 of the CWA,

4   which included a further § 7 inter-agency consultation with FWS for compliance with the

5   ESA.  The Builder Intervenors argue that now that the Supreme Court has eliminated the

6   ACOE's authority to regulate isolated bodies of water, such as the seasonal vernal pools, the

7   ITP can be read to grant take authority for the vernal pool species.  The Court rejects this

8   assertion as it is contrary to the evidence in the administrative record, the intent of FWS in

9   issuing the permit, and a reasonable interpretation of the special conditions in the permit.

10  The Builder Intervenors seek a windfall.  The Court denies the Builder Intervenors' request

11  to "rewrite" or "reissue" the permit.  The proper course is for the expert agency, in the first

12  instance, to consider what protections are necessary when a specific development will affect

13  the seven vulnerable vernal pool species.

14          2.  Builder Intervenors' Cross Complaint Lacks Merit

15          The Builder Intervenors' offer their own interpretation of Condition I, and their Cross

16  Complaint contains three causes of action regarding the scope of the take authority.  First,

17  they claim that the City's ITP, as issued, *does* provide authority to take the seven vernal pool

18  species *so long as* the development project complies with the terms in the MSCP and

19  Subarea Plan.  Cross Compl. ¶ 36.  Second, they argue FWS is legally compelled to issue a

20  new ITP that is consistent with their interpretation.  Cross Compl. ¶ 40.  Third, the Builder

21  Intervenors seek an injunction to order the Federal Defendants to issue such a permit.  Cross

22  Compl. at 16, ¶ 3.  These arguments lack merit, and the Court denies their motion for

23  summary judgment in its entirety.

24          The Builder Intervenors first argue that language in the IA bound FWS to allow take

25  of the vernal pool species.  In their view, the IA's list of "Covered Species Subject to

26  Incidental Take" means that the ITP – presently and immediately – grants take authority for

27  all species on that list, including the seven vernal pool species, so long as the particular

28  development project is consistent with the City's MSCP.  AR 26544-45, 26596 (IA § 1.4 &

- 17 -

1    Exs. C & D).[12]

2            The Court rejects this argument because the ITP, not the IA, defines the extent of take

3    authorized.  The Builder Intervenors rely on a simplistic reading of the phrase "Covered

4    Species Subject to Incidental Take" in the IA as if, by itself, it grants incidental take over

5    those species.  The phrase "Covered Species Subject to Incidental Take," however, is a term

6    of art and is specifically defined in the IA and the related documents.

7            The protections of the ESA apply only to those species that are officially "listed" as

8    either "threatened" or "endangered."  § 1533.  Over time, those listings change, for example,

9    as FWS receives and acts upon applications to list a species.  In order to ensure flexibility, a

10   HCP often studies any and all species that are "of concern," whether or not they are currently

11   listed on the ESA.  This over-inclusive planning ensures the viability of the conservation plan

12   over time; may even prevent the need to list a species on the ESA; and benefits the health of

13   the ecosystem since species are often interrelated and co-dependent upon common resources.

14   *See generally* H.R. Rep. No. 97-835, at 30 (1982).  The regional planning involved in this

15   litigation also contemplated that the San Diego area was the home to sensitive species that

16   might be candidates for listing under the ESA.  *E.g.*, AR 26544-45 (San Diego's MSCP

17   plants and animal species in the San Diego region includes those that "have *been listed* as

18   threatened or endangered, have been *proposed* for listing as threatened or endangered, *are*

19   *candidates* for listing as threatened or endangered, or which are *otherwise of concern*.")

20   (emphasis added).  Thus it was prescient to include protections in the fifty-year plan.  For

21   example, the planning process considered the spreading navarretia species, even though that

22   plant was listed as "threatened" well over a year after FWS issued the City's ITP.  63 Fed.

23   Reg. 54975.

24           To further distinguish between the species under examination, or "covered," the IA

25   defined two categories:  (1) the broader group of "Covered Species" and (2) the narrower

26   group of "Covered Species Subject to Incidental Take."  "Covered Species" are defined as

27

28           [12]The Court found Exhibit C in the Compendium of Cross-Complainant's AR (Ex.
     51), but it was not stamped with a specific page number.

1    "those which *will be* adequately conserved by the MSCP *when the MSCP is implemented*

2    through the subarea plans or will be adequately conserved through the permitting process" of

3    CWA § 404. AR 26547 (IA § 2.6) (emphasis added). By contrast, "Covered Species Subject

4    to Incidental Take" are "those Covered Species which *are* adequately conserved by the

5    Subarea Plan, and which are therefore *subject to Incidental Take under the Take*

6    *Authorization* issued in conjunction with this [Implementing] Agreement." AR 26547-48

7    (IA § 2.7) (emphasis added). In turn, "take authorization" is defined as "*the* Section 10(a)

8    Permit," AR 26551 (IA § 2.32) (emphasis added). Thus, further reinforcing the City's ITP as

9    the document that defines the extent and scope of the incidental take authority.

10          But "coverage" does not necessarily mean that *the ITP* authorizes incidental take of

11   the species because *any* take authorization depends upon *the terms* of the permit. And, as

12   stated above, Condition I of the City's ITP expressly excluded take authorization of the

13   vernal pool species (when within the jurisdiction of the ACOE as all vernal pools were then

14   thought to be).

15          Read in the proper context, the phrase "Covered Species Subject to Incidental Take"

16   refers to those animal and plant species "adequately conserved" by the City's Subarea Plan

17   (either alone or in combination with another entity's Subarea Plan). As the Federal

18   Defendants explain, the phrase is "a proxy for species that are 'adequately conserved' under

19   the Plan. Thus, the phrase was meant to identify those species adequately conserved that

20   would receive assurances. This presents a wholly separate question from what the Plan itself

21   requires for a species to be regarded as 'adequately conserved.'" Fed. Defs.' Mot. to Dismiss

22   Reply Br. at 6; *see also* Fed. Defs.' Alt. Summ. J. Mot. Br. at 7-8 & n.3. And as discussed,

23   the ITP and IA expressly required a § 7 consultation process between the ACOE (through the

24   CWA § 404 permit proceedings) and FWS to evaluate whether any take of the vernal pool

25   species would be authorized on a particular development project.

26          The Builder Intervenors argue that the Federal Defendants' interpretation of Condition

27   I does not make sense and that it actually threatens other species dependent upon wetlands.

28   They note that Condition I of the ITP refers to "wetland species." AR 26964. There are 30

- 19 -

1   plant and wildlife species on the list of "wetland species" – the seven vernal pool species in

2   this suit *and* an additional 23 species that are also "associated or dependent" upon "wetlands"

3   (as that term was understood for purposes of ACOE jurisdiction). *Id.* The Builder

4   Intervenors see incongruent results if only the vernal pool species require additional

5   protections. For example, they argue that the government's interpretation would mean that a

6   Southwestern willow flycatcher would be protected from harm while it was standing in a

7   vernal pool but not while it temporarily perched on a nearby fence post. Builder Intervenors'

8   Mot. for Summ. J. Br. on Cross Compl. at 38-40.

9        The Court rejects this argument because it ignores the fact that the Southwestern

10  willow flycatcher, like all of the 28 wetland species, is "associated with or dependent upon"

11  wetlands, and therefore, is protected by Condition I regardless of where the bird is found or

12  how far it travels.

13       The Builder Intervenors also argue that FWS has conflated the terms of the CWA with

14  the ESA. The Court disagrees. The Federal Defendants have simply recognized that this

15  lawsuit concerns only the seven vernal pool species (which were thought to reside in

16  "wetlands" as the ACOE had broadly construed its jurisdiction), and that Plaintiffs have not

17  challenged the ITP take authority for other wetland species or non-wetland species.

18       Finally, the Builder Intervenors argue that rules of contract interpretation apply and

19  that the parties who participated in the MSCP planning process did not anticipate Condition

20  I. They relied on the Assurances to protect them against additional regulatory procedures,

21  and they were taken by surprise when the provision was added at the end of the process.

22       The Court rejects this argument because the parties' intentions or expectations are not

23  the issue. Rather, the legal question presented is whether FWS violated the ESA or acted

24  arbitrarily when it imposed Condition I on the City's ITP. It did not. *Tennessee Valley*, 437

25  U.S. at 174 (the ESA is "abundantly clear that the balance has been struck in favor of

26  affording endangered species the highest of priorities"). There is nothing remotely unfair or

27  arbitrary about the requirement. The ACOE did not participate in the MSCP planning

28  process. AR 26562.

1    In the second cause of action, the Builder Intervenors maintain that FWS was
2  "required" to issue an ITP that corresponded exactly to the take proposed and described in
3  the City's HCP. Cross Compl. ¶ 40.   They rely on the statutory language that if FWS finds
4  that the HCP meets the requirements for species protection, and if the proposed impact will
5  not threaten the continued survival of the species, then FWS "shall" issue a § 10 permit. §
6  1539(a)(2)(B); *Firebaugh Canal v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000).

7    The Court rejects this argument.  The Builder Intervenors characterize FWS's duty as
8  a ministerial task.  In their view, FWS's § 10 findings are somehow divorced from an
9  independent review of the merits of the applicant's HCP.  *E.g.*, Builder Intervenors' Opp'n to
10  Fed. Defs.' Mot. to Dismiss at 8.  This construction violates the ESA by eliminating FWS's
11  duty to use its expertise to restrict the impact of the proposed project on the listed species.  It
12  would extinguish the agency's statutory authority to impose conditions, here conditions F and
13  I, to the permit.  The ESA plainly states that any "[t]he permit shall contain such terms and
14  conditions as the Secretary deems necessary or appropriate to carry out the purposes of [§ 10
15  ITP process]."  § 1539(a)(2)(B).  No one is entitled to take authorization.  The application for
16  a permit does not define the ITP; instead the ESA states that the application identifies "such
17  other measures that the Secretary may require as being necessary or appropriate for purposes
18  of the plan."  *Id.* § 1539(a)(2)(iv).  The ITP does not need to be "in accordance" with the
19  HCP; rather the reverse is true and FWS determines the terms and conditions under which
20  the applicant obtains an exception to the ESA § 9 take prohibition.  *Cf. Bennett v. Spear*, 520
21  U.S. 154, 172-73 (1997) (when ESA mandates an action, the Secretary must use his expert
22  discretion to apply the relevant factors and follow the required procedures).  Because the
23  second claim for relief fails, it follows that the Builder Intervenors are not entitled to the
24  injunction they request in the third cause of action.  Cross Compl. at 16, ¶ 3.

25             3.  FWS's *Recovery Plan for Vernal Pools of Southern California*
26    Plaintiffs allege that FWS has violated its own regulation by failing to re-initiate
27  consultation on the City's July 1997 ITP once FWS completed the recovery plan for vernal
28  pool species in September 1998. TAC ¶ 88-93; AR 32610-765 (Fed. Defs.' Ex. M)

98cv2234

1  (hereinafter "*Vernal Pool Recovery Plan*").

2        The Court is troubled that FWS is significantly behind schedule with the completion

3  of the recovery plans.[13] The statutory scheme contemplates orderly and timely progression of

4  action to list the species; designate its critical habitat; and create a recovery plan. § 1533;

5  *NRDC v. United States Dep't of Interior*, 113 F.3d 1121, 1125-26 (9th Cir. 1997); *Oregon*

6  *Natural*, 6 F. Supp. 2d at 1152 ("The ESA contains very strict and nondiscretionary

7  timelines"). If timely completed, FWS would use the recovery plan to evaluate the

8  sufficiency of the application for an ITP, particularly when the permit governs a large region

9  for an extensive period of time. *Cf. National Wildlife v. Babbitt*, 128 F. Supp. 2d at 1283

10 (Natomas Basin HCP included provision for incorporating the recovery plan for the

11 endangered snake when it was developed and approved). If the terms of the ITP were

12 inconsistent with the strategies and objectives in the recovery plan, then FWS would need to

13 explain why it reached inconsistent conclusions from the same evidence. *Defenders of*

14 *Wildlife*, 420 F.3d at 959; *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 422

15 F.3d 782, 799 (9th Cir. 2005) (deference is not owed when agency fails to adhere to a

16 consistent view). The *Vernal Pool Recovery Plan* is pertinent evidence of the measures

17 necessary to prevent the extinction of the vernal pool species. The language and structure of

18 the ESA's provisions for recovery plans shows that FWS must make a conscientious and

19

20

21

---

22     [13]FWS did not respond with the alacrity contemplated by the ESA time schedule for the vernal pool species. For example, FWS noticed the potential peril of the Otay Mesa Mint and California Orcutt grass as early as 1975, and the Riverside fairy shrimp in 1980. 58 Fed. Reg. at 41386. FWS did not determine that these three vernal pool species should be listed until August 1993 – a delay of thirteen to eighteen years. *Id.* Initially, FWS decided that designating the critical habitat was not prudent. 58 Fed. Reg. at 41390; 66 Fed. Reg. 29384 (noting the lawsuit that triggered this action); *Bldg Ind. Ass'n of So. Calif. v. Babbitt*, 979 F. Supp. 893, 905-06 (D.D.C. 1997) (in fairy shrimp case, noting presumption that listing decision and critical habitat designation should be concurrent). When FWS undertook the project, it was able to designate the critical habitat for the Riverside fairy shrimp eighteen months later, in May 2001. 66 Fed. Reg. 29384; *see also* 69 Fed. Reg. at 60113 (noting that designation of critical habitat for spreading navarretia was triggered by lawsuits). FWS completed a recovery plan for the vernal pool species in September 1998, though it aspired only to the modest goal of moving the "endangered" species to the "threatened" species list. AR 32611.

