1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                         **SOUTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10   **SOUTHWEST CENTER FOR**<br>   **BIOLOGICAL DIVERSITY, et al.,** | **CASE NO. 98-CV-2234-B(JMA)** |
| 11 | |
| 11                                **Plaintiffs,** | **ORDER GRANTING IN PART** |
| 12      **vs.** | **AND DENYING IN PART**<br>**PLAINTIFFS' MOTION FOR** |
| 13 | **ATTORNEY'S FEES AND**<br>**COSTS** |
| 14   **JIM BARTEL, RENEE**<br>   **LOHOEFENER, and DIRK** | |
| 15   **KEMPTHORNE,** | **[Docket Nos. 264 & 309]** |
| 16                               **Defendants,** | |
| 17   **and** | |
| 18   **BUILDING INDUSTRY LEGAL**<br>   **DEFENSE FOUNDATION, et al.,** | |
| 19          **Intervening Defendants.** | |
| 20 | |

21   **BUILDING INDUSTRY LEGAL**
     **DEFENSE FOUNDATION, et al.,**

22                            **Cross-Complainants,**
        **vs.**
23

24   **UNITED STATES FISH AND**
     **WILDLIFE SERVICE; et al.,**
                              **Cross-Defendants,**
25

26   **and**

27   **SOUTHWEST CENTER FOR**
     **BIOLOGICAL DIVERSITY, et al.,**
                        **Intervening Defendants.**
28

1   Now before the Court is the prevailing parties' motion for attorney's fees, which the

2   Court submitted without oral argument.  Plaintiffs seek approximately $725,000 in legal fees

3   and $12,000 in costs.  Federal Defendants have filed a brief challenging the amount of fees,

4   but no other party has responded.  Specifically, Federal Defendants object to those fees

5   attributable to work on phases of the litigation over which the government had no control and

6   took no adverse position to Plaintiffs.  *Love v. Reilly*, 924 F.2d 1492 (9th Cir. 1991).  Having

7   reviewed the legal briefs and the supporting documentation, the Court grants in part

8   Plaintiffs' motion for fees and costs with modifications.  The Court denies in part those

9   attorney's fees incurred during a phase of the litigation in which Plaintiffs were opposed *only*

10  by other parties.  *Id.*  The Court awards Plaintiffs $546,932.19 for fees and costs.

11                                       **Background**

12  The Court summarizes the events of this lengthy litigation that are most relevant to the

13  motion for attorney's fees.  In December 1998, several environmental groups[1] (hereinafter

14  "Plaintiffs") filed this lawsuit pursuant to the Endangered Species Act ("ESA").  16 U.S.C. §

15  1540(g) (citizen suit provision).  Plaintiffs challenged the decision of the United States Fish

16  and Wildlife Service[2] (hereinafter "FWS" or "Federal Defendants") to authorize the City of

17  San Diego to "take,"[3] pursuant to an incidental take permit ("ITP"), seven vernal pool species

18  in exchange for the City's plan to provide mitigation measures within the region.  *See* Third

20  [1]Southwest Center for Biological Diversity, California Native Plant Society, Wetlands Action Network, Save Our Forests and Ranchlands, Carmel Mountain Conservancy, Preserve Wild Santee, Ramonans for Sensible Growth, San Diego Audubon Society, Sierra Club, Horned Lizard Conservation Society, San Diego Herpetological Society, Earth Media, Inc., and Preserve South Bay.

23  [2]The "Federal Defendants" were named in their official capacities.  The Secretary of the Interior delegated responsibility for the ESA to the Fish and Wildlife Service.
    The complaint named the City Manager for San Diego as the holder of the ESA permit. Plaintiffs voluntarily dismissed the City Manager and its Sixth Cause of Action because the City stipulated that the ITP did not authorize take of the seven vernal pool species.  [# 134]  The Builder Intervenors, however, named the City as a defendant in their Cross Complaint.  Cross Compl. ¶ 12.  As the holder of the ITP, the City's interests are clearly at stake in this litigation.

28  [3]The ESA prohibits "take" of a listed species, and the statute defines "take" broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  16 U.S.C. § 1532(19).

1   Amended Complaint ¶ 41-42.  Pursuant to the Implementing Agreement ("IA"), FWS gave

2   the City the authority to issue project-specific take permits and, in turn, those contractors

3   obtained Third Party Beneficiary status with certain rights and responsibilities.

4        The original complaint also named Cousins Marketplace, Inc., a commercial

5   development project in Mira Mesa, as a defendant.  Cousins had been granted permission

6   from the City, as the holder of the ITP from FWS, to destroy 66 vernal pools on the

7   construction site.  Plaintiffs immediately sought a temporary restraining order ("TRO") but

8   that motion was denied as moot because the species had already been removed and the

9   grading work had already destroyed the habitat.  Order Denying Pls.' Ex Parte Application

10  for TRO at 3-5.  Plaintiffs' amended complaints did not name Cousins or any other

11  developers as defendants.

12       Soon thereafter, in June 1999, a construction company and four building associations

13  sought permission to intervene as defendants (hereinafter "Builder Intervenors").[4]  Plaintiffs

14  opposed the intervention motion, but the Federal Defendants did not take a position on the

15  motion.  The district judge then assigned to the case denied the motion, but the Ninth Circuit

16  reversed.  *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820-22 (9th Cir.

17  2001).  The Ninth Circuit accepted as true the assertion that the Building Intervenors owned

18  land that was subject to the ITP and had developed land "in reliance on the take authority in

19  the City's ITP granted pursuant to the IA."  *Id.* (evaluating interests of Pardee and the several

20  Associations as Third Party Beneficiaries).  The Ninth Circuit concluded that the private

21  landowners might have divergent interests from the City or FWS, thus, it was likely that the

22  Builder Intervenors would advance unique arguments.  *Id.* at 822-24.

23       The parties began settlement discussions early in the proceedings.  Subsequently, in

24  late 1999, the parties conducted extensive settlement discussions with the magistrate judge.

25  [# 74].  Though they failed, the Plaintiffs and Federal Defendants agreed not to seek fees

26  incurred in that specific time period.  [# 83]  Efforts to settle resumed in 2001 and continued

27  _____

28       [4]The intervenors include the Building Industry Legal Defense Foundation, the
     National Association of Home Builders, the California Building Industry Association, the
     Building Industry Association of San Diego, and Pardee Construction Company.