98cv2234

1   educated effort to implement the plans for the recovery of the species.[14]  § 1533(f)(1) ("The

2   Secretary shall develop and implement" recovery plans for the "conservation and recovery"

3   of the listed species unless "such a plan will not promote the conservation of the species.").

4   The statute gives the Secretary leeway by including the phrase "to the maximum extent

5   practicable."  § 1533(f)(1)(B).  Accordingly, during the re-initiation process ordered by this

6   Court in response to the *SWANCC* decision, FWS must consider the standards and other

7   information in its *Vernal Pool Recovery Plan* to evaluate the effect of the City's ITP on the

8   vernal pool species and whether the mitigation is adequate.

9       B.  FWS Failed to Consider the Issue of "Unnatural" Vernal Pool Habitat

10       In rare instances, vernal pool species have been found in "unnatural" areas, for

11

12       [14]Oddly, FWS in this litigation seeks to distance itself from a document that it
prepared in compliance with the ESA and as a result of its expertise.  The Federal

13   Defendants argue that its *Vernal Pool Recovery Plan* is not a binding document and the
agency is free to deviate from its findings and conclusions. Fed. Defs.' Cross Mot. Summ. J.

14   Br. at 19.  The Ninth Circuit has not yet decided this issue.  The Eleventh Circuit held that
FWS is not legally obligated to implement a recovery plan because it does not have the force

15   of law. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 547 (11th Cir. 1996).  The Court
respectfully disagrees with the cases minimizing the importance of recovery plans. "If the

16   intent of Congress is clear, that is the end of the matter; for the court, as well as the agency,
must give effect to the unambiguously expressed intent of Congress." *Wilderness Society*,

17   353 F.3d at 1059-60; *Arizona Cattle*, 273 F.3d at 1236; *Pacific Rivers*, 30 F.3d at 1054-55.
       The ESA describes the prototype recovery plan, subject to a reasonableness standard

18   of "the maximum extent practicable," in § 1533(f)(1)(B).  That statutory language specifies
that FWS must evaluate the "site-specific management actions," establish "objective,

19   measurable criteria," and estimate the time and cost to achieve "immediate steps" as well as
"measures needed to achieve the plan's goal."  *Id.*  These are specific, affirmative actions.

20   FWS is required to make the effort.  Congress could not mandate FWS *save* a species from
extinction, thus, the objectives of the recovery plan are aspirations to that degree.  FWS has

21   discretion, using its expertise, to decide the content of the recovery plan; however, the ESA
clearly requires FWS to follow through with the measures identified in recovery plans.

22       Indeed, FWS is required to report to Congress every two years "on the status of efforts
to develop and implement recovery plans" for all listed species and "on the status of all

23   species for which such plans have been developed." § 1533(f)(3).  There would be no need
for such ongoing reports if FWS were not endeavoring to meet the goal of recovery, as

24   described in the recovery plan.  Moreover, Congress instructed the Secretary to give priority
to the development and implementation of recovery plans for species "that are most likely to

25   benefit from such plans," and to species that "are, or may be, in conflict with" development
projects. § 1533(f)(1)(A).  The next provision, § 1533(g), reinforces that Congress expected

26   FWS to engage in earnest and conscientious activity to use the recovery plans to try to
remove the species from the protection of the ESA.  Section 1533(g) provides that once a

27   species has been removed from the ESA listing, FWS must monitor the species for not less
than five years, and orders the Secretary to make prompt use of the § 7 consultation process

28   "to prevent a significant risk to the well being of any such recovered species."

- 23 -

1    example, in a rut left by a tire track, a roadside ditch, or a cattle stockpond.  The biological

2    explanation for these "unnatural" occurrences is that the area was once a healthy vernal pool

3    complex, but over time, it was degraded by human activity (such as off-road vehicle use or

4    scraping for construction) to the point of virtual destruction.  AR 32465-67; 63 Fed. Reg. at

5    54975; 59 Fed. Reg. 64812, 64814; *see* 62 Fed. Reg. at 4926 (alternatively, the fairy shrimp

6    eggs may be distributed by birds, or nearby habitat may be washed into an adjacent area

7    during heavy rains).  Over time, if that area is left relatively undisturbed and rains fill these

8    "man-made" depressions with fresh water, then the species may re-vitalize, for example,

9    some fairy shrimps' eggs may have survived a few years in their dormant state in those

10   damaged soils.  62 Fed. Reg. at 4926, 4930; AR 32466-67.  While the parties refer to these

11   instances as being "unnatural," it is more accurate to describe them as "survivors" of a

12   degraded habitat.

13        The City's conservation plans distinguish between "naturally occurring" vernal pools,

14   and "road rut" vernal pools; and also provides greater protection to vernal pools within the

15   Preserve boundaries than those located outside the Preserve.  "Outside the MHPA, narrow

16   endemic species [including four vernal pool plant species] will be protected through the

17   following measures, as deemed appropriate:  1) avoidance; 2) management; 3) enhancement;

18   and/or 4) transplantation to areas identified for preservation."  AR 24955.  According to the

19   Federal Defendants, the only vernal pools affected by this sentence are those unnaturally

20   occurring in road ruts, tire tracks, or water ponds.  The Federal Defendants characterize the

21   amount of take authorized by this sentence as "largely theoretical" or "negligible."  *E.g.*, Fed.

22   Defs.' Cross Mot. Summ. J. Br. at 1, 3, 14-16, 23, 34, 38.

23        Plaintiffs argue that FWS did not analyze the impact of the taking of these "unnatural"

24   instances of vernal pool species.  "FWS simply ignored this issue altogether."  Pls.' Br. at 41.

25        The Court agrees.  A decision is arbitrary if the agency "entirely failed to consider an

26   important aspect of the problem."  *Motor Vehicle*, 463 U.S. at 43.  FWS authorized the take

27   of vernal pool species when found in these "unnatural" locations in Condition I by

28   authorizing the City to take vernal pool species "outside" of "jurisdictional wetlands."  But

- 24 -

1  there is no discussion or evaluation of the impact of the adverse effects on those rare

2  instances in the context of the survival of the species as a whole.  It appears, that as a matter

3  of convenience, FWS concluded that these errant locations of species or habitat would not

4  constitute wetlands, even under the ACOE's definition that its CWA jurisdiction

5  encompassed isolated bodies of water.  Yet the record contains no discussion of the reason

6  for this distinction for purposes of enforcing the ESA.  It is arbitrary to distinguish between

7  vernal pools within or outside the ACOE's wetlands jurisdiction as a basis for providing

8  different levels of protection for the endangered species that may inhabit or rely upon those

9  bodies of water.

10       Similarly, the Court finds that the agency has not adequately explained its decision

11  and has not based its decision on facts in the record.  *Citizens to Preserve*, 401 U.S. at 415.

12  The record shows that, against all odds, vernal pools can sometimes survive on a damaged

13  location, and the dormant cysts of the fairy shrimp may hatch several years later.

14  Given the exceptionally small number of vernal pool species that may still be viable in San

15  Diego, it defies reason to give *less* protection to those creatures and plants that have survived

16  some measure of damage by human activity, as these would appear to be among the more

17  hearty specimens.  A "road rut" vernal pool has most likely been damaged in violation of the

18  strict ESA take prohibition but have survived that disruption.  It is arbitrary to assume that

19  surviving vernal pools need less protection than those that exist in relatively pristine and less

20  developed settings.  FWS has the statutory duty to protect the threatened and endangered

21  vernal pool species that now reside in those degraded habitat areas.  Despite the prior harm,

22  these vernal pools have regained their capacity to sustain life.  Yet FWS gives these hearty,

23  surviving species less protection that other vernal pools simply because those pools were

24  considered to be within the jurisdiction of the CWA.

25       C.  The Assurances Violate the ESA by Locking in Inadequate, Unproven, and

26            Uncertain Mitigation Measures for the Seven Vernal Pool Species

27       The next issue concerns the operation of the "Assurances" on the seven vernal pool

28  species in light of FWS's decision to defer analysis of the direct and indirect impacts of

1   development under the MSCP until future § 7 consultations with the ACOE. The Assurances

2   prohibit FWS from imposing additional conservation measures beyond those measures

3   contained in the City's HCP during the fifty-year life of the ITP. FWS will not require

4   additional land, land restrictions, money, conservation measures, or mitigation from the City

5   or a developer (by virtue of their Third Party Beneficiary status). AR 26555-56 (IA § 9.4,

6   9.5). FWS agreed to step in to fill any void to bear the financial burden because it expected

7   that the likelihood of such an event would be "small." AR 26933 (Findings); *see also* AR

8   26200, 26210 (BiOp states that FWS will "request and receive" funding "needed to assure

9   adequate conservation of covered species in perpetuity"). The structural problem is FWS did

10  not evaluate the impact of the conservation plan, such as the design of the Preserve or the

11  methods and measures of mitigation, as applied to the vernal pool species at the initial stage

12  of issuing the ITP because it did not anticipate any take under Condition I; yet, FWS

13  promised that when a particular project is reviewed in the future, FWS will only enforce the

14  mitigation measures that are in that unexamined HCP. The Court agrees with Plaintiffs'

15  characterization of the structure of the Assurances on the facts of this case as creating a

16  "shell game" in which FWS effectively eliminates the ESA protections for vernal pools by

17  promising to protect them in the future at the same time it restricts its authority to those

18  unevaluated measures set forth in the MSCP and Subarea Plan.

19          At the time of issuing the ITP, FWS assumed it need not evaluate the extent of the

20  possible impact or the level of mitigation because in the future FWS would have considered

21  if a particular project would jeopardize the vernal pool species in conjunction with the CWA

22  permit process. *E.g.*, AR 26285-88 (direct impacts for all seven vernal pool species "will be

23  addressed" in future analyses); *cf.* AR 24146-47 (in early draft, FWS believed it had retained

24  right to impose additional mitigation measures during future § 404 proceedings with ACOE).

25  Pursuant to Condition I, FWS would consult with the ACOE to address specific species

26  needs on specific development projects. But the record shows that the future proceedings

27  would be empty because FWS gave away its power to protect the species in the Assurances.

28  If FWS found that a specific development project would impair the recovery of a vernal pool

1    species, and recommended modifications to the planned development to prevent that harm,

2    the developer has no obligation to provide any of those mitigation measures.  AR 26561-61

3    (IA § 9.8A).  FWS would be talking into the wind because the developer, protected by the

4    City's authority to issue an ITP for that project, is assured that it does not have to provide

5    those additional measures.

6         Even putting aside the fact that *SWANCC* has eliminated the procedure of turning to

7    the ACOE for a wetland permit that would trigger a future § 7 ESA consultation with FWS,

8    the structure of this agency action is fundamentally flawed when applied to the vernal pool

9    species.  The egregious flaw remains because FWS has not analyzed the impact of the City's

10   development plans on the vernal pool species (because it planned to undertake that

11   evaluation in conjunction with the § 7 consultation proceedings with the ACOE CWA permit

12   process), yet it has locked in the level and extent of mitigation.  The MSCP is structured to

13   create a Preserve, which eventually may contain 847 acres of the remaining vernal pool

14   habitat, but allows the City to authorize virtually unfettered development on the 336 acres

15   located outside the Preserve.  (The regulated destruction outside the Preserve would be

16   mitigated by remedial actions to vernal pools within the Preserve).  Notably, FWS has not

17   evaluated the design of the permanent Preserve to determine if it would mitigate the expected

18   harm to the vernal pool species outside the Preserve.  There is no indication that the acres

19   selected for preservation are *occupied* by viable populations of fairy shrimp.  Thus, the basis

20   for granting the Assurances is devoid of any evaluation of the impact, but by the time FWS

21   intends to evaluate that site-specific impact, it will have no ability to suggest or impose any

22   additional measures.

23        The AR bears out Plaintiffs' assertion of how the implementation of the conservation

24   plan and FWS's supervision of the mitigation efforts will operate because both the standard

25   to "avoid" and the type of mitigation are flawed.  First, the duty to "avoid" vernal pools is

26   toothless.  The Federal Defendants and Builder Intervenors insist that the Plaintiffs' position

27   lacks merit because of the significant protections in the City's conservation plan to "avoid"

28   vernal pool habitat.  They cite the standard in the MSCP and Subarea plan to "avoid" vernal

1  pools whether located in or outside of the planned Preserve; the adoption of the CWA's "no

2  net loss" policy; and the City's Environmentally Sensitive Lands Ordinance ("ESLO"). *E.g.*,

3  AR 23721 ("avoidance of impacts . . . to the maximum extent feasible"), 24955 (Subarea

4  Plan stated that vernal pools in naturally occurring complexes inside the Preserve "will be

5  avoided"; vernal pools within and outside the Preserve will be avoided "to maximum extent

6  practicable"); AR 25724-60 (ESLO); *accord* AR 19352, 22446, 23340-41 (draft EIS),

7  23966-68, 25227, 26912, 26914 (FWS Findings relies on directive to "avoid" impacts

8  "where possible" and to mitigate "unavoidable" impacts "to the maximum extent

9  practicable"), 26271, 26284-88 (same in BiOp), 26571 (IA), 39523 (MSCP § 3.3.3).  The

10 Court has examined each of these provisions and finds them utterly otiose.  Each avoidance

11 standard allows the City or developer to unilaterally determine that a particular development

12 project cannot avoid the vernal pools on the proposed construction site.  Both the City and

13 developers have a strong financial interest in obtaining the highest financial return on

14 expensive real estate, and neither has the expertise or incentive to contemplate the ESA

15 protections.[15]  By simple *ipse dixit*, the City or developer can proclaim that avoidance of the

16 vernal pools is not possible on the site, and thus shift their attention to providing the

17 mitigation outlined in the MSCP.