98cv2234

1   through 2002.  Additional discussions resulted in the filing of a Stipulation of Material Fact

2   between the Plaintiffs and Federal Defendants concerning the scope of the ITP for species

3   "dependent upon or associated with vernal pool wetlands."  [# 114]  In October 2002,

4   Plaintiffs dismissed their sixth cause of action against the City of San Diego.  [# 134]

5          After their successful interlocutory appeal, the Builder Intervenors answered

6   Plaintiffs' Third Amended Complaint in 2002.  [# 115]

7          These private parties also filed a cross-complaint against the Federal Defendants and

8   the City of San Diego.  Cross Compl. ¶ 9-12.  The Builder Intervenors claimed that the ITP

9   authorized extensive take of the vernal pool species, and they asked the Court to compel the

10  Federal Defendants to issue a permit consistent with their broad interpretation of its scope.

11  Plaintiffs' initially filed an answer to the cross-complaint, but on the Builder Intervenors'

12  motion to strike, the Court held that Plaintiffs must first seek leave to intervene in the cross

13  action. [# 122 & 145]  Thereafter, Plaintiffs' sought and received permission to intervene as

14  defendants in that cross-complaint.  [#150 & 240]  Thus, the Plaintiffs and Federal

15  Defendants opposed the legal position of the Builder Intervenors, though each from its

16  unique point of view.  *See* Order Granting Pls.' Mot. to Intervene in Cross-Compl.

17         In 2002, several motions were filed simultaneously on the subject matter jurisdiction

18  over various claims and parties.  Federal Defendants moved to dismiss the Builder

19  Intervenor's Cross Complaint as well as a claim in the Plaintiffs' Third Amended Complaint

20  on grounds of ripeness.  [# 142]  Plaintiffs opposed that part of the government's motion that

21  sought to dismiss their cause of action concerning the Assurances, and Plaintiffs also filed

22  their own motion to dismiss the Builder Intervenors' Cross Complaint on grounds of

23  jurisdiction and standing.  [# 132, 157]  During this time, the parties resumed negotiations to

24  settle the merits.  *See* Order Voluntarily Dismissing Pls.' Sixth Cause of Action against City

25  of San Diego. [# 134]  The case was transferred to the undersigned, and, in 2004, the Court

26  concluded that it had subject matter jurisdiction over all claims.  [# 241 & 252]

27         In the interim, the parties filed substantive briefs on the merits of the Plaintiffs' claims

28  and the Builder Intervenors' cross claims. [# 174, 181, 189, 197]  The Court heard oral

98cv2234

1   argument in August 2004.  In October 2006, the Court issued its decision and injunction in

2   favor of Plaintiffs.  *Southwest Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118

3   (S.D. Cal. 2006).  The Court agreed with Plaintiffs' legal position and rejected the opposing

4   arguments of the Federal Defendants and the Builder Intervenors.

5          The Federal Defendants and Builder Intervenors have filed notices of appeal from the

6   final decision and injunction.[5]

7          Two matters arose after entry of the final judgment.  Federal Defendants filed a Rule

8   59(e) motion, and Plaintiffs filed a statement of non-opposition to the proposed correction of

9   certain language in the final order.  [# 268, 273, & 279]  Shortly thereafter, Builder

10  Intervenors asked to Court to "clarify" the scope of the injunction.  [# 278] Both Plaintiffs

11  and Federal Defendants filed opposition briefs.  [# 289 & 290]  The City filed a statement of

12  non-opposition, but stated that it would appreciate clarification if the Court found that it had

13  misinterpreted the application of the injunction to specific types of vernal pool habitat.  [#

14  293] The Court rejected the attempt to exempt certain construction projects from the scope of

15  the injunction.  [# 306]

16                                    **Discussion**

17  **A.  Attorney's Fees under ESA**

18         The citizen suit provision of the ESA states that "[t]he court . . . may award costs of

19  litigation (including reasonable attorney and expert witness fees) to any party, whenever the

20  court determines such award is appropriate."  16 U.S.C. § 1650 (g)(4).  This express statutory

21  authority allows the court to award attorney's fees to parties who obtain "some" degree of

22  success on the merits.  *Rucklehaus v. Sierra Club*, 463 U.S. 680, 682-86, 688-89, 692 & n.1

23  (1983) ("appropriate" standard appears in many environmental statutes and is more lenient

24  than the "prevailing party" standard).  The purpose of the fee-shifting statute is "to encourage

25  litigation which will assure proper implementation and administration of the act or otherwise

26  serve the public interest."  *Id.*  (quoting H.R. Rep. No. 95-294, at 337 (1977), *as reprinted in*

27  _____

28         [5]District courts should promptly resolve requests for attorney's fees without awaiting
    the resolution on appeal. *Obin v. Dist. No. 9 of the Int'l Ass'n of Mach. & Aerospace
    Workers*, 651 F.2d 574, 584 (8th Cir. 1981).

1   1977 U.S.C.C.A.N. 1416)); *Pennsylvania v. Delaware Valley Citizens' Council for Clean
2   Air*, 478 U.S. 546, 559-60 (1986) (costs of litigation awarded when citizen performs a public
3   service by enforcing environmental statutes).

4         Federal Defendants do not dispute that Plaintiffs are entitled to attorney's fees under
5   the ESA.  Defs.' Opp. Br. at 1.  Federal Defendants argue, however, that the United States
6   has not waived its sovereign immunity as to certain fees.  But the ESA expressly waived the
7   United States' immunity to be sued and to pay the costs of such litigation.  16 U.S.C. §
8   1540(g).  The Court has subject matter jurisdiction over the Plaintiffs' fee application under
9   Congress' "unequivocally expressed" language in the ESA.  *Dunn & Black, P.S. v. United
10  States*, __ F.3d ___, 2007 WL 1989364 at *2 (No. 05-35766) (9th Cir. July 11, 2007).  That
11  waiver must be narrowly construed, thus, the Court will address Federal Defendants'
12  objections to certain line items below when it determines the reasonable amount of fees.