18      The "no net loss" standard illustrates the flaccidity of the avoidance standard in the

19 HCP.  *See infra* pp. 43-46 & nn.19 & 20.  The uncontradicted evidence in the record

20 confirms that the "no net loss" standard is inadequate to protect the vernal pool species.

21 FWS determined that these seven fragile species required the procedural and substantive

22

23      [15]City employees have no reliable expertise in recognizing situations when these
   standards apply and the City has no incentive to deny building permits that will generate tax
24 revenues.  The ESLO allows the City to grant a variance when the property is "completely
   covered" by vernal pool habitat "leaving the site without development potential."  AR 25754.
25 If the site is under ten acres, the City can accept monetary compensation as mitigation.  AR
   25748.  The City is not a substitute guardian for the protection of endangered and threatened
26 species.  AR 22752 (noting four enforcement actions on City-owned property due to
   "inadvertent disturbance to vernal pools"); *see also* Pls.' Ex. 6 (after ITP issued, City
27 explained that 8 vernal pools had been cleared in Mira Mesa because "the grading permit was
   issued in error by employees who did not realize that the entire parcel was to be permanently
28 protected for vernal pool conservation to mitigate impacts from previous development of
   other property").

1 │ protections of the ESA because, in part, the CWA was not preventing harm. The HCP
2 │ defines a "no net loss" of functions and values standard with a broad practicality exception.
3 │ Here, the "no net loss" policy permits the substitution of off-site mitigation whenever on-site
4 │ mitigation is "impracticable." Nothing suggests that merely drafting a development plan that
5 │ envisions using the entire plot could render on-site mitigation "impracticable." *E.g.*, AR
6 │ 30094 (Cousins resulted in 100% loss of vernal pools on the 67-acre site). Unlike the ESA,
7 │ which broadly prohibits harm "in the broadest possible manner to include every conceivable
8 │ way in which a person can 'take'" a species, *Forest Conservation*, 50 F.3d at 784, the "no net
9 │ loss" policy would permit such harm as long as another, comparable body of water is
10 │ restored.

11 │      Similarly, the City's ESLO favors development. The Ordinance states simply that
12 │ "impacts to wetlands should be avoided." AR 25730. The term is not defined and merely
13 │ offers a suggestion that development "should" avoid the vernal pools. "Examples of
14 │ unavoidable impacts include those necessary to allow reasonable use of a parcel entirely
15 │ constrained by wetlands," AR 25731, 23351-52, thereby allowing development of a large
16 │ complex of interrelated vernal pools when that provides the healthiest environment for these
17 │ species. The ESLO allows the developer to define the scope of what can be "avoided," thus,
18 │ the inclusion of upland watershed is equally ineffectual. If you can't "avoid" a vernal pool, it
19 │ is irrelevant that a developer should have "avoided" the watershed acreage that supported
20 │ that habitat. These passing, undefined references to "avoidance" do not satisfy the ESA,
21 │ which affords imperiled species the "highest of priorities." *Tennessee Valley*, 437 U.S. at
22 │ 174.

23 │      The weakness of the obligation to "avoid" vernal pools is then purportedly
24 │ recompensed, but in fact, the approved mitigation measures are uncertain and inadequate.
25 │ *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 254 F. Supp. 2d 1196, 1214 (D.
26 │ Or. 2003) (a properly supported BiOp cannot rely on mitigation that is not reasonably certain
27 │ to occur). The Federal Defendants and Builder Intervenors stress that when vernal pool
28 │ habitat is destroyed, the MSCP imposes significant mitigation responsibilities. The problem

1   with the proposed mitigation for the two fairy shrimp, however, is that they either have been

2   proven to be ineffective or they are untested experiments.[16]  The City's conservation plans

3   concentrate on collecting species from the site of the development and transplanting them to

4   a site within the Preserve, *e.g.*, AR 19627-28, 19678, 24859-60, 24909, but the record

5   establishes that fairy shrimp cannot be successfully transplanted, and, even if successful, it

6   risks hybridization with other species of fairy shrimp.  FWS reached that conclusion in

7   February 1997, just a few months before it approved the proposed mitigation method in the

8   MSCP.  62 Fed. Reg. at 4926, 4931 (no scientific data on method of inoculating an existing

9   pool with a known quantity of eggs in face of threat of hybridization, damage to eggs during

10  collection, storage, and transportation; efforts to restore this fragile habitat can fail when the

11  depth of the pool is altered or the pool is modified to hold water for an inappropriate length

12  of time).  The City's ESLO states that "creation" is an acceptable type of mitigation, *e.g.*, AR

13  25747, yet FWS has completely rejected that method as ineffective.  *See also* Cousins' Opp.

14  to TRO at 3-4 (ACOE approved mitigation package that included "creation" of vernal pool

15  basins and relocation of fairy shrimp eggs).  Because FWS is bound by the Assurances not to

16  require additional mitigation measures – even if over time, biologists learn new and better

17  ways to protect the species or conversely, if time shows certain restoration methods fail –

18  FWS would not be able to require the developer to accommodate these new scientific

19  advances into the mitigation measures because the Assurances have frozen the state of

20  knowledge to that known as of 1997.  In short, the destruction is permanent and the

21  "mitigation" is illusory.

22          This situation is analogous to the problem addressed in the Ninth Circuit's decision in

23  *Conner v. Burford*, 848 F.2d 1441, 1457-58 (9th Cir. 1988).  Plaintiffs argue that FWS

24  violated the ESA by failing to consider the *entire* agency action in its Biological Opinion

25

26          [16]For vernal pools on municipal land, the City has a management plan (Builder
    Intervenor's Ex. 33), but all mitigation depends upon finding the funds and the
27  recommendations are voluntary (except those parcels where the federal government has
    stepped in to enforce statutes).  *E.g.*, AR 13324, 13330, 22752-54, 22757, 22763.  Also, FWS
28  has noted that the City's plans are "seldom enforced" and often overridden.  63 Fed. Reg. at
    54988; *accord* 62 Fed. Reg. at 4936 (1980 plan).

1  (BiOp).  FWS did not include any analysis of the direct or indirect impacts on vernal pool

2  species of the City's conservation plan; instead, FWS deferred that analysis to the future §

3  404 CWA permitting process.  Plaintiffs argue this approach "artificially narrowed the scope

4  of its review by claiming the required analysis of direct impacts will be performed during

5  future site-specific section 7 consultations."  Pls.' Summ. J. Br. at 37.  But this was an empty

6  promise because "the City's HCP controlled and limited these future consultations.  First, in

7  establishing a 12% cap in the City's HCP on the additional loss of vernal pool habitat, FWS

8  must approve all future projects provided this 12% limit is not reached."  *Id.* at 38.  Second,

9  the Assurances prevented FWS from recommending or requiring any additional mitigation

10  measures not contemplated and included in the MSCP and Subarea Plans.  *Id.*

11  "Consequently, future section 7 consultations will merely 'rubber stamp' each project

12  consistent with the City's HCP."  *Id.*

13       The Court concludes that the BiOP violates the guiding principle of the Ninth

14  Circuit's *Conner* decision.  The ESA "does not permit the incremental-step approach" of

15  consultation because "biological opinions must be coextensive with the agency action."

16  *Conner*, 848 F.2d at 1457-58; *accord Center for Biological Diversity v. Rumsfeld*, 198 F.

17  Supp. 2d 1139, 1155 (D. Ariz. 2002); *Greenpeace v. National Marine Fisheries Serv.*, 80 F.

18  Supp. 2d 1137, 1143-45 (W.D. Wash. 2000).  "[T]he ESA requires that all impacts of agency

19  action – both present *and* future effects on species – be addressed in the consultation's

20  jeopardy analysis."  *American Rivers v. United States ACOE*, 271 F. Supp. 2d 230, 255

21  (D.D.C. 2003).  This rule ensures that the ESA is enforced in an effective manner because

22  "impermissible segmentation would allow agencies to engage in a series of limited

23  consultations without ever undertaking a *comprehensive assessment of the impacts of their*

24  *overall activity on protected species*."  *Id.* (emphasis added).

25       The lesson of *Conner* applies to this case because the ESA's policy of

26  "institutionalized caution," *Tennessee Valley*, 437 U.S. at 194, "can only be exercised if the

27  agency takes a look at all the possible ramifications of the agency action."  *Conner*, 848 F.2d

28  at 1453 (quotation and citation omitted).  Though FWS chose not to evaluate the cumulative

1   impact of the implementation of the MSCP and Subarea Plan on the vernal pool species, it

2   fixed the ameliorative measures for the fifty-year life of the ITP to those contemplated in

3   1997. Ironically, this structure diminishes the value of one of the primary strengths of

4   regional conservation planning – enabling jurisdictions to plan and implement protections for

5   an entire ecosystem. *E.g.*, AR 6780-82, 23189-90, 28100-01, 39463. By the time FWS

6   undertakes its incremental site-specific consultations it may have lost the opportunity to

7   protect the vernal pool species from extinction. *Conner*, 848 F.2d at 1454-58 (requiring

8   comprehensive information and review "to avoid piecemeal chipping away of habitat"). The

9   flaw is fatal in the context of this case because all vernal pool habitat outside of the San

10  Diego region has been destroyed. *E.g.*, AR 26236 ("The loss of vernal pool habitat is nearly

11  total in Los Angeles, Riverside, and Orange counties"); 63 Fed. Reg. at 54983-84; 58 Fed.

12  Reg. at 41387 (otay mesa mint). The vernal pool species have narrow and strict habitat

13  requirements. *E.g.,* 58 Fed. Reg. at 41388 (Riverside fairy shrimp); 62 Fed. Reg. at 4929

14  (San Diego fairy shrimp). The remaining habitat in found within the area covered by the

15  MSCP (and lands controlled by the military). Because the MSCP controls the fate of the

16  remaining vernal pool habitat throughout all of its range, it is particularly important that to

17  comply with the purpose and spirit of the ESA to seek to prevent the extinction of these

18  species.[17]

19      Federal Defendants argue that the framework of Condition I of the ITP, the MSCP,

20  and the Subarea Plan is more akin to *Swan View Coalition v. Turner*, 824 F. Supp. 923, 934-

21  

22  [17]The flaw is also heightened by the failure of FWS to timely prepare its *Vernal Pool Recovery Plan. See supra* pp. 21-23 & nn. 13 & 14. A recovery plan identifies the "site-

23  specific management actions as may be necessary *to achieve the plan's goal for the conservation and survival of the species*." § 1533(f)(1)(B) (emphasis added). In this case,

24  FWS issued the ITP to the City without the benefit of a Recovery Plan for the vernal pool species. Congress imposed deadlines to avoid conflicts between planned and potential

25  development and the agency's § 7 consultation process on specific sites – the very problem occurring in this case. H.R. Rep. No. 97-385, at 20-25. Thus, the administrative process did

26  not incorporate the wisdom of "objective, measurable criteria" that would result in the de-listing of the vernal pool species, nor the time and cost estimates for the intermediate and

27  final achievement of such goals. § 1533(f)(1)(B).
        Moreover, the goal of this recovery plan is too limited in its objective, in that it seeks

28  to stabilize the existing vernal pool species such that they may be reclassified from the "endangered" list to the "threatened" list – as compared to eliminating the need for ESA protection. *Compare* AR 32616, 32684 *with* § 1533(f).

1   35 (D. Mont. 1992), where the district court approved reliance on future agency proceedings

2   at subsequent stages.   This case, assuming that it was correctly decided, is distinguishable

3   because the future permit proceedings were "*in addition* to the analysis already done" at the

4   time FWS issued the permit. *Id.* at 935.  By contrast, here, FWS did not anticipate any take

5   of the vernal pool species at the time it issued the permit, thus, did not evaluate whether the

6   HCP would adversely affect these species or the adequacy of the proposed mitigation

7   measures.

8         The violation of the conservation goals of the ESA is illustrated by comparing the

9   Assurances offered in this case to those offered under the paradigm approach described by

10  Congress and approved by other courts.  H.R. Rep. No. 97-835, at 30-32 (1982), *reprinted in*

11  U.S.C.C.A.N. 2807.  The model paradigms include constant monitoring *and revision* based

12  on that data, but that safety feature is absent from the MSCP and Subarea Plans.  The

13  omission of flexible monitoring features is exacerbated because the large scale and long term

14  of the City's ITP. *Id.* at 31 (noting that permits lasting 30 or more years may be appropriate

15  but FWS must consider the possible negative effects associated with such a duration, and

16  "the extent to which the conservation plan is likely to enhance the habitat of the listed species

17  or increase the long-term survivability of the species or its ecosystem"); *cf. Jantzen*, 760 F.2d

18  at 983 (permit for one species on one mountain could be reconsidered based upon data

19  revealed by the monitoring).  Congress expected that FWS would pay particular attention to

20  both the benefits of such a long-term permit (*e.g.*, allowing time to assemble a large,

21  integrated permanent preserve) against the *negative* consequences (*e.g.*, locking the

22  mitigation measures to those known as of 1997, rather than permitting the species to benefit

23  from the developing science and experience on specific sites).  The San Bruno mountain

24  butterfly conservation plan had specific biological goals that were created after two-years of

25  biological study of the proposed development's effect on the butterfly species; it required

26  specific and constant monitoring of the butterfly; and if time revealed that the species was

27  suffering more than expected and permitted, the plan provided for adaptive management

28  techniques that would remedy the problem before allowing further harm to the species.