13        The Court concludes, without question, that Plaintiffs are entitled to the costs of the
14  litigation, including attorney's fees, under the ESA.[6]  Plaintiffs were successful.   The Court
15  agreed with Plaintiffs that FWS must reinitiate review of the ITP now that the Army Corps of
16  Engineers would probably not participate in future regulatory review of vernal pools.  *Bartel*,
17  470 F. Supp. 2d at 1130-33.  During the review, FWS must consider the recovery goals it set
18  for the vernal pool species.  *Id.* at 1136-37.  Plaintiffs further prevailed on their attack of
19  FWS's analysis of so-called "unnatural" vernal pools as well as the use of a 12% measure.
20  *Id.* at 1137-39, 1146-55.  Plaintiffs prevailed on their novel claim that the Assurances locked
21  in inadequate mitigation measures.  *Id.* at 1139-46 (FWS's "shell game" of promised
22  protections violated the ESA).  Finally, Plaintiffs successfully challenged the FWS's
23  conclusion that the City would ensure funding for the promised mitigation measures.  *Id.* at
24  1155-57.  The Court enjoined any further destruction of vernal pool habitat.  *Id.* at 1157.  In
25  short, Plaintiffs achieved the results they sought to accomplish and they would be entitled to
26  fees even under the narrower "prevailing party" standard.  *See Hensley v. Eckerhart*, 461

27  _____
28        [6]In the alternative, Plaintiffs cite the Equal Access to Justice Act (EAJA) as legal basis
    for their entitlement to legal fees.  28 U.S.C. § 2412(d).  Because the ESA clearly governs
    this case, the Court will analyze Plaintiffs' fee motion under that statute.

U.S. 424, 433 (1983).

These citizens did what FWS should have done in the first instance.  The lawsuit ensured that the regulated kill of certain number of endangered species will minimize and mitigate the impact on protected species so that they may survive and recover overall as contemplated by the ESA.  16 U.S.C. §§ 1532, 1536, 1539; *Delaware Valley*,  478 U.S. at 565 ("the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws"). Plaintiffs substantially contributed to the goals of the ESA in terms of the implementation of regional, long-term, and multi-species conservation plans.

**B. <u>Amount of Fees and Costs</u>**

The parties dispute the amount of attorney's fees.  An award of attorney's fees must be reasonable both in terms of the hourly rate and the hours expended.  *Delaware Valley*, 478 U.S. at 562-66 (collecting authorities discussing "reasonable" fees); *see Hensley*, 461 U.S. at 433.  The Court considers a variety of factors, including the time and labor expended; the difficulty of the legal questions; the experience, reputation, and ability of the attorneys; and the results obtained.  *Id.*; *Palila v. Haw. Dep't of Land and Natural Res.*, 512 F. Supp. 1006, 1007 (D. Haw. 1981) (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th 1975)).

**1. <u>Reasonable Hourly Rate</u>**

"The established standard is the 'rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation.'"  *Barjon v. Dalton*, 132 F.3d 496, 502 (9th Cir. 1997) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987)).

Federal Defendants argue the hourly rates are too high.  They note that the non-profit organizations could not have afforded to hire attorneys at $400 per hour.  They assert that each attorney's hourly rate should be reduced by $110 beginning in 1997, with a $10 per hour rise in subsequent years (*i.e.*, Rohlf would bill at $250 in 1997 instead of his requested $360, and his hourly rate would increase to $350 for work in 2007 instead of $460).  Fed. Defs.' Attachment 1(a).  This argument fails because fees "are to be calculated according to

the prevailing market rates in the relevant community, regardless of whether the plaintiff is represented by private or nonprofit counsel." *Blum v. Stenson*, 465 U.S. 886, 985-86 (1984). Notably, counsel for Plaintiffs accepted the case on a pro bono basis. Rolfe Decl. ¶ 5 (lead client cajoled attorneys to take case pro bono after searching for counsel); *see Venegas v. Mitchell*, 495 U.S. 82, 90 (1990) (the fee-shifting statute measures the award, not the actual fee the client pays her lawyer).

Federal Defendants make a related argument when they cite a survey of legal fees. Defs.' Opp. Br. at 22 & Attachment 2 (Summary Graphs of 2005 Altman Weil Survey). This survey is not controlling because it averages the rates of associates in the entire Pacific region, which encompasses the states of Alaska, Hawaii, Washington, Oregon, and California, based solely on the size of the law firm. *Chalmers*, 796 F.2d at 1214-15 (opponents did not provide competing declarations); *Grunseich v. Barnhart*, 439 F. Supp. 2d 1032, 1034 (C.D. Cal. 2006) (rejecting reliance on Altman Weil survey submitted without testimony as to validity of methodology). The governing standard is the community of attorneys of equal experience in the *forum district*. *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992); *Marbled Murrelet v. Pacific Lumber Co.*, 163 F.R.D. 308, 317 (N.D. Cal. 1995) (using San Francisco area rather than rates from San Diego and other home communities of attorneys), *aff'd*, 83 F.3d 1060 (9th Cir. 1996). Also, in terms of years of experience and quality of work, Rohlf was acting as a partner at the time the lawsuit was initiated, and co-lead counsel Levine was functioning as a partner by the time the motions to dismiss and motions for summary judgment were prepared. Thus, the declaration of another attorney from Earthjustice, who had fifteen years of experience and sought $400 per hour for fees in 2001 to 2003, supports rather than diminishes the rates requested by Plaintiffs' lead attorneys. Defs.' Attachment 3 (Reames Decl. ¶ 33-34).[7]

---

[7]The Court also notes that the attorney in that case did not attend law school, but obtained admission to the bar as a law office study candidate. Defs.' Attachment 3 (Reames Decl. ¶¶ 6, 8). A different attorney in another case had graduated from the New College of California School of Law and had only a few years of experience as a sole practitioner before seeking fees of $150 per hour for contract work on a summary judgment motion. Defs.'

(continued...)

1    Plaintiffs have properly submitted declarations from several disinterested attorneys as

2    to the range of fees that lawyers of similar skill, experience, and reputation in the San Diego

3    metropolitan area would charge for similar legal work in a complex environmental case.

4    *Jordan v. Multnomah County*, 815 F.2d 1258, 1263 & n.9 (9th Cir. 1987); *see* Bevash Decl.

5    ¶¶ 6, 9, 11-14; Briggs Decl. ¶¶ 4-8; Delano Decl. ¶¶ 3-8.  The Court accepts these

6    assessments in light of the superior results obtained and the exceptional quality of work

7    performed by Plaintiffs throughout these lengthy and demanding proceedings.  *Hensley*, 461

8    U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a

9    fully compensatory fee.").  Plaintiffs secured an important victory to conserve and protect the

10   remaining vernal pool habitat.

11   The Court agrees with Plaintffs' contention that the case required specialized

12   knowledge of environmental law.  *Love*, 924 F.2d at 1496 ("Environmental litigation is an

13   identifiable practice specialty that requires distinctive knowledge.").  "Complex

14   environmental litigation such as this case requires special skills and specialization beyond

15   that possess by most attorneys in general practice."  *Palila*, 512 F. Supp. at 1008.  These

16   attorneys possessed the substantive knowledge and distinctive skills to competently and

17   efficiently litigate this difficult ESA case.  Rohlf Decl. ¶¶ 2-4 (teaches ESA law, has litigated

18   numerous environmental cases, and published author); Levine Decl. ¶¶ 2-6 (teaching and

19   litigation background); Mueller Decl. ¶¶ 2-6 & Ex. A (litigation experience and published

20   articles about ESA).   That specialization was necessary to this case because it was one of the

21   first to challenge regional habitat conservation plan of the scale of San Diego's Multi-Species

22   Conservation Plan.  Plaintiffs obtained their successful outcome by combing the extensive

23   90-volume administrative record, evaluating the strict biological needs of the fragile vernal

24   pool species, and applying the ESA provisions.