98cv2234

1  *Jantzen*, 760 F.2d at 979 & 983.

2      Similarly, a developer's conservation plan for a hawk and a snake in the Natomas

3  Basin near Sacramento was based on "adaptive management." *National Wildlife v. Babbitt*,

4  128 F. Supp. 2d at 1281-82.  The conservation plan acknowledged that the imperfect state of

5  knowledge of the needs of protected species, and that, over time, the assumptions in the

6  conservation plan may prove inaccurate.  *Id.*  Like the City's MSCP plan, this was a fifty-

7  year plan in an area experiencing rapid and extensive development and growth.  The district

8  court noted that part of the *regional* plan that permitted future adjustments based on new

9  information acquired on the two species over the life of the permit, but invalidated the *city's*

10  *local* plan that did not contain features for correction and reconsideration.  *Id.* at 1299-1300.

11  In the regional plan, modification could be triggered by new research on the species,

12  recovery strategies as formulated by FWS's recovery plan, and information gathering

13  pursuant to the monitoring obligations.  *Id.* at 1282.  There was an agreement to monitor the

14  entire system every five years to assess the effectiveness of meeting the conservation goals,

15  and periodic technical monitoring to assess the effectiveness of specific management and

16  enhancement programs.  *Id.*  In addition, the regional conservation plan contemplated a

17  comprehensive regional assessment to ensure the plan was meeting the specific conservation

18  goals for the species as development occurred and the preserve was assembled.  *Id.*  The

19  MSCP in this case does not contain these adaptive management protections that would

20  ensure that the vernal pool species would be effectively conserved; instead, the assurances

21  operate to lock in weakened safeguards for the vernal pool species for fifty years.  The

22  purpose of the ESA "is not simply to memorialize species that are on the path to extinction,

23  but also *to compel those changes needed to save the species from extinction*." *Oregon*

24  *Natural*, 6 F. Supp. 2d at 1152.

25      Congress added the § 10 ITP process to the ESA to provide incentives to private

26  landowners to commit resources to implement long-term HCPs, but it also expected FWS to

27  comply with the broad conservation goals of the ESA.  While Congress contemplated

28  assurances to developers that they would be required only to provide the explicit measures in

1    the conservation plan, Congress envisioned that such plans would provide for unforeseen
2    circumstances that threatened the survival and recovery of the species covered by the long-
3    term plan. H.R. Rep. at 31. Here, there is an exception for "extraordinary" or "unforeseen"
4    circumstances, but FWS again promised that if additional conservation were warranted under
5    this provision that they "shall not involve the commitment of additional land or additional
6    land restrictions or additional financial compensation" by the City or the developers. AR
7    26557 (IA § 9.6(E)). Further, if FWS determined that additional conservation measures were
8    necessary, they "shall be limited to modification of the City of San Diego's preserve
9    management program or habitat acquisition program as set forth in the Subarea Plan." *Id.*

10       It is particularly troubling when FWS did not scrutinize the conservation plan for
11   impacts to the vernal pool species. The result is that FWS has given Assurances to the City
12   (and developers who will obtain permits from the City) without the stabilizing balance of
13   protecting the species from extinction. For example, if, during the next fifty years, biologists
14   confirm that restoration attempts such as transplanting fairy shrimp cysts is unsuccessful, the
15   Assurances forbid the City or FWS from obtaining additional financial contributions, land
16   restrictions, or other mitigation. Further, FWS would bear the burden of proving the species
17   was in jeopardy by clear and convincing evidence. AR 26566 (IA § 9.6(C)). The unforeseen
18   circumstances provision has been stripped of its meaning. These consequences seem likely
19   to happen, since the scientific data in the AR shows that the vernal pool species will be
20   damaged by the fragmentation and edge-effects of the continued, rapid development of the
21   San Diego region. Thus, as development proceeds under the MSCP, the indirect harm to the
22   vernal pools intensifies. Yet, FWS will not require the developers who obtain permission to
23   take the species to repair that compounding damage to the listed species.

24       At the hearing, the Federal Defendants assured the Court that several levels of
25   protection remained and FWS would step in to protect the species from extinction by
26   exercising its eminent domain power or revoking the permit. But FWS limited its authority
27   to revoke the City's ITP in the IA. AR26557 (IA § 9.6(E)). Such an extreme remedy does
28   not replace the duty of FWS not to issue an ITP when the benefits to development outweigh

1  the detriment to the vernal pool species. *See Defenders of Wildlife*, 420 F.3d at 954, 974-75

2  (after-the-fact enforcement of ESA § 9 prohibition on take is not an adequate substitute for

3  preventing threat to species, especially plants). The flaw in the City's ITP is structural.

4       The Builder Intervenors stress that they have agreed to contribute valuable property to

5  assemble the Preserve, and this overall benefit for the region justifies the Assurances. This

6  logic is flawed, however, because if a vernal pool species is present on a parcel of property,

7  development that would kill, destroy, or harm those species would be barred under the § 9 of

8  the ESA. A properly supported ITP would ensure that the regulated kill could proceed

9  because the promised mitigation would not jeopardize the chance for the vernal pools to

10  recover to the point that they no longer need the protection of the ESA. The record in this

11  case shows that FWS has not evaluated how the contemplated development of lands

12  containing vernal pool habitat will be or could be mitigated so as to authorize any level of

13  take, thus, the Assurances are not properly applied to those species. The balance of the

14  MSCP, Subarea Plans, and the Assurances are not affected by this litigation, and the City, the

15  developers, and the ecosystem will benefit from the regional conservation plan as to the

16  remaining eighty-plus fragile species in the 900 square miles covered by the City's ITP.

17       On this record, the Court finds that the Assurances violate the ESA because they lock-

18  in ineffective, unstudied, and inadequate mitigation for the vernal pool species for fifty years.

19  The ESA requires useful mitigation. *Federation of Fly Fishers v. Daley*, 131 F. Supp. 2d

20  1158, 1163 (N.D. Cal. 2000). Under the terms of the City's conservation plans and its ITP,

21  development projects certainly will go forward to graze habitat and kill species, but the

22  commitments to "mitigate" will not protect the species in the long run. A close and careful

23  examination of the record reveals that the plan is structured to permit unfettered take of

24  vernal pool species and to destroy over 300 acres of its habitat, without any corresponding

25  duty to ameliorate the damage if conditions change. The Preserve has been designed to

26  protect 847 acres of vernal pool habitat, but the slack standard to "avoid" vernal pools

27  outside the planned Preserve leaves unrestrained discretion to development to destroy

28  completely the 336 acres outside the Preserve. *E.g.*, AR 23391. While the size and design of

1    the Preserve has been determined, FWS has not evaluated how the extent of take permitted

2    under the conservation plan will benefit the vernal pool species.  Any developer, by virtue of

3    its Third Party Beneficiary status under the IA, is assured that it will not have to commit any

4    funds or resources to mitigate for the take of the vernal pool species other than those

5    contemplated in the MSCP and Subarea Plan for fifty years, when the level of mitigation

6    necessary to conserve the vernal pool species in San Diego county has not been evaluated,

7    determined, or dictated.  Instead, any developer need only comply with the requirements of

8    the MSCP, effectively repealing the stricter protective ESA standards for the vernal pool

9    species for fifty years.  This result violates the ESA because it precludes FWS from making

10   changes to the City's ITP that may be necessary to ensure the survival and recovery of the

11   vernal pool species – even though FWS approved the conservation plan and found "no

12   jeopardy" on the premise that it did not anticipate any take of vernal pool species because

13   that analysis would be conducted in future administrative proceedings.  *E.g.*, AR 26303.  In

14   sum, FWS has issued an ITP with regard to the vernal pool species that (1) will *not*

15   "maximize to the extent practicable, minimize and mitigate the impacts" of those takings,

16   and (2) could "appreciably reduce the likelihood of the survival and recovery of the species

17   in the wild" in clear violation of § 10 of the ESA.  § 1539(a)(2)(B).

18        D.   The Twelve Percent Measure for Loss of Vernal Pools is Arbitrary

19        Plaintiffs contend that FWS violated the ESA by approving the City's conservation

20   plan that envisioned an additional 12% of habitat loss without analyzing the impact on the

21   survival and recovery of the imperiled species.  "The City's HCP indiscriminately caps

22   destruction of vernal pool habitat at 12% of the total remaining acreage . . . regardless of the

23   quality of the habitat or whether the pool is occupied by the seven vernal pool species."  Pls.'

24   Summ. J. Br. at 34.  This violates § 7 of the ESA because "FWS never analyzed the impact

25   of losing an additional 12% of vernal pool habitat in the Biological Opinion."  *Id.* at 39.

26   Plaintiffs cite the IA which states that "[f]or vernal pools in naturally occurring complexes,

27   and wetlands, impacts will be avoided to the maximum extent practicable both within and

28   outside the [MHPA Preserve]."  AR 26751 (IA §10.8(G)(3)).  Plaintiffs characterize the

- 37 -

98cv2234

1 | "maximum extent practicable" language as a "loophole," which is converted to a firm
2 | percentage in the MSCP documents. The City designed a 171,917 acre Preserve, which was
3 | intended to conserve or "cover," among others, the seven vernal pool species. AR 19335-51.
4 | Table 3-5 of the regional MSCP Plan identifies the level of potential impact or development
5 | for each species. As evaluated by the MSCP, the San Diego and Riverside fairy shrimp were
6 | "covered" because "12% of vernal pool habitat may be impacted, but this habitat is subject to
7 | no net loss function and value and 404(b)1 guidelines." AR 22486-87 (MSCP 1996); *accord*
8 | *id.* at 22467 (San Diego button celery), 22474-75 (*navarretia fossalis*), 22477-80 (14% of
9 | California Orcutt grass, 12% of San Diego mesa mint, and 9% of Otay Mesa mint, may be
10 | impacted) (see correction in Final MSCP at AR 39552 for percentage of Otay Mesa mint).

11 | The Federal Defendants respond that the 12% figure is not a term of the ITP. The ITP
12 | did not authorize take associated with 12%, or any percentage, because FWS anticipated
13 | "virtually zero" impact on the vernal pool species. All take of such species would be
14 | assessed in future § 404 permit proceedings and subject to the "no net loss" policy of the
15 | CWA. They argue that Table 3-5 outlines the anticipated, expected, or potential impacts, not
16 | the authorized level. FWS repeatedly emphasizes that it did not anticipate that the issuance
17 | of the ITP would result in any take of the vernal pool species (with the exception of the few
18 | pools that occurred outside the jurisdictional wetlands of the ACOE, as that definition was
19 | then known to apply to isolated bodies of water).

20 | The Court is persuaded by Plaintiffs' position and concludes the flaw infected both
21 | FWS's § 7 Biological Opinion and its § 10 Findings. The Court has conducted a thorough
22 | and searching review of the AR, and finds that FWS failed to consider this important aspect
23 | of the City's conservation plan. *Motor Vehicle*, 463 U.S. at 43; *Citizens to Preserve*, 401
24 | U.S. at 415-16. FWS's BiOp relies on the future § 404 CWA permits for wetlands, and the
25 | accompanying inter-agency consultation between ACOE and FWS, as a basis for approving
26 | the City's conservation plan as to vernal pools. AR 26203 ¶ 4. In delineating the effects of
27 | the City's plan, FWS noted that "Table 3-5 of the MSCP Plan (Appendix A) summarizes the
28 | level of take anticipated for each Covered Species." AR 26255, 26256 (same as to

1    "wetlands, including vernal pools in naturally occurring complexes"), 26205, 26207-08

2    (describing the anticipated incidental take of the species as governed by Table 3-5 of the

3    MSCP, and the IA protecting vernal pools by requiring the City to avoid impacts to the

4    maximum extent possible).  FWS defined the percentages depending upon the level of

5    information about the population, and noted that "precise quantification" of take was not

6    possible.  AR 26255.  The BiOp analyzed potential impacts to vernal pool species without

7    mentioning Table 3-5, the source of the 12% potential impact.  AR 26284-88.  In the final

8    section of the BiOp, "[t]he Service finds that the proposed action will not appreciably reduce

9    the likelihood of the survival and recovery of . . . San Diego fairy shrimp, or Riverside fairy

10   shrimp, *because no direct effects to these species is anticipated under the plan.*"  AR 26295

11   (emphasis added) (Pls.' Ex. 11 does not include the similar page for the plant species);

12   *accord* AR 26303 ("The Service anticipates no Riverside fairy shrimp [and San Diego fairy

13   shrimp] will be killed or harmed as a result of actions proposed in the City of San Diego's

14   Subarea Plan.").  The inconsistency between the agency's expectation (no impact because

15   future evaluation on specific sites) and the design of the City's plan (allowing from 9% to

16   14% direct impact on vernal pools habitat), including the percentage of vernal pool habitat

17   that would be included in the permanent preserve, warrants an explanation as to whether the

18   vernal pool species can withstand this much loss.  AR 26284 (BiOp states that "any net loss

19   will be significant").