25   The Court finds that Plaintiffs' counsel were eminently qualified to handle the

26   challenging assignment and that they exhibited a high level of competence.  The exceptional

27

28
     [7](...continued)
     Attachment 5 (Burr Decl. ¶¶ 2, 5, 8).

1   quality of their work, in particular the concise, accurate, and persuasive briefs on the

2   summary judgment motions, warrants an hourly rate at the high end of the market rates. *See*

3   *Delaware Valley*, 478 U.S. at 565 (quality of representation is factor in reasonable hourly

4   rate) (citing *Blum*, 465 U.S. at 898-900).  Because Federal Defendants vigorously opposed

5   every contention, Plaintiffs' reply briefs and their preparation for the two-day hearing was

6   essential to the success of their lawsuit.  Their performance was outstanding in all respects.

7   Several disinterested attorneys attest that the lawyers possess stellar reputations.  Briggs

8   Decl. ¶ 5; Bevash Decl. ¶¶ 12-14; Delano Decl. ¶ 5.

9          The Court further notes that Plaintiffs seek hourly rates that are adjusted over the

10  eleven years that the case was pending in the district court.  Plaintiffs are exercising restraint

11  to reduce their award instead of seeking an award for all hours over the several years of

12  litigation under the current rate.  *Missouri v. Jenkins*, 491 U.S. 274, 282-84 & n.6 (1989)

13  (proper to base award on *current* rate to account for three-year delay in payment until the

14  favorable decision); *Jordan*, 815 F.2d at 1262 n.7 (using *current* billing rate is one method of

15  compensating for effects of inflation, when an adjustment is appropriate for delay in payment

16  or other circumstances of case).

17         In summary, the Court accepts the hourly rates requested by Plaintiffs for the lead

18  attorneys.  The Court will award the two lead counsel, Rohlf and Levine, at hourly rates

19  between $360 to $460, and $310 to $410, respectively.

20         **(a) <u>Additional Lawyers</u>**

21         Federal Defendants question the need for attorney Mueller's involvement in the action

22  and argue that her hourly billing rate should be reduced to $210.

23         After carefully considering the matter, the Court awards co-counsel Mueller a billing

24  rate of $320 for her legal services in 1998 *and* 1999 (after which time she substituted out of

25  the case).   Her qualifications merit the $320 per hour billing rate.  Mueller Decl. ¶¶ 2-11 &

26  Ex. A.  Mueller requests an increase to $330 in her billing rate for hours billed in 1999, but

27  the Court sustains the objection to the raise.  The Court does not question Mueller's abilities,

28  but notes that her role was to act as local counsel.  Mueller's limited involvement in the

1   action was for a twelve month period that ended in 1999.  Mueller Decl. ¶ 10 & Ex. B.  In the

2   early days of the litigation, Mueller's billing statements show that she provided necessary

3   services to initiate the law suit.  Thereafter, nearly every entry involves a telephone

4   conversation with one or both of the lead attorneys on the case, thus, appear to involve

5   consulting.  *Suzuki v. Yuen*, 678 F.2d 761, 763 (9th Cir. 1982) (court should "survey a fee

6   request in light of the record to exclude duplicative effort" but should award those fees that

7   are typically paid by a client, in order to encourage private enforcement of public interest

8   laws).  The lead attorney explains these consultations by stating that Mueller's involvement

9   was necessary because of the complexity of the case.  Levine Decl. ¶ 8.  Aside from

10  consultations on the possibility of an early settlement, Mueller did not complete any

11  substantive legal work in 1999.  (As discussed below, much of her substantive work dealt

12  with issues solely attributable to the intervention by private parties on issues where FWS was

13  not adverse to Plaintiffs' position, and as such, cannot be shifted to the government.)  The

14  Court's concern about Mueller's request for an increased billing rate is assuaged because

15  Gonzalez did not seek fees for any of his legal services once he replaced Mueller as local

16  counsel.  Gonzalez Decl. ¶ 1; Levine Decl. ¶ 6.  It is further mitigated because Mueller did

17  not seek fees for the preparation of this motion.  *Cf.*  Levine Decl. at 29.  On balance, the

18  Court concludes that Mueller's work should be awarded at $320 per hour because the same

19  level of skill was involved during the short time period.

20                    **(b) Law Clerk Services**

21         Federal Defendants object to the 138 hours of law clerk time at $125 per hour.

22         The Court holds that Plaintiffs are entitled to costs of hiring a law clerk to perform

23  appropriate work.  *Suzuki*, 678 F.2d at 763-64; *see Trustees of Constr. Indus. and Laborers*

24  *Health and Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1256 (9th Cir. 2006) (citing

25  *Jenkins*, 491 U.S. 274 for principal that attorney's fees should include normally charged

26  expenses of work delegated by attorneys to lower-paid employees at law firm); *cf. Barjon*,

27  132 F.3d at 503 (permitted by regulation).  The practice of delegating specific assignments to

28  professionals who bill at lower rates helps to reduce costs, and as such is to be encouraged.

1   *See In re Equity Funding Corp. of Am. Sec. Litig.*, 438 F. Supp. 1303, 1330 (S.D. Cal. 1977).

2   Plaintiffs' billing records show that the law clerk performed appropriate duties such as legal

3   research and drafting dispositive motions from September 2002 to April 2003 under the

4   supervision of the senior attorneys.  Rohlf Decl. Ex. B.  Counsel states that this particular law

5   clerk's work was instrumental to the successful prosecution of the case.  Levine Decl. ¶ 6.

6   Moreover, Plaintiffs have elected not to seek legal fees for the additional <u>160 hours</u>

7   performed by four other law clerks.  *Id.*  Plaintiffs' request in that regard illustrates their

8   good faith attempt to seek reasonable fees.  *Hensley*, 461 U.S. at 437 (attorneys "should

9   exercise 'billing judgment' with respect to hours worked").  Plaintiffs have not provided a

10   resume for the law clerk except to state his participation in the Lewis and Clark Law

11   School's environmental law clinic for a school year.  Rohlf Decl. ¶¶ 2-3, 8 & Ex. B.  The

12   declarations support the request for the requested rate.  Briggs Decl. ¶ 4; Delano Decl. ¶ 4;

13   Gonzalez Decl. ¶ 8.  The Court grants Plaintiffs' request for reimbursement for the law clerk

14   at a fair billing rate of $125 per hour.  *Cf. Portland Audubon Soc. v. Lujan*, 865 F. Supp.