20          The Federal Defendants' contention that the MSCP language merely discusses

21   "potential" impact is belied by the actual and consistent application of the provision to

22   measure the accumulated take by the City's 12% figure.  The application to development

23   projects reveals that Plaintiffs have correctly interpreted the use of the 12% provision in

24   Table 3-5.  Despite the Federal Defendants' position in this litigation to the contrary, the

25   Court finds that FWS is authorizing the take of the vernal pool species under this 12%

26   measure.

27          At this juncture, the Court must address an issue concerning the scope of the AR.

28   Plaintiffs have submitted evidence of four agency actions taken after FWS issued the City's

- 39 -                                                    98cv2234

1    ITP (in July 1997) that use the 12% measure.  AR 30088-101 (Pls.' Ex. 19) (May 1998 BiOp

2    on Cousins); Pls.' Ex. 3 (Feb. 1999 BiOp on Route 125 on Otay Mesa); Pls.' Ex. 5 (July 1999

3    BiOp on Route 56); and Pls.' Ex. 4 (Sept. 1999 BiOp on Brown Field).  The Court hesitated

4    to consider this information because it was created *after* FWS issued the City's ITP.  *Fund*

5    *for Animals v. United States Sportsmen's Alliance Found.*, 391 F. Supp. 2d 191, 196-200 &

6    n.4 (D.D.C. 2005) (to ensure fair judicial review under APA, the court "should have before it

7    neither more nor less information than did the agency when it made its decision") (quotations

8    and citations omitted).  This concern is largely alleviated because *FWS authored* the BiOps.

9    They are based upon the *same data* (*e.g.*, status and threats facing the vernal pool species)

10   and in the same context of implementing the City's ITP; therefore, the four BiOps do not

11   raise the type of problem associated with third-party reports, new scientific data, or recent

12   field information that was not available to the agency at the time it made its decision to issue

13   the ITP.  *Cf. Miccosukee Tribe of Indians of Fla. v. United States*, 396 F. Supp. 2d 1327

14   (S.D. Fla. 2005) (report showed decline of species *after* agency action was excluded because

15   it "was not generated until over a year after the challenged decision").  Instead, the BiOps

16   illustrate the FWS's reasoning on the subject involved in the decision making process of

17   granting the City the ITP with Condition I – whether the taking of vernal pool species and

18   their habitat was truly "incidental" to the development activities, as defined by the ESA.

19        In the final analysis, the Court concludes that it is permissible to consider these four

20   BiOps for illustrative purposes.  They apply the terms of the City's ITP to real projects,

21   thereby serving the purpose of illustrating the complexities of the densely-worded provisions

22   in the MSCP.  *Southwest*, 100 F.3d at 1450; *see Amoco Oil v. EPA*, 501 F.2d 722, 729 n.10

23   (D.C. Cir. 1974) (considering testimony given after agency decision because it bore "directly

24   upon the plausibility of certain predictions made" by the EPA).  The specific applications of

25   the ITP have been very informative on the operation of the MSCP, the mitigation measures

26   for the vernal pools, and FWS's interpretation of its § 7 duty to consult with the ACOE on

27   site-specific projects within the confines of the City's ITP.  The Court is not using the BiOps

28   on specific construction sites to question the *wisdom* of the agency's policy decision, *Fund*

1  *for Animals*, 391 F. Supp. 2d at 196-97 & 199 n.6; *Sierra Club v. Dombeck*, 161 F. Supp. 2d

2  1052, 1062-63 (D.Ariz. 2001); rather, they show the Court *how* FWS implemented its ITP for

3  vernal pools in reliance on the mitigation measures in the MSCP.

4         The specific examples were particularly helpful in this litigation because of the

5  litigation position taken by the Federal Defendants.  Throughout their legal briefs and during

6  oral argument, the Federal Defendants repeatedly assured the Court that the MSCP did not

7  operate as the Plaintiffs contended.  *See Citizens to Preserve*, 401 U.S. at 420 (considering

8  agency's rationalization for its decision, which had been prepared for litigation).  The Court

9  is mindful of its obligation to defer to the agency's expertise.  *Sierra Club v. United States*

10  *EPA*, 346 F.3d 955, 961 (9th Cir. 2003).  When the Court examined the relevant documents,

11  however, the factual basis for the agency's assertions was either absent or masked by

12  convoluted provisions.[18]  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("focal point for judicial

13  review should be the administrative record already in existence" unless the record fails to

14  explain the decision); *cf. National Wildlife v. Babbitt*, 128 F. Supp. 2d at 1289 (expanding

15  AR to determine if agency "swept stubborn problems . . . under the rug") (citations omitted).

16  In order to provide effective judicial review of the agency's action, the Court is required to

17  conduct a "searching and careful" examination to ensure that the connection between the

18  facts and the agency's rationale for its decision.  *Marsh v. Oregon Natural Resources*

19  *Council*, 490 U.S. 360, 378 (1989); *Sierra Club*, 346 F.3d at 961 ("While our deference to

20  the agency is significant, we may not defer to an agency decision that 'is without substantial

21  basis in fact.'").

22         Turning to the examples of how FWS has applied the 12% cap, Plaintiffs first point to

23  the Cousins project in Mira Mesa.  That large commercial development project destroyed all

24  64 vernal pools of the complex on the site, where San Diego fairy shrimp had been observed.

25  _____

26      [18]Another reason to consider these BiOps is that they show that FWS failed to consider the factor of the 12% loss when it issued its Findings, BiOp, and the ITP.  The Federal

27  Defendants have clouded the issue by engaging in circular reasoning:  FWS did not anticipate any take so it did not need to evaluate the City's application for a 12% impact, but FWS will

28  not undertake that evaluation in future specific projects because FWS accepts that measure as the touchstone.  These BiOps show the actual effect of the ITP and illustrate the omission that Plaintiffs raise.

98cv2234

1  AR 30094-95, 30133.  In exchange, the developer agreed to mitigate this loss of 0.2 acres by

2  purchasing and preserving other vernal pool sites.  AR 30089-92 (identifying sites at Mesa

3  Norte, with 23 vernal pools, and Gleitch Parcel).  When FWS described the proposed

4  development, it used the 12% figure in the MSCP as a measure:

5          For vernal pool species, Table 3-5 states that 88% of the vernal pool habitat
        will be conserved.  To be consistent with the [MSCP] Plan, only 12% of the
6        remaining habitat can be impacted. . . .  If there is no avoidance of vernal pools
        on the project site, then this acreage will be subtracted from the projected 12%
7        loss of habitat.

8  AR 30095.

9          This was not a one time incident.  FWS used similar language in the BiOps approving

10  State Routes 56 and 125, and the Commerce Center at Brown Field and included a running

11  tally of the acres that had been impacted between 1997 and 1999.  Pls.' Ex. 4 at 11, 14 &

12  Table 1 (Sept. 1999 BiOp); Pls.' Ex. 5 at 8 (July 1999 BiOp); Pls.' Ex. 3 at 8-9 (Feb. 1999

13  BiOp of Route 125).  With regard to the State Route 56 project in the Del Mar Mesa region,

14  FWS issued a BiOp approving the ACOE's proposed CWA § 404 permit.  The project would

15  fill eleven vernal pools, and would impact two additional pools.  "San Diego fairy shrimp

16  were detected in 9 of these pools."  Pls.' Ex. 5 at 5.  FWS concluded that the destruction was

17  permitted by relying on Table 3-5 of the City's MSCP, which is the source of the 12%

18  measure:

19          For vernal pool species, Table 3-5 state that 88% of the vernal pool habitat will
        be conserved.  To be consistent with the plan, only 12% of the remaining
20        habitat can be impacted. . . . *This acreage will be subtracted from the
        projected 12% loss of habitat.*
21

22  *Id.* at 6 (emphasis added).  Two months later, the agency repeated that analysis in a BiOp

23  approving the Federal Aviation Administration's plan to expand Brown Field, a small airport

24  in Otay Mesa.  Pls.' Ex. 4.  The project would destroy ten of eleven pools on the site.  *Id.* at

25  8.  FWS measured the pools by their basin area (.06 acres), and added the surface area within

26  the basin that supported both fairy shrimp (2.55 acres).  *Id.*  The remaining pool, which

27  supported the San Diego button celery would be preserved on-site with stakes and

28  monitoring, as well as its nearby watershed.  *Id.* at 2.  FWS included the identical language,

1  quoted above, to conclude that the impact on the endangered species would be "subtracted

2  from the projected 12% loss of habitat." *Id.* at 5.  This BiOp also contains a historical chart

3  of the accumulated takes of vernal pool species in the months since the City obtained its ITP.

4  *Id.*  It lists both the Cousins and Route 56 projects just discussed, the Route 125 example, as

5  well as two other projects at Robinhood Ridge and New Century Center.  *Id.*  Using the

6  "vernal pool basin area" measurement, FWS found that .867 acres of vernal pools had been

7  lost since the implementation of the MSCP. *Id.*

8      Each of these BiOps is silent about how that calculation will be used to determine

9  when the City's 12% cap will be reached.  Thus, these projects confirm the Plaintiffs'

10 assertion that FWS is allowing continued destruction of vernal pool habitat consistent with

11 the City's unilateral selection that a 12% "impact" is permitted.[19]

12     The Builder Developers join the Federal Defendants' and argue that the 12% measure

13 is not as it appears.  The Builder Intervenors stress that the MSCP requires developers to

14 comply with the "no net loss" policy that was borrowed from the CWA § 404 permit process.

15 This argument misses the point.  FWS did not anticipate take of vernal pools within the

16 jurisdictional waters of the United States (that is, as regulated by the ACOE at the time FWS

17 issued the permit to the City), therefore, it did not evaluate the impact of any take of the

18 vernal pool species when it issued its BiOp on the City's ITP.  Whether the 12% measure is

19 an unintended consequence or an undetected structural flaw in the City's HCP, it has not

20 been evaluated by the agency entrusted with the conservation of listed species.  FWS did not

21 consider a 12% loss of habitat, whether or not that impact would be compensated by the "no

22 net loss" policy of the CWA.  Thus, it does not help that the City's MSCP and Subarea Plans

23 incorporates the "no net loss" policy.  The lack of scrutiny by the agency is fatal.  §

24 1536(a)(1) (duty of Secretary to review programs and use authority to conserve species), §

25 1536(a)(2) (duty of Secretary to use best scientific data to insure actions do not jeopardize

26 

27     [19]In three of its BiOps, FWS concluded there would be no impact on critical habitat *because* no critical habitat designation had been made for these species.  Pls.' Ex. 19 at 6 (Cousins); Pls.' Ex. 4 at 10 (Brown Field); Pls.' Ex. 5 at 6 (Route 56).  An expedient but

28 unfortunate effect of the backlog and delay in implementing the ESA substantive protections for listed species. *See supra* n.13.

1   the continued existence of the species and the integrity of their habitat), § 1539 (duty of

2   Secretary regarding issuance of ITPs).

3       Moreover, as mentioned above, this argument fails because the "no net loss" standard

4   is an inadequate substitute to conserve the vernal pool species.[20] The "no net loss" standard

5   requires the developer to "avoid" impacts "where reasonably possible." *City of Ridgeland v.*

6   *National Park Serv.*, 253 F. Supp. 2d 888, 905-06 (S.D. Miss. 2002); *Coeur D'Alene Lake v.*

7   *Kiebert*, 790 F. Supp. 998, 1009 (D. Idaho 1992) ("no net loss" policy is "simply a statement

8   of goals for the agencies to strive for in the interpretation and administration of the CWA and

9   the administrative guidelines under Section 404"); *Robbins v. United States*, 40 Fed. Cl. 381,

10  388 (1998). The reasonableness standard of take is incompatible with the ESA command to

11  conserve the species, "to halt and reverse the trend toward species extinction," and to strike

12  the balance in favor of protecting the listed species. *Tennessee Valley*, 437 U.S. at 184, 194.

13  The Builder Intervenors' interpretation would, in effect, substitute a lenient CWA standard

14  for the strict ESA standard. These statutes are not interchangeable when listed species are

15  concerned. FWS has repeatedly noted that the CWA has not effectively prevented or limited

16  damage to vernal pools. In 1993, FWS stated that "Section 404 of the CWA has not

17  historically provided adequate protection to [Riverside fairy shrimp and three plants] from

18  grading or fill activities for most pools." 58 Fed. Reg. at 41388. FWS identified one

19  problem as ACOE's inability to regulate significant threats to the vernal pools, such as

20  "grazing, off-road activity, and seeding with non-native species." *Id.* Moreover, ACOE was

21

22          [20]Under the "no net loss" guidelines, the ACOE would require sequencing analysis to
23  attempt to achieve a consistent type and extent of mitigation in § 404 CWA permits. 55 Fed.
    Reg. 5510 (1990); *see generally Moore v. United States*, 943 F. Supp. 603, 605-06 (E.D. Va
24  1996). "[I]t established a sequencing scheme of addressing wetland impacts, requiring first,
    that the § 404 permit applicant avoid wetlands impacts, where reasonably possible; that it
25  minimize impacts where unavoidable; and lastly, that it compensate for any loss of wetlands
    by creating or replacing at least as many acres of wetlands as would be impacted by the
26  development project in order to prevent any net loss of wetlands." *Ridgeland*, 253 F. Supp.
    2d at 905-06. The "no net loss" policy provides compensation criteria for unavoidable
27  impacts. It prefers on-site mitigation over off-site mitigation; but if off-site mitigation is not
    practical, then mitigation should occur within the same watershed. *Id.* Next, in-kind
28  compensatory mitigation is preferred over out-of-kind mitigation; and finally, wetlands
    restoration, which has a greater likelihood of success, is preferred over man-made wetlands.
    *Id.*

1    not regulating "activities within the watershed (*i.e.*, adjacent upland) of vernal pools;" yet

2    "[t]he watershed is an essential component of the vernal pool eceosystem." *Id.* at 41389.