15   1464 (D. Or. 1994).

16          **2.  <u>Reasonable Hours and Costs</u>**

17          Having determined the billing rates of the individual lawyers, the Court now turns to

18   the reasonableness of the hours and costs on Plaintiffs' billing statements.

19          Plaintiffs seek approximately $725,000 in legal fees and $12,000 in costs.[8]  Plaintiffs

20   provided time sheets with descriptions of the legal services and affidavits from the attorneys

21   on the necessity of the hours spent.  Levine Decl. ¶ 6 & Ex. A; Rohlf Decl. ¶¶ 5-8 & Exs. A

22   & B; Mueller Decl. ¶¶ 10-11 & Ex. B.

23          "The fee applicant bears the burden of documenting the appropriate hours expended in

24   the litigation and must submit evidence in support of those hours worked."  *Gates v.*

25   *Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (citing *Hensley*, 461 U.S. at 433, 437).

26   "The party opposing the fee application has a burden of rebuttal that requires submission of

27

28          [8]Plaintiffs are not seeking an enhancement to the lodestar.  Pls.' Reply Br. at 1 n.1; *cf.*
     *Earth Island Inst., Inc. v. So. Cal. Edison Co.*, 838 F. Supp. 458, 464 (S.D. Cal. 1993).

1   evidence to the district court challenging the accuracy and reasonableness of the hours

2   charged." *Id.* at 1397-98 (citing *Blum*, 465 U.S. at 892 n.5).

3          Overall, Plaintiffs dedicated many hours to this case and this commitment was

4   necessitated by the complexity of the biological issues of the vernal pool species, the intricate

5   structure of the regional conservation plan, the size of the administrative record, the hard-

6   fought opposition by the Federal Defendants, and the challenging legal issues.  Plaintiffs

7   performed professionally during the preliminary and substantive motions and at the two-day

8   hearing.  The Court has reviewed the billing statements and finds that "the time spent was

9   reasonably necessary to the effective prosecution of plaintiff's" case.  *Sealy, Inc. v. Easy*

10  *Living, Inc.*, 743 F.2d 1378, 1385 n.4 (9th Cir. 1984).  The Court finds the level of staffing

11  appropriate given the complexity of the legal issues and depth of the record in this case.

12  *McGrath v. County of Nevada,* 67 F.3d 248, 255 (9th Cir. 1995) ("the participation of more

13  than one attorney does not necessarily constitute an unnecessary duplication of effort")

14  (quoting *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989)).  Finally, the Court notes

15  that counsel have made conscientious efforts to reduce duplicative and tangential hours.

16  Decl. Rohlf ¶ 7; Decl. Levine ¶ 6; *Hensley*, 461 U.S. at 434 (counsel must make good faith

17  effort to exclude redundant or unnecessary hours).

18              **(a) <u>Activity Related to Builder Intervenors</u>**

19          The central issue in the motion is the application of the *Love v. Reilly* decision.

20  Federal Defendants object to the portion of the request that relates to the Plaintiffs' work

21  against the Builder Intervenors.  Plaintiffs argue that this work was necessary because it was

22  interrelated with the position of the Federal Defendants and because their participation was a

23  logical outgrowth of the flawed ITP issued by FWS.

24          The Ninth Circuit has held that a fee award against the government must exclude that

25  part attributed to a third party's positions in which United States did *not* take a position

26  *adverse* to the prevailing plaintiff.  *Love*, 924 F.2d at 1495-96 (adopting reasoning of

27  *Avoyelles Sportsmen's League v. Marsh*, 786 F.2d 631, 632-36 (5th Cir. 1986)).  The Ninth

28  Circuit reasoned that it was unfair to shift fees to the government that a plaintiff incurred

1  *only* as a result of the litigation activities of private defendants, particularly when those

2  parties have intervened in an action between a citizen and the government.  *Id.* at 1496.

3  Under the fee-shifting statutes, a plaintiff's recoverable fees must be attributable to fighting

4  an issue "opposing government resistance."  *Id.*

5      First, the Court finds that Plaintiffs may not recover the fees incurred as a result of

6  opposing the Builder Intervenors' June 1999 motion to intervene as defendants into the

7  Plaintiffs' case and the subsequent appellate proceedings.  Plaintiffs oppose this reduction on

8  the ground that the Federal Defendants "essentially acquiesced" to the intervention and

9  because the intervention necessarily complicated the Plaintiffs' case against FWS.  Pls.'

10  Reply Br. at 8.  While other courts have adopted that analysis, it is not the law in the Ninth

11  Circuit.  *Cf. Am. Lung Ass'n v. Reilly*, 144 F.R.D. 622 (E.D.N.Y. 1992) (rejecting *Love* as too

12  formalistic and adopting alignment of interests test that evaluates facts and circumstances

13  regarding the government's abstention from an issue).

14      Here, the Federal Defendants did not take a position adverse to the Plaintiffs on the

15  phase of the litigation when third parties sought to intervene into the original action.  Order

16  Denying Intervention at 5 ("None of the defendants filed an opposition to applicants'

17  motion.") [# 48], *rev'd by Berg*, 268 F.3d 810.  In connection with that matter, Plaintiffs'

18  legal services were only against the Builder Intervenors, who were private parties.  This

19  portion of the case is squarely controlled by the *Love* decision which involved a similar

20  question of an intervening party that was unopposed by the United States.  *Love*, 924 F.2d at

21  1493, 1495-96.  These items are clearly delineated on the billing statements during the period

22  of June 1999 and through the appeal in 2001.  Rohlf Decl. Ex. A at 2 (2.2 hours); Levine

23  Decl. Ex. A at 5-6 (97.8 hours "Opposing BIA Intervention" entries); Mueller Decl. Ex. B at

24  19-20 (21.2 hours).  Accordingly, the Court deducts the hours relative to the Builder

25  Intervenors' request to intervene into the Plaintiffs' lawsuit and the travel costs for the

26  appeal.