3    The vernal pool species have highly specialized requirements for hydrology and soil

4    conditions.  For example, "[h]igh livestock densities may result in excessive physical

5    disturbances, such as trampling, and changes in pool water chemistry and water quality" that

6    negatively impact the San Diego fairy shrimp.  62 Fed. Reg. at 4930.  The area around the

7    individual pools is so sensitive that even "[t]rampling of pool margins and thinning

8    vegetation from overgrazing may increase pasture runoff, leading to erosion and increased

9    siltation of vernal pool habitat." *Id.*  In February 1997, during the time that FWS was

10   reviewing the MSCP, FWS noted that the San Diego fairy shrimp continued to sustain

11   substantial habitat losses under existing CWA's § 404 permits and "no net loss" policy, state

12   laws such as California's Natural Community Conservation Planning Act, and local

13   regulatory measures.  62 Fed. Reg. at 4935-36 & 4931-32 (in the three years between 1993

14   and 1996, FWS identified 15 unauthorized projects in San Diego that destroyed or damaged

15   40 vernal pools); *id.* at 4932-34 (surveying the current and planned construction and

16   development projects that would further destroy, damage, or fragment the vernal pool habitat

17   in San Diego).  That February 1997 listing decision expressed concern that the City's MSCP

18   planned to protect "[o]nly a portion of the extant vernal pools" and that serious threats to the

19   species continuing viability remained. *Id.* at 4937.  In making the decision to list the

20   spreading navarretia in October of 1998, three months after the City obtained its ITP, FWS

21   stated that the involvement of the ACOE "does not ensure their protection."  63 Fed. Reg. at

22   54987 ("At least two vernal pool complexes that represented suitable habitat for *Navarretia*

23   *fossalis* that were under ACOE jurisdiction in San Diego county have been destroyed or

24   degraded without a section 404 permit.").

25        The inadequacy is vividly illustrated by the four site-specific projects, just discussed,

26   where FWS approved destruction of vernal pool habitat using the CWA standard to measure

27   the mitigation. *E.g.*, Pls. Ex. 4 at 4-5 (FWS notes "the mitigation is not always

28   implemented"), 9 (noting ACOE had not yet required mitigation that had been ordered four

1 years earlier on Montgomery Field and the species had died).  The "no net loss" standard

2 allows unavoidable impacts to be compensated by "creating or replacing" the acreage "in

3 order to prevent any net loss of wetlands." *Ridgeland*, 253 F. Supp. 2d at 905-06.  As

4 applied to the vernal pool species, the AR shows without dispute that the "creation" of off-

5 site vernal pools is ineffective and unacceptable mitigation.  62 Fed. Reg. at 4931 (relocation

6 of soil is not viable; attempts to collect and move eggs have failed to show long-term

7 viability; and re-introducing species into other pools risks hybridization); AR 24435 (because

8 creation of vernal pool habitat is not successful, "the wildlife agencies do not accept creation

9 as mitigation for vernal pool impacts"); AR 32472 (FWS concludes that efforts to "create"

10 vernal pools by transporting the soil are unsuccessful, unscientific, and unmonitored, and

11 transplanting species had not been tested or proven successful).  Efforts to transplant the

12 cysts of fairy shrimp have only been experimental, is extremely risky given the susceptibility

13 to damage by crushing or keeping inadequate temperature controls requirements of the eggs,

14 and have not been monitored for long term success.  62 Fed. Reg. at 4931.  And attempts to

15 restore fairy shrimp habitat may damage or destroy them. *Id.*  Yet, in each of the projects

16 discussed above, FWS found "no jeopardy" because the impact to the vernal pools on those

17 sites would be mitigated as defined by the CWA's "no net loss" standard.[21]  The 12%

18 measurement problem is thereby compounded by the type and extent of mitigation that has

19 been accepted by FWS on particular development sites.

20         Another significant problem with the use of the percentage measurement is that the

21 base is undefined.  The record contains a variety of measurements of vernal pool acreage (for

22

23     [21]The Cousins development relied upon creation, and required preservation of 23 vernal pools (7,710 square feet) in Mesa Norte and an unspecified number of pools (8,900

24 square feet) in Gleitch Parcel (which supported a small population of San Diego mesa mint and a large population of San Diego button celery).  AR 30089-90 (Pls.' Ex. 26 at 2), 30615.

25 These two off-site parcels provided mitigation for the .2 acres of vernal pool basin lost.  AR 30094, 30098.  The Route 56 project would preserve and restore .09 acres of vernal pool

26 basin area to mitigate the .04 acre loss, Pls.' Ex. 5 at 7, and the Brown Field project would preserve and restore .12 acres of existing vernal pool basin area within the planned

27 permanent reserve, to mitigate the .06 acre loss.  Pls.' Ex. 4 at 9.  Other mitigation included relocation of fairy shrimp. *Id.* at 2-3 (¶¶ 4, 7).  Similarly, the Route 125 project contemplated

28 mitigation of .35 acres of habitat, in exchange for "preservation, enhancement, and restoration of existing vernal pool habitat" in Otay Mesa, calculated as .70 acres of vernal pool surface area.  Pls.' Ex. 3 at 9-10, 12, 18-19.

- 46 -

98cv2234

1    example if the watershed and upland acres are included) and the chosen definition

2    significantly affects the calculation of the remaining habitat. *Compare* AR 32464 (in 1995

3    Carlsbad Field Office estimates "898 acres of original vernal pool habitat in San Diego is

4    extant") *with* AR 23340-41 (in 1996 FWS used figures of 3,254 total acres in region, then

5    excluded 2,071 acres on military land, to find 1,183 acres of vernal pool habitat within City's

6    MSCP); *compare* AR 32464 (1986 FWS field study estimates 1,796 acres) *with* AR 31905-

7    06 (Pls.' Ex. 22) (1986 Bauder reports 2,068 *watershed* acres); *see also* AR 16648-51

8    (Builder's Tab 23 calculates percentages including military lands), 32880-94 (Fed. Defs' Ex.

9    P noting difficulty of quantifying historical losses).  The record is devoid of any indication of

10   how the City or FWS would determine when this 12% bar had been reached.  Is the 12% to

11   be measured from the estimate of vernal pool habitat thought to be in existence in 1995, or

12   will it be adjusted as recent surveys document that suitable habitat actually remains in the

13   region as direct and indirect impacts (and possibly natural events) continue to degrade vernal

14   pools?  FWS is tallying the accrued loss of vernal pools without adjusting for the overall,

15   current status of the species.

16          Yet another critical flaw of a fixed percentage is that it does not allow for an

17   assessment of the quality of the habitat (for example, is it in pristine or degraded condition; is

18   it isolated or part of a larger, connected complex of pools; what are the edge effects of the

19   particular site that will affect the viability of the pools).  Nor does it take into account the

20   critical inquiry of whether the pools at issue are *occupied* by fairy shrimp.  *See* 62 Fed. Reg.

21   at 4929 (upon review of all data, FWS estimates San Diego fairy shrimp "inhabits a

22   minimum of 25 vernal pool complexes" from Santa Barbara to Baja, and clarifying that "less

23   than 81 ha (200 ac) of habitat remain that *support* the species") (emphasis added), 4932-34

24   (inventory of locations that contain *suitable* habitat).  The lack of a qualitative measure

25   frustrates the purposes of the ESA to provide both "a means whereby the ecosystems upon

26   which endangered species and threatened species may be conserved" and "a program for the

27   conservation of such endangered species and threatened species."  § 1531(b).  This flaw is

28   amplified for the vernal pool species because it is important to consider whether particular

1   pools are or are likely to become isolated, hybridized, or damaged by edge effects. For that

2   reason, FWS has found that the best measure is by "pool complexes." 62 Fed. Reg. at 4926;

3   *accord* AR 7969-70 (Ogden biological report sets standard as requiring "within dedicated

4   managed preserve a minimum of 98% of the acreage of extant vernal pool habitat," and

5   concluding that the 2% impact should exclude "large or high value" complexes, which he

6   then identifies). Given the strict, specialized environmental requirements of the vernal pool

7   species (including the depth of pool, water temperature, and soil acidity) and its exceptional

8   sensitivity to harm (including watershed issues such as drainage and pollution, edge effects

9   of neighboring land uses, and trampling), the Court concludes that allowing the City to

10  develop in compliance to the 12% measure is flawed because it is a free floating measure that

11  is not anchored to a baseline or governed by any consistent measurement.

12      What is clear is that when calculating the mitigation that will be required in exchange

13  for the destruction of vernal pool habitat the smallest measure – the square footage of the

14  surface area of the pool – is used. In the Cousin's Market Center project in Mira Mesa, for

15  example, FWS allowed the take of all 64 vernal pools on the site.[22] This was one of the two

16  largest areas of vernal pool habitat. *See* AR 30092, 32882 (Figure 1). FWS measured the

17  required mitigation as .2 acres, that is, 8,500 *square feet* of vernal pool *surface area*. This is

18  not a fair trade, and such a parsimonious measure will not "halt and reverse the trend toward

19  species extinction." *Tennessee Valley*, 437 U.S. at 175.

20      Finally, Plaintiffs correctly observe that the 12% measure contradicts the available

21  scientific data relied upon by FWS. The use of internally contradictory reasoning indicates

22

23      [22]Initially, this lawsuit challenged the destruction of the vernal pools on the Cousin's
    Market Center construction project and sought injunctive relief. Plaintiffs' First Amended
24  Complaint ¶ 118-143; *see also* Second Amended Complaint ¶ 57-65 (Cousins and Torrey
    Surf developments). Plaintiffs immediately sought a temporary restraining order to prevent
25  the destruction of *occupied* vernal pools on that site. [Doc. Nos. 5-8]. The district judge
    presiding over the suit at that time denied the injunction because *"the harm has already
26  occurred"* as Cousins had collected the species and relocated them to a new site. Order
    Denying Plaintiffs' Ex Parte Application for Temporary Restraining Order at 4 [Doc. No. 9].
27  Thus, the Cousins project has been at issue in this lawsuit from the outset, the parties have
    provided the relevant portions of the Administrative Record on this project, and it is proper
28  for the Court to consider these facts. *See* Fed. Defs.' Tab E (AR 30088); Notice of Filing
    Index & Zoutendyk Decl. [Doc. Nos. 25-26].

1    arbitrary action. *Defenders of Wildlife*, 420 F.3d at 959. Ogden, whose studies were relied

2    upon in the listing decisions, studied the design of a San Diego preserve and suggested that a

3    viable standard might permit a 2% impact on vernal pool species. AR 7969-70 (Pls.' Ex. 17).

4    Even that 2% figure was not a fixed measure, for example, given the precarious position of

5    the Riverside fairy shrimp and four of the vernal pool plant species, the report stated that

6    100% of these populations should be preserved. *Id.* at 8029 (prostrate navarettia), 8033

7    (California orcutt grass), 8035-37 (San Diego mesa mint and Otay Mesa mint), 8047

8    (Riverside fairy shrimp). In its February 1997 listing decision, during the time that FWS was

9    evaluating the City's application, FWS concluded that "the continued survival and recovery

10   of the San Diego fairy shrimp can only be assured at this time by the preservation and

11   enhancement of extant vernal pools and their associated watersheds." 62 Fed. Reg. at 4931;

12   *accord* Pls.' Ex. 2 at 11 (in a 1995 BiOp authorizing destruction of 162 vernal pools in Otay

13   Mesa, FWS concluded that "[i]n the future, it is unlikely that mitigation measures could be

14   developed to offset any additional losses to this habitat type. Avoidance will likely be the

15   only acceptable strategy in planning projects within vernal pool habitat"). The 12% figure is

16   also inconsistent with the FWS's *Vernal Pool Recovery Plan*.[23] AR 32610-765 (Fed. Defs.'

17   Ex. M). FWS concluded that the vernal pool species might be reclassified from endangered

18   to threatened status if the *existing populations* were stabilized and protected. *Id.* at 32616

19   *passim*. In particular, the "Riverside fairy shrimp and their associated watersheds should be

20   secured from further loss and degradation in a configuration that maintains habitat function

21   and species viability." *Id.* at 32616-17. There must be a "rational connection between the

22   facts found and the choice made," and here, a 12% across-the-board destruction  runs counter

23

24          [23]FWS was preparing this recovery plan at the same time FWS was evaluating the
     City's ITP and it was based upon the same scientific data of the needs and status of the
25   species. The vernal pool recovery plan states the obvious conclusions from the existing
     evidence compiled and in the agency's possession at the time it issued the ITP to the City of
26   San Diego. Federal Defendants admit that FWS was preparing the *Vernal Pool Recovery
     Plan* during 1997, Answer to TAC ¶ 92, thus, the agency would have had the information of
27   its own experts during the time that it evaluated the City's application for an ITP. Federal
     Defendants also argue that the information in the *Vernal Pool Recovery Plan* is not "new"
28   information because FWS compiled it from "existing information." Fed. Defs.' Cross Mot.
     Summ. J. Br. at 19 n.12.

98cv2234

1    to the evidence of the species' survival and recovery in light of its vulnerabilities of the

2    remaining vernal pool species in Southern California. *Baltimore*, 462 U.S. at 105.