27      The second issue is the Cross Complaint.  The Builder Intervenors were acting beyond

28  a role as a Third Party Beneficiary of the ITP because they sought to expand the scope of the

take authority beyond that granted by Federal Defendants.  The Cross Complaint alleged two claims against the Federal Defendants and the City of San Diego regarding the scope of the incidental take permit.  Cross Compl. ¶ 9-12; *see* Order Resolving Subject Matter Jurisdiction at 4-5 [# 252]; *Bartel*, 470 F. Supp. 2d at 1133-36 (discussing and rejecting Builder Intervenors' Cross Complaint).[9]  The position taken in the Cross Complaint was clearly adverse to that of the Plaintiffs but it was also opposed by the Federal Defendants.  As Federal Defendants stated in their summary judgment brief, "the Federal Defendants are in the middle of a huge disagreement.  . . . On one side, the Lead Plaintiffs . . . want more protection.  On the other side, Cross Plaintiffs from the development community . . . want less protection" for the vernal pool species.  Fed. Defs.' Mot. Summ. J. at 1. [#190]

In the instant fee application, Plaintiffs seek fees for work to review that cross-claim, to oppose the motion to strike their own answer to it, and to follow up with a motion to intervene as cross-defendants.  Levine Decl. Ex. A at 19-20.   The Court sustains the Federal Defendants' objection to these hours.  These hours are clearly identifiable as being devoted to tasks that were generated solely by the private parties.  The Federal Defendants did not take positions adverse to Plaintiffs on these matters.  Applying the Ninth Circuit's *Love* rule to this separate category of legal work, the Court deducts the attorney hours expended on this distinct portion between July 2002 and April 2004.  Rohlf Decl. Ex. A at 5-6 (claiming 21.6 hours); *id.* Ex. B at 15 (law clerk billed 15.1 hours on motion to strike and Plaintiffs' briefs on their own motion to intervene as defendants in Cross Complaint); Levine Decl. Ex. A at 19-20 (identifying 107.5 hours); Mueller Decl. Ex. B at 19 (claiming 21.2 hours).

The same reasoning applies to a third category of expenses – the hours expended by Plaintiffs to move to dismiss the Builder Intervenors' Cross Complaint for lack of subject matter jurisdiction and pursuant to the contractual bar.  Pls.' Mot. to Dismiss Intervenors'

---

[9]Plaintiffs could seek these fees and costs from the Builder Intervenors.  *Ruckelshaus*, 463 U.S. at 692 n.12 (private parties and government entities should not be treated in exactly the same manner in deciding whether to award fees in environmental litigation, thus, court should exercise "special care" when imposing fees against a private party with "differing abilities to bear the cost of legal fees and differing notions of responsibility for fulfilling" statutory goals); *Coalition for Clean Air v. So. Cal. Edison*, 971 F.2d 219, 230 (9th Cir. 1992).

1   Cross Compl. & Reply Br. (filed Oct. 7 & 28, 2002).  [#132 & 140]  Federal Defendants

2   sought this same relief when they moved to dismiss the Cross Complaint on grounds that the

3   claims were not yet ripe for judicial review and were barred by the Implementing Agreement.

4   Fed. Defs.' Mot. to Dismiss & Reply Br.  [# 143 & 165]  The Court therefore disallows the

5   hours Plaintiffs' devoted to this phase of the litigation in September and October 2002.

6   Rohlf Decl. Ex. A at 5; *id.* Ex. B at 14-15 (law clerk); Levine Decl. Ex. A at 19.

7        The next issue is the summary judgment motions.  Federal Defendants did not object

8   to shifting the fees incurred during this phase of the litigation.  This silence may be due to the

9   fact the summary judgment briefs necessarily intertwined essential issues and thus cannot be

10  easily compartmentalized.  The legal work involved the same record review and preparation

11  for the hearing.  To the extent that there are overlapping expenses during the preparation of

12  the summary judgment motions that disposed of the merits of the entire action, the Court

13  finds that the issues raised by the Builder Intervenors were variations of the positions of the

14  Federal Defendants.  Both the Builder Intervenors and the Federal Defendants opposed the

15  Plaintiffs' motion for summary judgment on the Third Amended Complaint.  Federal

16  Defendants, like the Builder Intervenors, sought to defeat the Plaintiffs' claims, for instance,

17  that the ITP violated the ESA because the regional plan provided inadequate mitigation

18  measures.  In some instances, the Builder Intervenors provided additional arguments to those

19  provided by the Federal Defendants, but the Federal Defendants were clearly adverse to the

20  Plaintiffs' position in this aspect of the case.  Plaintiffs' reply brief quickly disposes of any

21  additional arguments presented by the Builder Intervenors.  *E.g.*, Pls.' Reply Br. at 9-10, 19-

22  20 & nn. 2, 3, 5, 7, 8, 9, 16 (footnotes and text responding to Builder Intervenors'

23  arguments).  Thus, the Court will not reduce the hours devoted to preparing the summary

24  judgment motions on a overall basis.

25       Nonetheless, the Court has identified a discrete portion of the summary judgment

26  expenses that relate wholly to the Builder Intervenors:  Plaintiffs' brief opposing the Builder

27  Intervenor's summary judgment motion on the Cross Complaint.  Pls.' Opp. to Summ. J. on

28  Cross Compl. (filed April 11, 2003) [# 187].  Federal Defendants also opposed the merits of

the Builder Intervenors' Cross Complaint.  *E.g.*, Fed. Defs.' Reply Br. at 2-4, 7-10, 14-15, & 30-34.  As stated above, the Builder Intevenors sought relief in the Cross Complaint that went well beyond simply defending the ITP as it was issued by FWS.  Plaintiffs' expenses relative to filing this reply brief were not "incurred in opposing government resistance." *Love*, 924 F.2d at 1496.  Thus, under *Love*, the costs associated with that service cannot be shifted to the United States.  The Court has reviewed the billing statements and denies the request for the hours that correspond to this separate task.  Levine Decl. Ex. A at 16 (63.7 hours on entries to "draft opp to MSJ" between April 3, 2003 and April 10, 2003); Rohlf Decl. Ex. B at 15 (law clerk billed 15 hours to oppose Building Industry's summary judgment motion from February to April 2003).

### (b) <u>Settlement Discussions</u>

The parties engaged in settlement discussions from the outset of the case until 2002, when the summary judgment motions were briefed and when the Builder Intervenors filed their own Cross Complaint.  Federal Defendants contend that only 18 hours of Plaintiffs' request is recoverable.  Fed. Defs.' Attach. 1(a) (Settlement column).