3         In sum, the agency's BiOps demonstrate that FWS itself is using the 12% figure as a

4    measure of permissible loss. Yet, FWS confirmed that it did not evaluate the impact of

5    future development activities in accordance with the City's HCP documents *because* it

6    anticipated virtually no take of the vernal pools. FWS's proposed explanation runs counter

7    to the evidence before the agency, as well as being inconsistent with the agency's prior

8    position on the needs of these imperiled, and extremely particular, vernal pool species.

9    *Motor Vehicle*, 463 U.S. at 43; *Citizens to Preserve*, 401 U.S. at 415-16; *Defenders of*

10   *Wildlife*, 420 F.3d at 959.

11        E. <u>Adequate Funding</u>

12        Plaintiffs argue that FWS's conclusion that the City's HCP identified adequate

13   funding to implement and monitor the program is not supported by the facts. TAC ¶ 65, 67;

14   *see Center for Biological Diversity v. Norton*, 254 F.3d 833, 839 (9th Cir. 2001). Section 10

15   of the ESA requires FWS to find that the applicant "will ensure that funding for the plan will

16   be provided." § 1539(a)(2)(B)(iii); *e.g., National Wildlife v. Norton*, 306 F. Supp. 2d at 926-

17   27. The applicant cannot rely on speculative future actions of others. *National Wildlife v.*

18   *Babbitt*, 128 F. Supp. 2d at 1294-95; *Sierra Club v. Babbitt*, 15 F. Supp. 2d at 1280-82.

19        The City will bear two main categories of expenses. First, the money to acquire the

20   land that it must contribute to the Preserve, and second, the funds required to administer the

21   MSCP and Subarea Plan for the life of the ITP. *See generally* AR 19433-56, 24669, 24677-

22   87, 25040, 25046-47, 25114-17, 26837-43. For the land purchase, the City estimated that it

23   would need to acquire 2,400 acres from willing sellers at fair market costs. AR 19445-51,

24   19725, 19378-79. The land acquisitions must be completed within thirty years (except that

25   certain parcels slated for imminent development must be acquired immediately). AR 19444,

26   25116-17, 39654. It is important to acquire open space promptly, so as to insure the Preserve

27   "will be established before essential resources disappear." AR 24147. The purchase of

28   2,400 acres would be expensive. AR 19446 (using conservative estimate of $9,700 to

- 50 -

1   $13,300 per acre, City's share would cost between $40 and $70 million); AR 26840 (using

2   conservative estimate of $27,000 per acre, the City would need $62 million dollars); *see* AR

3   5363-64 (financial projections are "overly optimistic"). With the exception of 1,400 acres,

4   however, the City will acquire 1,000 acres for the MHPA Preserve through mitigation from

5   developers who impact land outside the Preserve through open-space easements and land-use

6   regulations. AR 39598 (MSCP Table 4-3); AR 24956 (Subarea Plan § 1.7); AR 26572 (IA §

7   11.1). In addition, the City would require continuous funding to manage the Preserve,

8   conduct biological monitoring and maintenance, and to cover administration costs. AR

9   19447-51.

10          The Court concludes that FWS arbitrarily concluded that the City ensured adequate

11   funding for the plans will be provided because the City identified undependable and

12   speculative sources for the necessary funds. § 1539(a)(2)(B)(iii). Although FWS has recited

13   the statutory language in its findings, "merely referencing a requirement is not the same as

14   complying with the requirement." *Gerber v. Norton*, 249 F.3d 173, 185 (D.C. Cir. 2002)

15   (citation, quotations, and alterations omitted). The record does not demonstrate a rational

16   connection between the facts – the City's shaky pledge to make an effort to find funding –

17   and FWS's conclusion that the ESA funding requirement had been satisfied.

18          Plaintiffs emphasize that the City expressly refused to guarantee funding with a

19   clearly identified source of revenue. AR 31070 (City promised to use its "best efforts to

20   implement the financing and land acquisition components"; however, City cannot "guarantee

21   that funds for the purchase of lands in the Preserve System will be available beyond those

22   obtained through the mitigation process."). While an applicant need not acquire all the land

23   nor set aside a trust account of ready cash *before* obtaining an ITP, the City's reluctance to

24   confirm that it would fund the long-term conservation plan raises a red flag. *Cf. Southwest*

25   *Ctr. for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 523-24

26   (9th Cir. 1998); *National Wildlife v. Norton*, 306 F. Supp. 2d at 922-23 (funding plan

27   included detailed, mandatory measures with adjustments allowed for increased costs and a

28   mid-point review).

98cv2234

1    Rather than create a concrete budget, the City relied on future actions, such as a
2    regional plan with other jurisdictions, a possilbe bond issue requiring voter approval, or
3    raising the sales tax. AR 19454; AR 25117 (Funding Committee Report); AR 26573 (IA §
4    11.2(C)(1)). The uncertainty of these ideas is readily apparent. *E.g.,* AR 12543 (County
5    Supervisor stated "MSCP may need to be scaled back to a level where adequate funding can
6    be assured"); AR 21788 ("the certainty of the City's funding contributions must be
7    significantly strengthened" in the IA); AR 21805 ("the MSCP merely provides that the
8    participating local jurisdiction applicants will attempt to raise the vast majority of their
9    funding component via future action by the electorate. Of course, local jurisdictions have no
10   control over the electorate."); AR 25031 ("One need only look at recent problems the City
11   has faced on infrastructure financing to see why a carefully delineated plan is necessary," and
12   noting that land prices continue to rise). The Court finds that the applicant has simply relied
13   on speculative future actions by unnamed parties, namely, the voters, for the majority of
14   money needed to implement the conservation plan. Yet FWS did not express any concern
15   over the City's unlikely funding plan. *Sierra Club v. Babbitt*, 15 F. Supp. 2d at 1281-82.
16   The City's reliance on the participation of the other jurisdictions within the region is
17   extremely unreliable. *National Wildlife v. Babbitt*, 128 F. Supp. 2d at 1295.

18       If the City's public funding efforts failed, it could not ask the developers to make up
19   the difference. AR 19720 ("No additional fees will be charged to landowners for biological
20   monitoring."); AR 19725 ("City will not increase private development contributions").
21   Consequently, Plaintiffs accurately characterize the language as vague, non-committal, and
22   referring to hopes and promises. *E.g.,* AR 19725-27 (MSCP states City "has been exploring
23   methods" to finance acquisition and maintenance costs, "is seeking short term financing,"
24   "agrees to participate in pursuing regional sources of funding," has identified strategies it
25   "intend[s] to pursue," and "will begin a process to procure funding" on a time table); AR
26   25119 (City "should be encouraged to identify as soon as possible the specific revenue
27   sources" for short-term financing); AR 26574 (IA § 11.2(D) (if regional funding is
28   inadequate, City "will meet and confer to cooperatively develop a strategy to address the

98cv2234

1   funding shortfall."); AR 31070 ("Local jurisdictions shall use their best efforts").  Despite

2   the City's evasion, FWS did not discuss whether the City would be likely to pay for its

3   responsibilities.  *Cf. Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987) (in context of

4   mitigation, reliance on promises by others to act in the future is not adequate).

5          Based upon its review of the record, the Court concludes that FWS could not

6   rationally conclude that the City will ensure adequate funding as the ESA requires.  The plan

7   is similar to that in *National Wildlife v. Babbitt*, 128 F. Supp. 2d at 1294-95, where the

8   district court disapproved the § 10 findings because "of the City's explicit refusal to 'ensure'

9   funding" for the mitigation, "the adequacy of funding depends on whether third parties

10  decide to participate," and "no entity will be responsible for making up the funding

11  shortfall."

12         F.  Injunction

13         Having taken into account that the ACOE will no longer exercise jurisdiction over the

14  isolated vernal pools, thereby eliminating that anticipated avenue of future review on specific

15  sites; and that the Assurances freeze the potential remedial actions to unproven and

16  ineffective measures, as well as the lack of record support for the findings that the City will

17  fund the conservation plan, that "unnatural" vernal pools need less protection, and the

18  ramifications of the 12% measure of loss, the Court grants Plaintiffs' request for an

19  injunction.  *See Forest Conservation*, 50 F.3d 791 (courts can enjoin future or imminent

20  injury to wildlife).

21         The Court immediately enjoins Defendants from further executing pending site-

22  specific projects under the ITP affecting the seven vernal pool species.  The injunction

23  applies to three categories of activity.  First, the Court enjoins any and all *pending*

24  applications for development of land containing vernal pool habitat.  Second, the Court

25  enjoins those projects where the City has granted permission, but the development has not yet

26  physically begun to destroy vernal pool habitat.  Third, the Court enjoins further development

27  where the permittee is presently engaged in the destruction of vernal pool habitat.

28         The Court orders Defendant City of San Diego to serve a copy of this Order forthwith

98cv2234

1   on all applications affected by the injunction.

2          In view of the definitively irreparable injury that has already been sustained by at least

3   the two animal species, if not all seven vernal pool species involved in this lawsuit, this

4   Court will not stay this injunction.

5          G.  Independent Evaluation of "Biologically Preferred Scenario"

6          One of the § 10 prerequisites to an ITP is that the proposed HCP minimize the harm to

7   the species "to the maximum extent practicable." § 1539(a)(2)(B)(ii).  The ESA requires the

8   applicant to disclose the range of actions considered as alternatives to the plan finally

9   proposed and to explain why it rejected those alternatives.  § 1539(a)(2)(A)(iii).  FWS must

10  make an independent determination of practicability and make a finding that the impacts of

11  the taking will be minimized and mitigated "to the maximum extent practicable."  §

12  1539(a)(2)(B)(ii); *Gerber*, 249 F.3d at 184.  Though the applicant decides the content of its

13  HCP, FWS must determine whether the HCP satisfies the statutory standard.  *Gerber*, 249

14  F.3d at 184; *Jantzen*, 760 F.2d at 982 (FWS "must scrutinize the plan"); *National Wildlife v.*

15  *Babbitt*, 128 F. Supp. 2d at 1292 ("the most reasonable reading of the statutory phrase

16  'maximum extent practicable' nonetheless requires the Service to consider an alternative

17  involving greater mitigation").  If FWS finds that the HCP fails to mitigate and minimize

18  harm to the species "to the maximum extent practicable" – because the applicant rejected

19  another alternative that would have provided more mitigation or caused less harm to the

20  endangered species <u>and</u> FWS determined in its expert judgment that the rejected alternative

21  was in fact feasible –  then FWS cannot approve the application for an ITP using that less

22  protective proposal.

23         Plaintiffs argue this case is like *Gerber*, 294 F.3d at 177-78, where the D.C. Circuit

24  held that FWS erred when it simply relied on the developer's views without making

25  independent findings.  "[T]he agency's decisional documents do not contain any *analysis*

26  whatsoever as to whether implementation of the Reduced Impact Alternative would actually

27  result in additional costs and delay, or whether the magnitude of such costs or delay would

28  render the alternative impracticable."  *Id.* at 185.

- 54 -

1    Here, the City identified and then rejected four alternatives to its final choice – the

2    MHPA Preserve that would be assembled and managed as described in the City's HCP. AR

3    18525, 18640. Plaintiffs focus on the "Biologically Preferred Scenario." Overall, "[t]his

4    alternative would attempt to preserve those lands with the *highest conservation value* in the

5    [582,243-acre] planning area, including multiple habitats and habitat linkages. This

6    alternative is *based heavily on biological criteria* rather than other land use issues that

7    determine the feasibility of preservation." 60 Fed. Reg. 12246, 12247 (emphasis added).

8    Plaintiffs contend that FWS did not analyze the practicability of this alternative even though

9    it was more beneficial to the protected species than the chosen MHPA Preserve. Plaintiffs

10   favor the Biologically Preferred Scenario because it (1) had a larger permanent preserve; (2)

11   included property that supported a greater bio-diversity among the protected species, AR

12   9678, 9688 (Pls.' Ex. 20); (3) contained larger blocks of core habitat areas, AR 9678; (4)

13   provided corridor links to all public lands; and (5) had larger buffers from activities outside

14   the preserve, AR 18648-49; AR 9688 (Table 9); AR 5610-15. Plaintiffs argue FWS violated

15   its statutory duty by ignoring these benefits and failing to evaluate whether the Biologically

16   Preferred Scenario was impracticable. *National Wildlife v. Babbitt*, 128 F. Supp. 2d at 1291-

17   92 ("the record should provide some basis for concluding, not just that the chosen [plan of

18   mitigation and preservation] are practicable, but that [the alternative plan] would be

19   impracticable").

20   At first glance, it appeared to the Court that the Plaintiffs had identified a serious

21   weakness. In its Record of Decision, FWS simply stated its concurrence with the City's

22   economic analysis, but did not evaluate it. AR 26943; *Gerber*, 294 F.3d at 185 ("'[s]tating

23   that a factor was considered' – or found – 'is not the same as complying with that

24   requirement'"); *see also Sierra Club v. Babbitt*, 15 F. Supp. 2d at 1281 (issuance of ITP was

25   arbitrary given "lack of any analysis in the Administrative Record" and failure "to provide

26   the necessary analysis" on a statutory factor). FWS stated that the selection of the MHPA

27   Alternative was "larger" than the other alternatives, and would be "managed." AR 26942-

28   43. Plaintiffs challenged the accuracy of the first statement, and the second factor, ongoing

- 55 -

1  management, was also included in the Biologically Preferred Alternative. Thus, it appeared
2  that FWS had blindly adopted the City's economic rationale as determinative.