The first objection is a simple matter.  Federal Defendants object to the hours related to the settlement discussions between September 1999 and April 2000 because Plaintiffs entered into a stipulation not to seek those fees.  Order to Amend Compl. ¶ 5 [# 83] Plaintiffs concede the error and withdraw their request for $62,006 in fees and $1,252 in associated travel costs.  Pls.' Reply Br. at 1, 4-7.   Accordingly, the Court disallows the charges associated with the settlement discussions between September 1, 1999 and April 25, 2000 in accordance with the parties' agreement to that effect.[10]  Rohlf Decl. Ex. A at 3 (74.2 hours); Levine Decl. Ex. A at 7-8 (100.8 hours); Mueller Decl. Ex. B at 20 (0.3 hour entry for 9/13/99).  In addition to the $1,251.89 in travel costs, the Court also deducts $45 of

---

[10]Plaintiffs drafted the stipulation, which states that "Plaintiffs waive the right to seek attorney fees and costs, under the Endangered Species Act and Equal Access to Justice Act, against Federal Defendants for work performed on the parties' settlement discussions from September 1, 1999 through April 25, 2000."  Order to Amend Compl. ¶ 5.  Plaintiffs and Federal Defendants signed the stipulation in May 2000.  At that time, the City still was still a named defendant, but it did not sign the stipulation, and the Builder Intervenors were in the process of preparing appellate briefs to challenge their exclusion from the lawsuit.

telephone costs because the billing entries show that nearly every settlement discussion took place by telephone.  Levine Decl. Ex. B.

Second, Federal Defendants contest most of the billing entries for the settlement discussions outside the time period covered by the stipulation.  Fed. Defs.' Attach. 1(b).  Federal Defendants argue that any discussions involving the Builder Intervenors and the City are not payable under the *Love* decision.  *Id.*  In those instances where the line entry does not specify which party was involved in the settlement discussions, Federal Defendants argue that those hours are not recoverable because Plaintiffs bear the burden of proof.  *Id.*

The Court overrules this objection because the facts are distinguishable from the *Love* decision.  Here, FWS issued a permit that delegated its ESA take authority to the City and granted Assurances to landowners who became Third Party Beneficiaries throughout the 543,243 acres in the San Diego region for fifty years.  *Bartel*, 470 F. Supp. 2d at 1128.  Importantly, the settlement discussions at issue occurred *before* the Builder Intervenors filed their Cross Complaint (a separate portion of the litigation which was opposed by both Federal Defendants and Plaintiffs).  Instead, Plaintiffs discussed settlement with landowners who derived their take authority from FWS's ITP.  These projects had been granted permission to destroy vernal pool species under the now-invalid umbrella permit that FWS had issued to the City.  *E.g.*, Rohlf Decl. at 4 (discussing proposed settlement agreements with City).[11]  Plaintiffs' attack on the validity of the ITP made FWS the true target at that stage of the litigation and the key opponent in any potential compromise to settle the lawsuit.

Moreover, Federal Defendants were actively involved in the issue of whether to settle and upon what terms.  The billing statements reflect that Plaintiffs consulted with Federal Defendants about possible settlement language on these ongoing development projects.  *E.g.*,

_____

[11]For example, upon filing the TRO, Plaintiffs billed 29 hours for various settlement discussions on the Carmel Mountain and Cousins projects.  Levine Decl. at 6-7 (up to the date that the stipulation to waive took effect on September 1, 1999).  These projects were on going developments governed by the FWS's permit, which Plaintiffs proved had been issued in violation of the ESA.  The Court notes that Federal Defendants did not object to the hours that Plaintiffs billed in connection with the TRO itself.  Also, the Cousins project was used as an illustration of the flawed 12% measurement in the final decision.  *Bartel*, 470 F. Supp. 2d at 1149.

98cv2234

1  Levine Decl. Ex. A at 7 (after discussing settlement on the Cousins project on February 9,

2  1999, Plaintiffs discussed terms and language with Federal Defendants; same for Torrey

3  Pines project on August 2, 1999), *id.* at 9-12 (August 17, 2001, October 2 & 12, 2001,

4  February 4, 15, 20, & 22, 2002 entries show Plaintiffs' discussed the content of the proposed

5  settlement with City with the Federal Defendants).  Because Federal Defendants participated

6  in discussions and reviewed the proposed terms to settle Plaintiffs' allegations against the

7  ITP, Plaintiffs' settlement-related expenses "were incurred opposing improper *government*

8  resistance to their rightful demands" concerning the validity, implementation, and operation

9  of the ESA permit.  *Love*, 924 F.2d at 1495-96 (quoting *Avoyelles*, 786 F.2d at 636).  Federal

10  Defendants have not stated that they did not oppose the Plaintiffs' attempts to settle at this

11  stage of the litigation or that they took "no position" on the desirability of settlement, thus,

12  this factor is not present.  *Love*, 924 F.2d at 1495.

13      In sum, it is not "manifestly unfair" to shift the entire expense for the settlement

14  discussions to the Federal Defendants, *id.* at 1496 (quoting *Avoyelles*, 786 F.2d at 636) since

15  that portion of the litigation was "made necessary" by the issuance of the ITP and the

16  granting of Assurances.  The Federal Defendants' position was "antagonistic" to Plaintiffs'

17  claims and Plaintiffs prevailed on the merits by showing the Federal Defendants were

18  "remiss in enforcing the [ESA]."  *Avoyelles*, 786 F.2d at 637.  Therefore, the Court awards

19  Plaintiffs their fees for the early settlement discussions (*i.e.*, those that occurred before the

20  Builder Intervenors filed their Cross Complaint).  Rohlf Decl. Ex. A at 2-4 (3.1 hours before

21  waiver period and 31.7 hours thereafter); Levine Decl. Ex. A at 6-12 (27.5 hours before and

22  95 hours after waiver); Mueller Decl. Ex. B at 20 (8.4 hours before Sept. 1, 1999).  Because

23  the settlement discussions concluded in 2002 and none of the billing entries indicate that the

24  lawyers traveled in 2003, the Court disallows the $412 travel charge identified as "2003

25  (Setl. Mtgs)."  Levine Decl. Ex. B.

26      In a third item of dispute, Federal Defendants oppose the time spent to negotiate and

27  prepare the stipulation of material fact.  This was part of the discussions between Plaintiffs

28  and Federal Defendants in order to streamline the summary judgment motions.  Order at 4.

1   As such, the Court concludes that Plaintiffs are entitled to recover fees for this work.

2                   **(c) <u>Post Judgment Activity</u>**

3          Federal Defendants contend that the fees and costs associated with litigation activities

4   that took place after the Court issued its final decision are not recoverable.