3       After examining the record, however, the Court finds sufficient evidence in the AR
4  that FWS independently considered and evaluated the more protective alternative. In its
5  Findings, FWS stated that the City rejected the Biologically Preferred Alternative because it
6  was more costly than the proposed plan.[24] AR 26915 (noting City conducted an analysis
7  using population, housing, personal income, and retail sales factors). Cost is a legitimate
8  factor to evaluate alternatives. *Bennett*, 520 U.S. at 176-77.

9       In the Record of Decision, FWS gave another reason for approving the City's
10  decision. FWS eliminated the Biologically Preferred Alternative because "it assumes a
11  smaller preserve system than the one finally negotiated under the MSCP planning process."
12  AR 26943. The Court concludes that FWS properly characterized the MHPA Preserve as
13  being "larger" than the Biologically Preferred Scenario. During oral argument, the Plaintiffs
14  and Federal Defendants disputed the comparative size of the proposed preserves and both
15  parties characterized the other's alternative as being "smaller." *E.g.*, Pls.' Br. at 31 (citing
16  224,089 acres of preserve). The record is confusing because the configuration of the
17  proposed preserves changed over the planning process and because a variety of comparisons
18  were used. *E.g.* AR 9678 & 18641 (using "planning area" as percentage of the MSCP "study
19  area"); *compare* AR 18593 (Table 2-1) *with* AR 18648 (Table 2-6) (listing percentages of
20  vegetation communities within total MSCP area). Ultimately, the AR establishes that the
21  City configured its MHPA Preserve to encompass 171,917 acres of vacant land.[25] AR 39504

22

23       [24]The parties did not submit the portions of the AR in which the City explained its
    reasons for rejecting these alternatives. *Cf.* Builder Intervenors' Ex. 24 (omits analysis
24  section). The Federal Defendants' cited AR 39656-57 as support for its assertion that the
    City compared the costs of the alternatives, Cross Mot. Summ. J. Br. at 28; however, this
25  page of the Final MSCP does not discuss the alternative options for designing the preserve.

26       [25]The City selected the property that would become a part of the preserve on three
    factors: biological, land use, and economic. AR 18589, The City looked specifically at the
27  vegetation represented in that area (*e.g.*, whether the land supported a "core biological
    resource," which was defined as an area that supported a high concentration of sensitive or
28  rare species, like the vernal pools), and looked generally to the overall configuration of the
                                                                              (continued...)

1   (MSCP § 3.0); AR 18590 (Aug. 1996 Draft EIR).  Of that total acreage, protected vegetation

2   and habitat were present on 167,667 acres.  The remaining 4,250 acres did not necessarily

3   support a protected species or have an independent biological benefit, but this land

4   contributed to the overall design of the preserve, for example, by providing connecting

5   linkages between sections of the preserve.  By contrast, the Biologically Preferred Scenario

6   would create a permanent preserve of 167,000 acres, or 667 acres less than the MHPA

7   Preserve. *Id.* at 18641 (Table 2-4) & 18645 (Aug. 1996 Draft EIS); *but see* AR 26940

8   (ROD) (describing "the planning area" as 224,090 acres with 185,738 acres of "habitat," but

9   that only 167,000 acres would be permanently preserved in Biologically Preferred Scenario).

10  The Federal Defendants emphasize that the MHPA Preserve is configured to preserve a

11  larger area of *habitat* (167,667 acres).  Thus, the Court concludes that the Biologically

12  Preferred Alternative cannot accurately be described as being "larger" than the MHPA

13  Preserve.  Thus, there is a rational basis in the AR for FWS' assessment that the

14  "Biologically Preferred Alternative was not selected because it assumes a *smaller preserve*

15  *system* than the one finally negotiated under the MSCP planning process."  AR 26943

16  (emphasis added).

17       The Builder Intervenors point out that FWS gave additional reasons for rejecting the

18  Biologically Preferred Alternative in the preliminary Environmental Impact Reports, which

19  distinguishes this case from *Gerber*.  *Cf. Gerber*, 249 F.3d at 185 (FWS found in both its

20

---

21       [25](...continued)
22  preserve (*i.e.*, whether the location of the lands created linkages with other protected land
    that would benefit the protected species).  AR 39478 (MSCP § 1.2.1 Biological Goal of
23  Preserve); *id.* at 39483 & 39489; AR 18594-598 (vernal pool species "adequately
    conserved," meaning "[t]he overall benefits of the multi-species planning effort to the natural
24  ecosystem will provide for the species that inhabit that ecosystem").  The City also
    considered how the land was currently being used, for example, whether it was already
25  subject to a local regulation (such as an open space easement) that protected the land from
    development.  AR 39480, 39493, 39498.  A final factor was economic – whether the land
26  was already owned by the public, and whether the financial burden of donating land would
    be equitably distributed among the municipalities and private land owners.  AR 39498,
27  39592-95; *accord* AR 18589 ("Another goal has been to maximize the inclusion of public
    lands within the preserve."); AR 18604 ("The MSCP preserve system incorporates public
28  lands to the greatest extent possible, to minimize the need to acquire private lands and to
    avoid increasing extractions on private land development beyond the existing requirements
    of local, state, and federal regulations.").

1  draft and final EIR that there was a better alternative).  FWS found that the Biologically

2  Preferred Alternative would not effectively protect multiple species within a broad range of

3  vegetation communities.  Specifically, the percentage of maritime succulent scrub, oak

4  woodlands, and beach habitats was lower when compared to the MHPA Preserve for these

5  vegetation communities. *Compare* AR 18593 (Table 2-1) *with* AR 18648 (Table 2-6).  In

6  addition, the EIR found that the Biologically Preferred Alternative did not include land that

7  the City deemed important for preservation, such as designated linkages in the urbanizing

8  area.  AR 18649 (Aug. 1996 Draft EIS) (noting three sections of land excluded).  These are

9  valid reasons for rejecting the Biologically Preferred Alternative. *Mt. Graham Red Squirrel*

10  *v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993) ("a court is not to substitute its judgment for

11  that of the agency" if it is informed and rational); *Jantzen,* 760 F.2d at 986 (same).

12      The AR shows that each of the proposed preserves included lands that were beneficial

13  to certain vegetative communities. *E.g.*, AR 26940-41 (assessing conservation of coastal

14  sage and gnatcatcher – the habitat and species that were the impetus for the MSCP process).

15  The relative benefits were complicated by the large number of species involved, and the final

16  plan accommodated the competing interests. *E.g.*, AR 18601-603 (evaluating watersheds in

17  area that supported various habitats and species).  These are the types of issues that implicate

18  FWS's expertise. *National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 843-44 (9th Cir.

19  2003) (deferring to FWS's discretion to evaluate scientific evidence).

20      The Court is satisfied that FWS fulfilled its statutory duty in this regard. *Baltimore*,

21  462 U.S. at 105; *Motor Vehicle*, 463 U.S. at 43.

22      H.  Framework Management Plan

23      Plaintiffs contend that the City breached its obligation to prepare a final Framework

24  Management Plan for the MHPA Preserve, and that FWS should have had that document

25  before approving the ITP. *Rumsfeld*, 198 F. Supp. 2d at 1154.

26      The Court finds that this argument is based upon a factual error.  The Plaintiffs rely on

27  a document with a handwritten notation suggesting that, as of July 15, 1997, the City had not

28  yet prepared its Framework Management Plan. Pls.' Ex. 8 at 26 (IA at 26, § 10.6(B)) (AR

1   26568A).  The language in FWS's Findings and Recommendations, prepared on July 17,

2   1997, also suggests that the City's Framework Management Plan had not yet been submitted

3   for review and approval.  AR 26912 ("Each take authorization holder *will be* required under

4   the plan *to submit a draft framework management plan* to the wildlife agencies *within six*

5   *months* of issuance of take authorizations; and *to submit a final plan within nine months* of

6   issuance of take authorization.) (emphasis added); *accord* AR 26939 (July 1997 Record of

7   Decision) ("A final framework plan *is to be submitted . . . within nine months*.") (emphasis

8   added).  Unfortunately, the language in these documents had not been updated to reflect

9   accurately that the City had prepared its Framework Management Plan; nonetheless, the AR

10  shows that the City completed the required Plan and included it in the final March 1997

11  version of its Subarea Plan.  AR 24900-52 (§1.5) (Fed. Defs.' Ex. N).  The record also shows

12  that FWS fulfilled its duty to review the Plan in the process of approving the ITP;

13  consequently, this argument fails.

14       I.  Duty to Revoke ITP Upon Violation of Terms

15       In its Fifth Claim for Relief, Plaintiffs allege that FWS has violated the ESA by failing

16  to revoke the City's ITP.  Plaintiffs cite infractions at the Square One Development project as

17  triggering FWS's mandatory duty.  Pls.' Ex. 6.

18       The ESA dictates that "[t]he Secretary shall revoke a permit issued under [§ 10] if he

19  finds that the permittee is not complying with the terms and conditions of the permit."  §

20  1539(a)(2)(C); *Bennett*, 520 U.S. at 172-73 (when ESA mandates an action, the Secretary

21  must use his expert discretion to apply the relevant factors and follow the required

22  procedures).

23       The City's violation of the permit illustrates the fundamental problem of an umbrella

24  permit that authorizes a municipality that is inexperienced in the technicalities of the ESA to

25  issue ITPs directly to developers.  FWS discovered the egregious error only after the vernal

26  pools on the site had been destroyed, and this is fatal and irreparable to the vernal pool

27  species.  The harm was exacerbated first, because those vernal pools were *occupied* by the

28  protected plant and fairy shrimp species, and second, because that site had been *set aside as*

- 59 -

1  *mitigation* for an earlier destruction of other vernal pools.  Nonetheless, in light of the

2  Court's order to remand for further proceedings on the protections for the vernal pool species

3  and the injunction on further destruction of the species, the Court declines at this time to

4  order FWS to revoke the City's ITP because the finding was tentative.  Pls.' Ex. 6 at 3.

5                                              Conclusion

6          Based upon a review of the record, consideration of the arguments of counsel in their

7  briefs and at the hearing, and for the reasons stated above,

8          1.  The Court immediately enjoins the City of San Diego's Incidental Take Permit

9  (No. PRT-830421, dated July 18, 1997, and issued by the United States Fish and Wildlife

10  Service) for those pending and future development projects that "take" any of the seven

11  vernal pool species – San Diego fairy shrimp (*Branchinecta sandiegonensis*); Riverside fairy

12  shrimp (*Streptocephalus woottoni*), Otay mesa mint (*Pogogyne nudiuscula*); California

13  Orcutt grass (*Orcuttia californica*); San Diego button celery (*Eryngium aristulatum var.*

14  *parishii*); San Diego mesa mint (*Pogogyne abramsii*); and spreading navarretia (*Navarretia*

15  *fossalis*) – as defined and governed by the Endangered Species Act. 16 U.S.C. §§ 1531-44.

16  Specifically, the Court enjoins (1) any and all pending applications for development of land

17  containing vernal pool habitat; (2) those projects where the City has granted permission, but

18  the development has not yet physically begun to destroy vernal pool habitat; and (3) any

19  further development where the permittee is presently engaged in the destruction of vernal

20  pool habitat.  The Court orders Defendant City of San Diego to serve a copy of this Order

21  forthwith on all applicants and permittees affected by the injunction as noted above.  The

22  Court will not stay this immediate injunction.

23          2.  The Court is unable to approve the Incidental Take Permit as to the seven vernal

24  pool species.  The Assurances lock in unacceptable risks to these endangered and threatened

25  species because the planned methods to compensate for development that is certain to occur,

26  is not beneficial to these highly-specialized creatures, yet the measures cannot be modified

27  for fifty years *and* the Fish and Wildlife Service did not "anticipate" or evaluate the impact of

28  the City's conservation plan on the seven vernal pool species.  That problem is critical

1  because the conservation plan covers the remaining habitat for the two fairy shrimp, they are
2  extremely sensitive to their specialized environment, and it is not biologically feasible to
3  move them to another location.  The use of a flat 12% measure of impact is arbitrary and
4  capricious, as is the lesser protection afforded "unnatural" vernal pools.  The funding is
5  speculative and unlikely.  FWS did, however, explain its decision to reject an alternate design
6  for the permanent preserve, and ensured that the City prepared its Framework Management
7  Plan.  Because the Court has ordered the Fish and Wildlife Service to review the adequacy of
8  the conservation plan now that the Army Corps' of Engineers will no longer participate in the
9  protection of vernal pools, the Court declines to order the permit revoked.  Accordingly, the
10  Court grants in part and denies in part Plaintiffs' Motion for Summary Judgment [# 174];
11  grants in part and denies in part Federal Defendants' Cross Motion for Summary Judgment [#
12  189] on the Plaintiffs' Third Amended Complaint; and denies the Builder Intervenors'
13  Motions for Summary Judgment on the Third Amended Complaint [# 197] and their Cross
14  Complaint [# 181].

15       3.  The Court remands the matter to the United States Fish and Wildlife Service with
16  instructions to reinitiate consultation looking toward revisions of the City of San Diego's
17  Incidental Take Permit at least on the seven vernal pool species, and for further action not
18  inconsistent with this decision.

19       4.  The Clerk shall terminate this civil action.

20       IT IS SO ORDERED.

21  DATED: October 13, 2006

UNITED STATES SENIOR DISTRICT JUDGE

cc:     Counsel of Record

- 61 -

98cv2234