5          First, Builder Intervenors filed a motion to "clarify" the scope of the injunction which

6   was a veiled attack on the Court's decision on the merits.  Plaintiffs opposed the Builder

7   Intervenors' attempt to exempt certain construction projects from the Injunction.  [# 290]

8   Simultaneously, Federal Defendants filed a brief in which they stated they did "not object to

9   some of the requests for clarification in Intervenors' motion, but do not join the motion."

10  Fed. Defs.' Opp. Br. to Intervenors' Rule 60 Mot. at 1, 13-15 [# 289]   Federal Defendants

11  then briefed the procedural and substantive issues surrounding the motion for clarification,

12  and also raised a new issue that the case would soon be moot.  *Id.* at 2-17.

13         The Court agrees with the Federal Defendants on this billing item.  That motion was

14  filed by the Builder Intervenors and the legal work performed by Plaintiffs to oppose it was

15  directed at that separate party.  [# 278 & 290]  It is true that the Federal Defendants opposed

16  the issuance of the injunction throughout the litigation and that they used their own brief to

17  argue that the case would soon be moot.  Fed. Defs.' Response to Mot. to Clarify at 1-5 [#

18  289]  Nonetheless, Federal Defendants were bound by the Court's injunction and did not join

19  the post-judgment objections.  *Id.* at 1, 9-13.  In any event, the hours that Plaintiffs billed to

20  oppose the motion to clarify were not "incurred in opposing government resistance" to the

21  injunction, but were directed only at the Builder Intervenors.  *Love*, 924 F.2d at 1496.  Thus,

22  under *Love*, the costs associated with that work cannot be shifted to the United States.  For

23  the same reason, the Court disallows the hours that Plaintiffs devoted to determining the

24  effect of the Builder Intervenors' premature notice of appeal on their motion to clarify.

25  [#284]  The Court further disallows the hours devoted to the Ninth Circuit's mediation

26  process because they related solely to the appeal filed by the Builder Interveners (though the

27  Federal Defendants later filed their own notice of appeal).  By contrast, the Court allows the

28  other hours that Plaintiffs devoted to determining the effect of the injunction on behalf of

98cv2234

1   their clients.  Rohlf Decl. Ex. A at 8 (30.1 hours); Levine Decl. Ex. A at 20 (3.3 hours

2   between 11/3/06 & 12/7/06).

3        Second, the Federal Defendants filed a Rule 59(e) motion to alter or amend the

4   judgment.  [# 268].  Plaintiffs filed a short statement of non-opposition to the motion and

5   billed 0.3 hours for this task.  Levine Decl. Ex. A at 20.  Federal Defendants object.

6        The Court overrules this objection.  Plaintiffs incurred these fees in the process of

7   determining whether or not to oppose the Federal Defendants' post-judgment motion;

8   therefore, the legal fees were caused by the government's action.  Plaintiffs filed a written

9   statement of non-opposition to comply with a Court rule.  Local Civil Rule 7.2 (f)(3).

10  Federal Defendants' Rule 59(e) motion asked the Court to modify some language in the final

11  decision to clarify their position in the litigation on the effect of the Supreme Court's

12  *SWANCC* decision.  In the underlying litigation, the Court resolved that issue in favor of the

13  Plaintiffs' view that *SWANCC* required FWS to re-initiate consultation on the ITP.  *Bartel*,

14  470 F. Supp. 2d at 1130-33.  In these circumstances, the Court finds it reasonable and

15  appropriate to award the cost of this post-judgment activity between the prevailing plaintiff

16  and the government.  *Cf. Love*, 924 F.2d at 1495-96.

17       Third, Federal Defendants object to the hours devoted to preparing this fee application

18  on the ground that Plaintiffs took unreasonable positions that unduly protracted the resolution

19  of the issue.  The Court overrules this objection.  Plaintiffs may recover "fees incurred while

20  pursuing merits fees ('fees on fees')."  *Thompson v. Gomez*, 45 F.3d 1365, 1366 (9th Cir.

21  1995); *Palila*, 512 F. Supp. at 1009.  The Court discerns no basis for reducing the hours spent

22  in compiling the billing records and preparing the instant motion and in all respects finds the

23  charges reasonable under the circumstances.  Rohlf Decl. at 12 (4.9 hours); Levine Decl. at

24  (54.8 hours); *see* Pls.' Reply Br. at 1 &11 (at Plaintiffs' requested sum of $30,422, the Court

25  calculates approximately 76 hours).  Nonetheless, because the preparation of the fee

26  application does not require the specialized skill of an environmental lawyer, the Court finds

27  that a reasonable rate for these hours to be $320.  *Ursic v. Bethlemhem Mines*, 719 F.2d 670,

28  677 (3d Cir. 1983) ("A Michaelangelo should not charge Sistine Chapel rates for painting a

1   farmer's barn."); *Palila*, 512 F. Supp. at 1008.

2   **(e) Travel Expenses and Local Counsel**

3   Federal Defendants argue that Plaintiffs should not recover travel costs because they

4   chose to hire attorneys from Colorado and Oregon. *See* Levine Decl. Ex. A at 31. Because

5   Plaintiffs have shown that they tried but could not find a competent attorney in the area who

6   was willing to accept the burdens of this extensive litigation on a pro bono basis, the Court

7   rejects this argument. The hearing was critical to the Court's understanding of the factual

8   and legal issues. That Plaintiffs found an attorney to act in the position of local counsel for

9   purposes of Local Civil Rule 83.3(c)(6), does not alter the Court's conclusion. Levine Decl.

10  ¶ 6. The attendance of the lead attorneys who were familiar with the merits was essential.

11  Also, the government has not been subjected to duplicative services because one local

12  counsel did not submit any bills. *Id.*; Gonzalez Decl. ¶ 1.

13  Conclusion

14  Upon due consideration of the parties' memoranda and exhibits, a review of the

15  record, and for the reasons set forth above, the Court grants in part and denies in part

16  Plaintiffs' Motion for Attorney's Fees and Costs. [#264 & 309] Federal Defendants shall

17  reimburse Plaintiffs $546,932.19 as reasonable costs (including attorney's fees) in this

18  Endangered Species Act litigation.[12] 16 U.S.C. § 1540(g).

19  IT IS SO ORDERED.

20  DATED: August 30, 2007

21

22  Hon. Rudi M. Brewster
    United States Senior District Judge
23

24  cc:  all counsel

25

26

27  _____

28  [12]This sum includes fees allocated as follows: (1) $72,022.50 for Rohlf's 161 hours (including $6,487.50 for his law clerk's additional 51.9 hours); (2) $458,464.00 for Levine's 1,302 hours; (3) $6,976.00 for Mueller's 21.8 hours at $320; and (4) expenses $9,469.69.

98cv2234