FILED

10 JUN -4  AM 8: 23

CLERK, U.S. DISTRICT C
SOUTHERN DISTRICT OF CALIF

BY: _____  DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SOUTHWEST CENTER FOR BIOLOGICAL DIVERSITY, et al.,** | **CASE NO. 98-CV-2234-B(WVG)** |
| **Plaintiffs,** | **RESPONSE TO CIRCUIT COURT'S ORDER FOR FURTHER INFORMATION AND CLARIFICATION** |
| **vs.** | |
| **JIM BARTEL, et al.,** | |
| **Defendants,** | |
| **and** | |
| **BUILDING INDUSTRY LEGAL DEFENSE FOUNDATION, et al.,** | |
| **Intervening Defendants,** | |
| **and related Counterclaim.** | |

In response to the Ninth Circuit's Order (filed April 8, 2010) requesting further information and clarification of this Court's Injunction, the Court, after considering the briefs and oral argument by all parties, submits its answers to the five questions posed and its clarification of the Injunction.

## I.    Answers to the Circuit's Five Questions

Question (1):  Does the court's order prohibit the City from approving under the ITP and MSCP all projects on land on which development was planned or proceeding under the authority of the ITP and MSCP at the time that the court issued the injunction?

/ / /

Answer – in two parts:

(1)(a) No, if none of the seven vernal pool species and/or their biologically-essential habitat is present on the property. 16 U.S.C. § 1531(b) (one purpose of ESA is "to provide a means whereby the *ecosystems* upon which endangered species and threatened species depend may be conserved") (emphasis added); 16 U.S.C. § 1532(5)(A)(i) & (ii) (defining critical habitat); 50 C.F.R. § 17.3 (defining harm). The City's ITP (No. PRT-830421, dated July 18, 1997) was invalidated only as to the seven vernal pool species and/or their said biologically-essential habitat at issue in this lawsuit. The City is free to approve projects that relate to the other 78 species and/or their habitat covered by the MSCP/ITP.

(1)(b) Yes, if there is vernal pool said biologically-essential habitat or species on the property. The Court invalidated the City's ITP (No. PRT-830421, dated July 18, 1997) only as to the seven vernal pool species and/or their said biologically-essential habitat. The City no longer has the authority or power to issue an ITP for those species and/or their said biologically-essential habitat. But, the City can issue ITPs for the other 78 species and/or their habitat.

Question (2): Does the court's order prohibit the City from approving under the ITP and MSCP new projects in new locations, if those new locations also contain vernal pools?

Answer: Yes. The City lost its power to rely on ITP (No. PRT-830421, dated July 18, 1997) as to the seven vernal pool species and/or their said biologically-essential habitat when this court invalidated it in its Decision (filed Oct. 13, 2006 and amended on Dec. 15, 2006). That final decision is law of the case and has not been appealed. The City cannot issue ITPs for old or new projects that rely on the invalidated MSCP/ITP for authorization to take the seven vernal pool species and/or their said biologically-essential habitat.

98cv2234

<u>Question (3)</u>: Does the court's order enjoin projects that have vernal pools on the property, but that do not anticipate take of either vernal pool habitat or vernal pool species?

      <u>Answer</u>: No. The ESA does not contemplate "anticipation" of a developer. It is essentially a strict liability statute. The statute prohibits the taking of a species, either directly or through biologically-essential habitat modification.

      If the hypothetical "vernal pools" are not biologically-essential habitat, the Injunction does not reach that property.

      If the Circuit question means by "vernal pools," "biologically-essential habitat," it is covered by the Injunction because the Injunction intends to include biologically-essential habitat as well as the species. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 179 (1978) (greatest threat was "destruction of natural habitats"); *see* 50 C.F.R. § 17.3 ("*Harm*" in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.").

      If FWS issues a new, independent ITP under ESA § 10 permit process or Incidental Take Statement ("Incidental Take Statement") under ESA § 7 consultation process, the landowner may submit the authorization to the City, which may then process the building permit under its ordinary procedures. Such a project is not enjoined.

<u>Question (4) – in three parts:</u>

<u>Question (4)(a)</u>: If a project has vernal pool habitat on its land, may the developer apply for an § 10 Incidental Take Permit directly from the Fish and Wildlife Service?

      <u>Answer</u>: Yes, the FWS may process an independent, individual application and issue an ITP under ESA § 10 or an ITS under ESA § 7 on the

98cv2234

1    seven vernal pool species and/or their habitat.

2          Anyone who contends the FWS action violates the ESA may file a

3    separate action.

4

5    Question (4)(b):  Phrased differently, may projects that originally sought to develop

6    land under the City's ITP now move forward, on a case-by-case basis, independent of the

7    City's ITP?

8          Answer:  Yes.

9

10    Question (4)(c):  Must projects that have obtained a § 10 ITP from the Service

11    nevertheless seek exemption from the district court's injunction?

12          Answer:   No, where the applicant has an independent, individual

13          ITP under ESA § 10 permit process or an Incidental Take

14          Statement under ESA § 7 consultation process.

15

16    Question 5 – in 2 parts:

17    Question (5)(a):  Are the City and the Fish and Wildlife Service currently negotiating

18    a revised regional ITP and MSCP that will address the protection of the seven vernal pool

19    species?  If so, what is the status of these negotiations?

20          Answer:  Yes.  The status of the negotiations is described in the Joint

21          Declaration of Federal Defendants and City of San Diego.  FWS and the City

22          recently executed a Planning Agreement regarding the Vernal Pool Habitat

23          Conservation Plan, which includes an Interim Project Review Process.  These

24          documents are attached to this Response.  Ex. 1 & 1(C) to Doc. No. 448.

25

26    Question (5)(b):  At what point will the injunction expire if the Service and the City

27    do not successfully complete negotiations?

28          Answer:  It is a permanent injunction as to any development of property

1    sought under the invalidated ITP as to the seven species only.  The Court's

2    Decision and Injunction was not dependent upon, nor did it rely upon the future

3    existence of a new regional MSCP/ITP to protect the seven vernal pool species

4    and/or their said biologically-essential habitat.  As explained in answers to

5    question 4 above, the Injunction would not apply to any new MSCP/ITP.

6  **II.   Clarification of Injunction**

7        The Ninth Circuit stated that this Court may revise and clarify the Injunction.  The

8    Court clarifies the Injunction by adding the underlined text as follows.

9            The Court immediately enjoins the City of San Diego's Incidental Take

10       Permit (No. PRT-830421, dated July 18, 1997, and issued by the United States

11       Fish and Wildlife Service) for those pending and future development projects

12       that "take" any of the seven vernal pool species – San Diego fairy shrimp

13       (*Branchinecta sandiegonensis*); Riverside fairy shrimp (*Streptocephalus*

14       *woottoni*), Otay mesa mint (*Pogogyne nudiuscula*); California Orcutt grass

15       (*Orcuttia californica*); San Diego button celery (*Eryngium aristulatum var.*

16       *parishii*); San Diego mesa mint (*Pogogyne abramsii*); and spreading navarretia

17       (*Navarretia fossalis*) – and/or their biologically-essential habitat as governed

18       by the Endangered Species Act.  16 U.S.C. § 1531(b) (one purpose of ESA is

19       "to provide a means whereby the *ecosystems* upon which endangered species

20       and threatened species depend may be conserved") (emphasis added); 16

21       U.S.C. § 1532(5)(A)(i) & (ii) (defining critical habitat); 50 C.F.R. § 17.3

22       (defining harm).  Specifically, the Court enjoins (1) any and all pending

23       applications for development of land containing vernal pool biologically-

24       essential habitat; (2) those projects where the City has granted permission, but

25       the development has not yet physically begun to destroy vernal pool

26       biologically-essential habitat; and (3) any further development where the

27       permittee is presently engaged in the destruction of vernal pool biologically-

28       essential habitat; unless the United States Fish and Wildlife Service issues a

1     new, independent Incidental Take Permit under ESA § 10 permit process or

2     Incidental Take Statement under ESA § 7 consultation process, in which case

3     the landowner may submit the authorization to the City, which may then

4     process the building permit under its ordinary procedures.  Such a project is not

5     enjoined.

6         The Clerk shall transmit a copy of this Response, with the attachments, to the Ninth

7 Circuit Court of Appeals (No. 06-56851).

8 DATED:  June 3, 2010

9

10                          Hon. Rudi M. Brewster

11                          United States Senior District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27 cc:  All Parties
        Ninth Circuit (No. 06-56851)

28

98cv2234

1  IGNACIA S. MORENO
   Assistant Attorney General
2  Environment & Natural Resources Division
   JEAN E. WILLIAMS, Chief
3  ROBERT P. WILLIAMS, Trial Attorney
        U.S. Department of Justice
4       Environment & Natural Resources Division
        Wildlife & Marine Resources Section
5       Ben Franklin Station, P.O. Box 7369
        Washington, D.C. 20044-7369
6       Telephone: (202) 305-0206
        Facsimile: (202) 305-0275
7       robert.p.williams@usdoj.gov
   Attorneys for Federal Defendants
8
   JAN I. GOLDSMITH, City Attorney
9  DONALD R. WORLEY, Assistant City Attorney
   CHRISTINE LEONE, Chief Deputy City Attorney
10 California State Bar No. 208803
   GEORGE F. SCHAEFER, Deputy City Attorney
11 California State Bar No. 139399
        Office of the City Attorney
12      Civil Division
        1200 Third Avenue, Suite 1100
13      San Diego, California 92101-4100
        Telephone: (619) 533-5800
14      Facsimile: (619) 533-5856
        GSchaefer@sandiego.gov
15 Attorneys for Cross-Defendant
   City of San Diego

16                 UNITED STATES DISTRICT COURT

17               SOUTHERN DISTRICT OF CALIFORNIA

18

19  SOUTHWEST CENTER FOR          )  Case No. 98-CV-2234-B (JMA)
    BIOLOGICAL DIVERSITY, et al., )
20                                )  **JOINT DECLARATION OF**
          Plaintiffs,             )  **FEDERAL DEFENDANTS AND CITY**
21                                )  **OF SAN DIEGO IN COMPLIANCE**
          v.                      )  **WITH COURT'S ORDER OF APRIL**
22                                )  **26, 2010 (DOC. # 446)**
    JIM BARTEL, et al.,           )
23                                )  Judge: Hon. Rudi M. Brewster
          Defendants,             )  Courtroom No. 2
24                                )  Hearing Date: June 2, 2010
    BUILDING INDUSTRY LEGAL       )  Hearing Time: 9:00 a.m.
25  DEFENSE FOUNDATION, et al.,    )
                                  )
26        Intervening Defendants.  )
                                  )
27  _____ )
                                  )
28  and related cross-complaint.   )
    _____ )

                                  1

1    We, Susan Wynn and Jeanne Krosch, jointly declare on behalf of the Federal Defendants

2    and the City of San Diego ("City") as follows:

3    1.    I, Susan Wynn, am a Fish and Wildlife Biologist in the Carlsbad Fish and Wildlife

4    Office for the U.S. Fish and Wildlife Service ("Service"), an agency of the U.S. Department of

5    the Interior ("DOI"), located in Carlsbad, California. In that capacity I am responsible for

6    implementing the Service's habitat conservation planning program in San Diego County under

7    the supervision of the Field Supervisor. As a Fish and Wildlife Biologist, I provide technical

8    assistance to applicants preparing habitat conservation plans ("HCPs") in support of applications

9    for incidental take permits ("ITPs") under Section 10 of the Endangered Species Act, 16 U.S.C.

10   1539(a)(1)(B) ("ESA") and review formally submitted ITP applications for consistency with the

11   permit issuance standards under Section 10 of the ESA. I have worked closely with the City for

12   the past 13 years to assist in the implementation of the City's Multiple Species Conservation

13   Plan/Habitat Conservation Plan ("MSCP/HCP") and I currently am assisting the City with its

14   development of a city-wide Vernal Pool HCP.

15   2.    I, Jeanne Krosch, am a Senior Planner with the City assigned to the MSCP section

16   of City Planning and Community Investment ("CPCI"). I work under the supervision of a

17   Principle Planner. In my capacity as a Senior Planner, I am responsible for the following: 1)

18   implementation of the City's MSCP; 2) acquisition of multi-habitat planning area lands; 3)

19   supervision of the review of public and private projects for consistency with the MSCP and

20   implementing regulations (including regulations for environmentally sensitive lands); and 4)

21   development of the City's Vernal Pool HCP and preparation of the related environmental impact

22   report.

23   3.    We make this joint Declaration based upon our own personal knowledge. If called

24   upon to testify as to those matters stated in this Declaration, we could and would competently

25   testify to those matters.

26   4.    This joint Declaration is submitted for the purpose of assisting the Court in

27   answering the following questions posed by the Circuit Court of Appeals for the Ninth Circuit in

28   this case: 1) "Are the City and the Fish and Wildlife Service currently negotiating a revised

1   regional ITP and MSCP that will address the protection of the seven vernal pool species?" and 2)

2   " If so, what is the status of these negotiations?"

3       5.    As an initial matter, we would like to advise the Court that, on April 20, 2010, the

4   City notified the Service in writing that it was relinquishing coverage of the seven vernal pool

5   species under the current ITP and MSCP/HCP. *See* Exhibit 1 to this Declaration. The City's

6   decision to relinquish coverage of the seven vernal pool species under the existing ITP and

7   MSCP/HCP and proceed with a new Vernal Pool HCP precludes the City from authorizing any

8   future "take" of ESA-listed vernal pool fairy shrimp in reliance on the relinquished ITP.

9       6.    As we explain more fully below, the City, in close coordination with the Service,

10  intends to develop a new Vernal Pool HCP that protects eight vernal pool species, including the

11  five threatened or endangered plant species and two threatened or endangered fairy shrimp

12  species at issue in this case, in full conformance with the requirements of the ESA.

13      7.    Specifically, in response to question 1 from the Circuit Court, the City and the

14  Service are negotiating a new HCP that is anticipated to cover: the San Diego button celery,

15  spreading navarretia, California orcutt grass, San Diego mesa mint, Otay mesa mint, San Diego

16  fairy shrimp and Riverside fairy shrimp (the seven vernal pool species at issue in this case), plus

17  the little mousetail, a currently unlisted vernal pool plant species. This HCP under preparation is

18  anticipated to establish a defined vernal pool preserve within the City to conserve sensitive vernal

19  pool resources, identify preserve management and maintenance obligations, and provide a reliable

20  funding mechanism to fully implement the HCP. If the City's ITP application based on the vernal

21  pool HCP is approved by the Service, it would authorize the City and third parties under the

22  City's jurisdiction and control to commit "take" of the two vernal pool animal species incident to

23  otherwise lawful activities in the City. It also would extend "no surprises" assurances under 50

24  C.F.R. § 17.22(b)(5) and 17.32(b)(5) to the eight vernal pool species. The City's vernal pool

25  species HCP currently under development and the resulting ITP, if issued, would be separate and

26  independent of the City's existing MSCP/HCP and ITP, which has been enjoined, in part, by this

27  Court and relinquished, in part, by the City.

28  ///

8.     In response to question 2 from the Circuit Court, in the Court's amended decision and injunction of December 15, 2006, the Court concluded: "The Court remands the matter to the United States Fish and Wildlife Service with instructions to reinstate consultation looking toward revisions of the City of San Diego's Incidental Take Permit at least on the seven vernal pool species, and for further action not inconsistent with this decision." (Doc. 280, p. 63: 10-13).

9.     Following the Court's injunction, all parties to the litigation agreed to participate in mediation sponsored by the Mediation Office of the Court of Appeals. The first in-person mediation session took place on June 4, 2007 at the Court of Appeals in San Francisco. Numerous in-person mediation sessions in San Diego and telephonic mediation sessions followed. In February 2009, the mediator declared an impasse in the mediation discussions.

10.     The mediation sessions included constructive discussion about potential revisions to the City's existing MSCP/HCP to improve protection of the seven vernal pool species and their habitat and, alternatively, development of a new Vernal Pool HCP that would support issuance of a separate ITP covering the seven vernal pool species.

11.     Pursuant to Section 6 of the ESA, 16 U.S.C. 1535, the Service has established the Cooperative Endangered Species Conservation Fund, which allows the Service to provide grants to States for conservation actions on non-Federal land. These competitive grants enable states to work with private landowners, conservation groups, and other agencies to initiate conservation planning efforts and acquire and protect habitat to support the conservation of threatened and endangered species. The City, with the encouragement of the Service, applied for a Section 6 planning grant to support the development of the Vernal Pool HCP.

12.     On April 20, 2009, the Service awarded a Section 6 planning grant to the City for the development of the Vernal Pool HCP. This grant, in the amount of $615,000, includes $500,000 for the City to help fund preparation of the Vernal Pool HCP and $115,000 for the State of California to cover state administrative costs. The grant requires a match of $205,000 in non-federal funds from the City, which will be met by the City through budgeted CPCI staff time.

13.     On March 15, 2010, the San Diego City Council approved acceptance of these federal grant funds for the development of the Vernal Pool HCP.

4

1    14.    On April 20, 2010, the City signed a Planning Agreement with the Service for the

2  Vernal Pool HCP. Exhibit 2 to this Declaration is a copy of the Planning Agreement.

3    15.    The Service and the City contemplate that preparation of the Vernal Pool HCP will

4  include public workshops to obtain input from stakeholders, environmental groups, development

5  community, and other public and private interests. As part of the environmental review process, a

6  scoping meeting and a formal public comment period to review of the draft HCP and associated

7  environmental documents will occur. The HCP process also will include input and technical

8  assistance from the Service and the California Department of Fish and Game and from

9  independent scientific advisors retained by the City.

10    16.    Upon the Service's receipt of a complete ITP application from the City, the

11  Service will publish a Notice of Availability in the Federal Register of the application for public

12  review. The public comment period usually is 60-90 days. As part of its review of the permit

13  application, the Service will prepare an intra-Service biological opinion under section 7 of the

14  ESA, 16 U.S.C. 1636, finalize compliance with the National Environmental Protection Act

15  ("NEPA"), prepare permit findings pursuant to Section 10 of the ESA, and if the decision is to

16  issue a permit, prepare the ITP.

17    17.    The City and the Service contemplate the following schedule for completion of the

18  HCP and related environmental documentation:

19  **February 2010 – January 2011:**    Preparation of HCP, including public workshops.

20  **January 2011 – December 2011:**    Preparation and submittal of permit application and
21                                         Environmental Documentation (NEPA and CEQA):
                                          Scoping meetings, preparation, public review & publication
22                                         of draft environmental and HCP documents.

23  **November 2011 – March 2012 :**    Prepare permit decision related documents.

24  **January 2012 – March 2012:**    City Council approval process authorizing signing of IA
25                                         Committee.

26  **March 2012:**    Issuance of ITP, if approved, by the Service.

27

28

Case No. 98-CV-2234-B (JMA))

1          We declare under penalty of perjury under the laws of the United States that this

2     Declaration is true.

3     Dated:  May 5 , 2010

                                                    Susan Wynn

4     Dated:  May 6 , 2010

                                                    Jeanne Krosch
5                                                   Senior Planner, City of San Diego

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          6



# EXHIBIT 1

**Planning Agreement**

by and between

**The City of San Diego and
U.S. Fish and Wildlife Service**

Regarding the

**Vernal Pool
Habitat Conservation Plan**

**October 2009**

# TABLE OF CONTENTS

1. Definitions ........................................................................................ 4
2. Background ....................................................................................... 5
   2.1 Habitat Conservation Plan.......................................................... 5
   2.2 Purposes of HCP Planning Agreement ...................................... 6
   2.3 Compliance with CESA and FESA.............................................. 6
   2.4 Assurances ................................................................................. 7
3. HCP Planning Goals ......................................................................... 7
4. HCP Planning Areas and Plan Participants ...................................... 7
   4.1 Vernal Pool HCP Study Area ...................................................... 7
   4.2 Excluded Lands ........................................................................... 8
   4.3 Local Agency .............................................................................. 8
   4.4 California Department of Fish and Game ..................................... 8
   4.5 U. S. Fish and Wildlife Service ................................................... 8
5. Preliminary Conservation Objectives................................................ 8
   5.1 Conservation Elements .............................................................. 9
      5.1.1 Vernal Pool Species, Mitigation, and Management ............. 9
      5.1.2. Vernal Pool Conservation Areas ....................................... 9
      5.1.3 Project Design .................................................................... 9
6. Preparing the HCP ........................................................................... 9
   6.1 Best Available Scientific Information ........................................... 10
   6.2 Data Collection........................................................................... 10
      6.2.1 Data Sources .................................................................... 10
   6.3 Independent Scientific Input........................................................ 11
   6.4 Public Participation..................................................................... 11
      6.4.1 Outreach............................................................................ 11
      6.4.2 Availability of Public Review Drafts ................................... 11
      6.4.3 Public Hearings.................................................................. 12
      6.4.4 Public Review and Comment Period Prior to Adoption ........ 12
   6.5 Covered Activities ...................................................................... 12
   6.6 Interim Project Processing .......................................................... 12
   6.7 Protection of Habitat Land during Planning Process ..................... 13
      6.7.1. Conservation Lands Acquired/Protected ........................... 13
      6.7.2 Mitigation Lands ................................................................ 13
7. Commitment of Resources ............................................................... 13
   7.1 Funding....................................................................................... 13
      7.1.1 Local Funding..................................................................... 13
      7.1.2 CDFG Assistance with Funding and CDFG Costs............... 13
      7.1.3 USFWS Assistance with Funding....................................... 13
   7.2. Expertise of Wildlife Agencies.................................................... 14
8. Miscellaneous Provisions ................................................................ 14
   8.1 Public Officials Not to Benefit ..................................................... 14
   8.2 Statutory Authority ..................................................................... 14

8.3  Multiple Originals ............................................................. 14
8.4  Effective Date .................................................................. 14
8.5  Duration ........................................................................... 14
8.6  Amendments .................................................................... 14
8.7  Termination and Withdrawal ........................................... 14
     8.7.1 Funding ................................................................... 15

## LIST OF EXHIBITS

Exhibit A -   City of San Diego HCP Planning Area Boundaries
Exhibit B -   Species List for the Vernal Pool HCP
Exhibit C -   Interim Project Review Process and Flow Diagram
Exhibit D -   Sample City of San Diego Conservation Easement

## Vernal Pool Habitat Conservation Plan Planning Agreement

This Planning Agreement is for the planning and preparation of the Vernal Pool Habitat Conservation Plan (HCP), and is entered into as of the Effective Date by and between the City of San Diego ("City") and the U. S. Fish and Wildlife Service ("Service"). These entities are referred to collectively as "Parties" and each individually as a "Party." The California Department of Fish and Game (CDFG) will be an advisory agency to this process. The HCP is a separate habitat conservation plan covering the vernal pool habitats and species within the city of San Diego (Exhibit A), and will complement the City of San Diego MSCP Subarea Plan adopted in 1997.

### 1. Definitions

Terms used in this Planning Agreement that are defined in the Natural Community Conservation Planning Act AND have the meanings set forth in Fish and Game Code Section 2805. The following terms as used in this Planning Agreement will have the meanings set forth below.

1.1   "City Council" means the City of San Diego City Council.

1.2   "CEQA" means the California Environmental Quality Act, Public Resources Code, Section 21000, *et seq.*

1.3   "CESA" means the California Endangered Species Act, California Fish and Game Code, Section 2050, *et seq.*

1.4   "City" means the City of San Diego.

1.5   "Covered Activities" means the activities that will be addressed in the Plan and for which the Local Agency will seek an incidental take permit (ITP) pursuant to Section 10 of the Endangered Species Act (ESA).

1.6   "Covered Species" means those listed and non-listed species identified in the approved Plan to be conserved and managed consistent with the approved Plan such that, through approval of the Plan, USFWS will authorize their take under Federal law.

1.7   "CDFG" means the California Department of Fish and Game.

1.8   "Effective Date" means the date by which all of the Parties to the Planning Agreement have signed it.

1.9   "FESA" means the Federal Endangered Species Act, 16 USC Section 1530, *et seq.*

4

1.10 "Habitat Conservation Plan" or "HCP" means a
conservation plan prepared pursuant to Section 10(a) (1)
(B) of FESA.

1.11 "Incidental Take Permit" means take that is incidental to,
and not the purpose of, the carrying out of an otherwise
lawful activity.

1.12 "Listed Species" means those species designated as
candidate, threatened, or endangered pursuant to CESA
and/or listed as threatened or endangered under FESA.

1.13 "MSCP" means Multiple Species Conservation Program.

1.14 "Natural Community Conservation Program Plan" or
"NCCP Plan" means a conservation plan created
pursuant to Fish and Game Code, Section 2801, *et seq.*

1.15 "Natural Community Conservation Planning Act" or
"NCCPA" means Fish and Game Code, Section 2800, *et
seq.*

1.16 "NEPA" means the National Environmental Policy Act,
USC Section 4321, *et seq.*

1.17 "Planning Area" means the geographic areas proposed to
be addressed in the Vernal Pool HCP as described in
Exhibit A. Specifically; this refers to the private and City-
owned land over which the City of San Diego has land
use jurisdiction.

1.18 "Study Area" means all lands in the project boundary of
the Vernal Pool HCP Study Areas (i.e., private land and
public lands).

1.19 "USFWS" means the U.S. Fish and Wildlife Service.

1.20 "Wildlife Agencies" means the CDFG and USFWS,
collectively.

## 2. Background

### 2.1. Habitat Conservation Plan

Under FESA, an incidental take permit is required when non-Federal
activities will result in "take" of threatened or endangered wildlife. A
habitat conservation plan (HCP) must accompany an application for an
incidental take permit. The purpose of the habitat conservation planning
process associated with the permit is to ensure there is adequate
minimization and mitigation for the effects of the authorized incidental

5

take. The purpose of the incidental take permit is to authorize the incidental take of a listed species, not to authorize the activities that result in take.

## 2.2. Purposes of HCP Planning Agreement

The purpose of HCP Planning Agreement is to:

a. Define the Parties' goals and commitments with regard to preparation of the HCP;

b. Define the geographic scope of the Planning Area;

c. Identify a list of vernal pool species that are intended to be the focus of the HCP;

d. Identify preliminary conservation objectives for the Vernal Pool HCP;

e. Establish a process for the inclusion of independent scientific input into the planning process;

f. Ensure coordination between the Wildlife Agencies, particularly with respect to FESA and CESA;

g. Establish a process to review interim projects with the potential to impact vernal pools within the Planning Area consistent with the preliminary conservation objectives; vernal pool preserve options for establishing a viable reserve system; and long-term conservation measures;

h. Ensure public participation and outreach throughout the planning process.

## 2.3. Compliance with CESA and FESA

The Planning Area contains valuable vernal pool resources. Within the Planning Area there are species that are protected, or may be protected in the future, under CESA and/or FESA. The Parties intend for the Plan to satisfy the requirements of an HCP under Section 10(a)(1)(B) of FESA and this will serve as the basis for take authorization.

FESA provides that after the approval of an HCP, USFWS may permit the taking of wildlife species covered in the HCP if the HCP and permit application meet the requirements of section 10(a)(2)(A) and (B) of FESA. Take authorization for federally listed wildlife species covered in the HCP shall generally be effective upon approval of the HCP and issuance of an incidental take permit. Take authorization for non-listed wildlife species covered in the HCP becomes effective if and when the species is listed pursuant to FESA. Take authorization during HCP preparation for wildlife species listed pursuant to FESA may be provided pursuant to individual permits issued pursuant to section 10(a)(1)(B), or consultations under section 7 of FESA. Although there is no take of plants under FESA and thus USFWS is not able to authorize take of plants, USFWS may include plants as covered species for purposes of extending Federal assurances for them provided the Vernal Pool HCP meets Section 10 issuance criteria and they provide conservation

benefits to plants.

**2.4. Assurances**

The Parties anticipate that the USFWS will provide assurances pursuant to applicable Federal law and regulations then in effect upon issuance of the Federal incidental take permits to the City.

## 3. HCP Planning Goals

The planning goals include the following:

    a. Provide for the conservation and management of Vernal Pool Covered Species;

    b. Preserve vernal pool resources through conservation partnerships with the Local Agency;

    c. Allow for appropriate and compatible growth and development that is consistent with applicable laws;

    d. Provide a basis for permits necessary for lawful incidental take of vernal pool Covered Species;

    e. Provide a comprehensive means to coordinate and standardize mitigation and compensation requirements of FESA, CESA, CEQA, and NEPA within the Planning Area;

    f. Provide a more efficient project review process which results in greater conservation values than project-by-project, species-by-species review; and

    g. Provide clear expectations and regulatory predictability for persons carrying out Covered Activities within the Planning Area.

## 4. HCP Planning Areas and Plan Participants

Implementation of the HCP will preserve a network of vernal pool habitat and open space, protect biodiversity, and also enhance the region's quality of life. Vernal pool habitat and species are considered sensitive because they have been greatly reduced in distribution by development. The City of San Diego intends to include San Diego and Riverside fairy shrimp, San Diego button-celery, little mousetail, spreading navarretia, California Orcutt grass, San Diego mesa mint, and Otay Mesa mint which are federally and/or state listed as endangered, threatened, or otherwise considered sensitive (see Exhibit B).

### 4.1.1. Vernal Pool HCP Study Area

The City of San Diego encompasses 206,124 acres within the MSCP study area. The HCP is a separate plan covering vernal pool areas within the City of San Diego's MSCP study area and will include the City-owned lands in the unincorporated areas of Otay Lakes and Marron Valley which support vernal pool habitat (Exhibit A). The HCP will complement the City of San Diego MSCP Subarea Plan adopted by the City Council in 1997. The City of San Diego has land use authority over private parcels and City-owned land in the City of San Diego.

### 4.1.2. Excluded Lands

Military lands, lands owned or managed by non-signatory public agencies, State or Federal agencies, or water and school districts are excluded from the Study Areas unless they consent and are willing to voluntarily participate in the HCP. The City will coordinate planning efforts with these entities to determine where and how conservation strategies will be able to complement one another. The HCP will be a stand-alone plan and the Study Areas' excluded lands will not be relied upon for conserving and gaining coverage from the Wildlife Agencies for listed and other sensitive species.

## 4.2. City of San Diego

The City of San Diego is the local sponsor of the HCP. As part of this planning process, the City has committed to undertake a collaborative, systematic approach to protect the significant vernal pool resources, including candidate, threatened, and endangered species and their habitats within the Planning Area to ensure that the Covered Activities comply with applicable Federal and State laws.

## 4.3. California Department of Fish and Game

CDFG is the agency of the state of California authorized to act as trustee for the state's wildlife. CDFG will act as an advisory agency for the purposes of the HCP planning process.

## 4.4. U. S. Fish and Wildlife Service

The USFWS is an agency of the United States Department of the Interior authorized by Congress to administer and enforce FESA with respect to terrestrial wildlife, certain fish species, insects and plants, and to enter into agreements with states, local governments, and other entities to conserve threatened, endangered, and other species of concern. USFWS is authorized to approve Habitat Conservation Plans and to issue Incidental Take Permits.

## 5. Preliminary Conservation Objectives

The preliminary conservation objectives intended to be achieved through the HCP are:

a. Provide for the protection of vernal pool species;

b. Preserve the diversity of vernal pool plant and animal species throughout the Planning Area;

c. Minimize and mitigate the incidental take of proposed vernal pool Covered Species;

d. Identify and designate vernal pool preserve areas;

e. Insure that activities are not likely to jeopardize the continued existence of any endangered or threatened vernal pool species;

f. Reduce the need to list additional vernal pool species; and

g. Set forth species-specific and habitat-based goals and objectives for the protection of vernal pool species.

8

## 5.1. Conservation Elements

### 5.1.1. Vernal Pool Species, Mitigation and Management

The HCP will employ a strategy that focuses on the conservation of vernal pool ecosystems within the Planning Area. The City is in the process of developing proposed amendments to the Land Development Code, Environmentally Sensitive Lands (ESL) regulations for sensitive biological resources (sections 143.0110, 143.0141 and 143.0150) and amendments to the Land Development Manual Biology Guidelines. It is anticipated and intended that the final amendments to the code, regulations and guidelines will reflect and implement the measures identified in the HCP to minimize and mitigate all impacts to vernal pool species and habitat. As part of the HCP process, the draft Vernal Pool Management Plan will be completed and will include site specific measures for conservation and management of vernal pool species and habitat within the Planning Area.

A preliminary list of the vernal pool species known from the Planning Area that are intended to be the focus of the HCP are provided in Exhibit B. The list identifies species that the Parties will evaluate for inclusion in the HCP, and they may not necessarily be the final Covered Species list for the HCP. The Parties acknowledge that inclusion of a particular species as a Covered Species in the HCP will require separate determination by USFWS that the HCP adequately provides for conservation of the species in accordance with Federal permit issuance requirements.

### 5.1.2. Vernal Pool Conservation Areas

The HCP will establish vernal pool conservation areas throughout the Planning Area. The vernal pool conservation areas will include a range of environmental gradients and ecological functions, and will address edge effects and other reserve design principles.

### 5.1.3. Project Design

The HCP will ensure that development projects are appropriately designed to avoid and/or minimize negative on-site and off-site impacts to vernal pool resources and to adequately mitigate for those impacts.

## 6. Preparing the HCP

The Parties intend that this Planning Agreement will establish a mutually agreeable process for preparing the HCP that fulfills the requirements of an HCP and FESA. As described below, the process used to develop the HCP will incorporate independent scientific input and analysis, and include public participation with ample opportunity for comment from the general public as well as advice solicited by the City as described below:

## 6.1. Best Available Scientific Information

The HCP will be based on the best available scientific information, including, but not limited to:

    a. Principles of conservation biology, community ecology, landscape ecology, individual species' ecology, and other scientific knowledge and thought;

    b. Thorough information about vernal pool habitat/species and proposed Covered Species on lands throughout the Planning Area; and

    c. Advice from well-qualified, independent scientists.

## 6.2. Data Collection

The Parties agree that information briefly described below in Section 6.2.1 is important for preparation of the HCP. Excellent distribution information and species data exists for vernal pools within the City of San Diego (e.g., Recovery Plan for Vernal Pools of Southern California, (USFWS 1998; Recovery Plan); Vernal Pool Inventory (City of San Diego 2004); and City-wide Vernal Pool Management Plan (City of San Diego 2009-10). The parties do not anticipate that additional data will be required. The project proposes to analyze these existing data sources to create an implementable strategy for conservation of threatened/endangered vernal pool species within the Planning Area.

### 6.2.1. Data Sources

The data anticipated to be utilized for the development of the HCP includes the following:

    a. GIS vernal pool database and baseline vernal pool data inventory. Data layers will include vernal pool locations, natural communities (using a classification system based on Holland 1986), topography, soils, land use, ownership, and resource management status. The vernal pool study area in the City of San Diego is included in Exhibit A.

    b. Vernal Pool Preserve design criteria. The preserve design criteria and conservation goals will include the basic principles and tenets of conservation biology and the coarse filter goals.

    c. Analysis of gaps in protection. The gap analysis will be used primarily to identify, at a coarse scale, areas of potentially high vernal pool habitat value that are currently not well protected (areas "at risk").

    d. Conservation analysis: The conservation analysis will provide detailed species-specific analyses for San Diego and Riverside fairy shrimp, San Diego button-celery, little mousetail, spreading navarretia, California Orcutt grass, San

Diego mesa mint, and Otay Mesa mint. The analysis will include the level of conservation and take expected from the implementation of the HCP as well as the ultimate biological effects from the establishment of the hard line vernal pool preserve and from the adherence to the City of San Diego's Environmentally Sensitive Land (ESL) Ordinance and Biology Guidelines, and other documents associated with the HCP.

## 6.3. Independent Scientific Input

The City of San Diego intends to include independent scientific input and analysis to assist in the preparation of the HCP by appointing Independent scientists representing a broad range of disciplines, including conservation biology and locally-relevant vernal pool knowledge will be included. They will be consulted on an individual basis. The City and the USFWS will provide existing, relevant data including the Vernal Pool Inventory (City 2004) and the draft Vernal Pool Management Plan to the advisors for their use during review of the HCP. The City will provide all questions in writing to the advisors and topics may include, but are not limited to, regional conservation, species natural history and biology, and on-going scientific research. The participation of the Scientific Advisors is expected to create a more robust HCP and to provide assistance to the City in preparing the HCP.

## 6.4. Public Participation

The City of San Diego will prepare the HCP in an open and transparent process with an emphasis on obtaining input from a balanced variety of public and private interests including state and local jurisdictions, landowners, conservation organizations, and the general public. The planning process will provide for thorough public review and comment. To assist in the development of the HCP, the City will form an Interagency working group consisting of the City, USFWS, and CDFG. The role of USFWS and CDFG on the Interagency working group will be to provide the City with technical assistance in development of the HCP.

### 6.4.1. Outreach

The City will provide access to information to persons interested in the HCP. The City expects and intends that public outreach regarding preparation of the HCP will be conducted largely through the public meetings. The public meetings will be used to present key decisions regarding the preparation of the HCP to allow the public the opportunity to comment on and inquire about the decisions.

### 6.4.2. Availability of Public Review Drafts

The City will designate and make available for public review in a reasonable and timely manner "public review drafts" of pertinent planning documents including, but not limited to, plans, maps, conservation guidelines, and species coverage lists. Such documents will be made available by the City at least ten working days prior to any

public hearing addressing these documents. This obligation will not apply to all documents drafted during preparation of the HCP.

### 6.4.3. Public Hearings
Public hearings regarding preparation of the HCP and environmental document will be planned and conducted in a manner that satisfies the requirements of CEQA, NEPA, and any other applicable local, state, or Federal laws.

### 6.4.4. Public Review and Comment Period Prior to Adoption
The City of San Diego will make the proposed draft HCP available for public review and comment for a minimum of 60 days before adoption. The City expects to fulfill this obligation by distributing the draft HCP with the draft environmental impact report prepared for the HCP pursuant to CEQA and/or the draft environmental impact statements prepared for the HCP pursuant to NEPA.

## 6.5. Covered Activities
Covered Activities under the HCP are those activities that may result in authorized take or loss of vernal pool Covered Species that will be identified and addressed in the HCP. Covered Activities may include: those land uses over which the City has land use authority and adaptive habitat management and monitoring activities in the Planning Area. The Parties intend that the HCP will allow vernal pool Covered Activities in the Planning Area to be carried out in compliance with NCCPA, CESA, and FESA.

## 6.6. Interim Project Processing
The Parties recognize that before the Wildlife Agencies approve the HCP, certain projects and activities may be proposed with the potential to impact vernal pools within the Planning Area. The Parties agree to the guidelines provided in the attached Interim Project Review Process (Exhibit C) to: (1) ensure that development, construction, and other projects or activities approved or initiated in the Planning Area before completion of the HCP are consistent with the preliminary conservation objectives (Section 5) and do not compromise successful completion and implementation of the HCP; (2) facilitate CEQA, CESA, and FESA compliance for interim projects subject to these laws; and (3) minimize, as appropriate, delays in processing projects during preparation of the HCP.

## 6.7. Protection of Habitat Land during the Planning Process

### 6.7.1. Conservation Lands Acquired/Protected
The Parties may elect to preserve, enhance, or restore, either by acquisition or other means (i.e., conservation easements, designated setbacks), lands in the Planning Area that contain vernal pool species prior to approval of the HCP. The City of San Diego will consult with the Wildlife Agencies regarding vernal pool lands to be protected and will identify preliminary hard line vernal pool preserve areas in the

12

north, central, and southern portions of the City to be used as the basis
for the HCP.

The Wildlife Agencies agree, as appropriate, to credit such lands,
using June 2009 the day the Vernal Pool HCP grant was awarded as
the date such crediting will commence toward the potential land
acquisition or habitat protection requirements of the HCP, provided that
the lands are permanently conserved and managed and contribute to
the conservation strategy for the Vernal Pool HCP.

### 6.7.2. Mitigation Lands

Lands, or portions of lands, acquired or otherwise protected solely to
mitigate the impacts of specific projects, actions, or activities approved
prior to approval by the USFWS of the HCP will be considered as
mitigation only for those projects, actions, or activities. Such lands will
be considered during the HCP analysis of the conservation of vernal
pools and vernal pool species.

## 7. Commitment of Resources

### 7.1. Funding

The Parties agree that they will work together to bring available funding
to the planning effort.

#### 7.1.1. Local Funding

The City recognizes that, as prospective applicants for state and
Federal permits, they have the responsibility for developing the
HCP that meet applicable legal requirements and that, as a result,
the preparation of the HCP must be funded primarily from locally
assured sources.

#### 7.1.2. CDFG Assistance with Funding and CDFG Costs

The Parties agree that the City shall not provide reimbursement to
CDFG beyond monies identified in the HCP Section 6 Grant for its
participation in the planning phase of the HCP. CDFG's
commitments under this Planning Agreement are subject to the
availability of appropriated funds and the written commitment of
funds by an authorized CDFG representative.

#### 7.1.3. USFWS Assistance with Funding

The USFWS agrees to cooperate with the other Parties in
identifying and securing, where appropriate, Federal and State
funds earmarked for habitat conservation planning purposes.
Potential Federal funding sources may include: the USFWS'
Cooperative Endangered Species Conservation Fund; Land and
Water Conservation Fund; and land acquisition grants or loans
through other Federal agencies such as the Environmental
Protection Agency, the Army Corps of Engineers, or the
Departments of Agriculture or Transportation. The commitments of

the USFWS under this Planning Agreement are subject to the requirements of the Anti-Deficiency Act (31 U.S.C. section 1341) and the availability of appropriated funds. The Parties acknowledge that this Planning Agreement does not require any Federal agency to expend its appropriated funds unless and until an authorized officer of that agency provides for such expenditures in writing.

### 7.2. Expertise of Wildlife Agencies
Subject to Section 7.1.3, the Wildlife Agencies agree to provide technical and scientific information, analyses, and advice to assist the Local Agency with the timely and efficient preparation of the HCP.

## 8. Miscellaneous Provisions

### 8.1. Public Officials Not to Benefit
No member of or delegate to Congress will be entitled to any share or part of this Planning Agreement, or to any benefit that may arise from it.

### 8.2. Statutory Authority
The Parties will not construe this Planning Agreement to require any Party to act beyond or in a manner inconsistent with its statutory authority.

### 8.3. Multiple Originals
This Planning Agreement may be executed by the Parties in multiple originals, each of which will be deemed to be an official original copy.

### 8.4. Effective Date
The Effective Date is the date by which all of the Parties to the Planning Agreement have signed it.

### 8.5. Duration
This Planning Agreement will be in effect until USFWS makes a decision on the City's application for an incidental take permit based on the HCP, or for a period of three years following the Effective Date, whichever occurs first, unless the duration is extended by an amendment. This Planning Agreement may be terminated pursuant to section 8.7 below.

### 8.6. Amendments
This Planning Agreement can be amended only by written agreement of all Parties.

### 8.7. Termination and Withdrawal
Subject to the requirement in Section 8.7.1 of the Planning Agreement, any party may withdraw from this Planning Agreement upon 30 days' written notice to the other Parties. The Planning Agreement will remain in effect as to all non-withdrawing Parties unless the remaining Parties determine that the withdrawal requires termination of the Planning Agreement. This Planning Agreement can be terminated only by written

agreement of all Parties.

### 8.7.1. Funding

In the event that Federal or state funds have been provided to assist with HCP preparation or implementation, any Party withdrawing from this Planning Agreement shall return to the granting agency unspent funds awarded to that Party prior to withdrawal. A withdrawing Party shall also provide the remaining Parties with a complete accounting of the use of any Federal or state funds it received regardless of whether unspent funds remain at the time of withdrawal. In the event of termination of this Planning Agreement, all Parties who received funds shall return any unspent funds to the grantor prior to termination.

## SIGNATURES

CITY OF SAN DIEGO

By: _____          Dated: _April 20, 2010_

Jay Goldstone, Chief Operating Officer

U. S. FISH AND WILDLIFE SERVICES

By: _____          Dated: _November 16, 2009_

Jim A. Bartel, Field Supervisor, Carlsbad Fish and Wildlife Office

15

**Exhibit A**
San Diego Vernal Pool HCP Planning Area Boundaries





# Exhibit B
## Species List for the Vernal Pool HCP

| LATIN NAME | COMMON NAME | STATUS FED/CA/CNP |
|---|---|---|
| **INVERTEBRATES** | | |
| Branchinecta sandegonensis; | San Diego fairy shrimp | FE |
| Streptocephalus wootoni | Riverside fairy shrimp | FE |
| | | |
| **PLANTS** | | |
| Eryngium aristulatum var. parishii | San Diego button-celery | FE/CE |
| Myosurus minimus var. apus | Little mousetail | ---- |
| Navarretia fossalis | Spreading navarretia | FT |
| Orcuttia californica | California Orcutt grass | FE/CE |
| Pogogyne abramsii | San Diego Mesa Mint | FE/CE |
| Pogogyne nudiscula | Otay Mesa Mint | FS/CE |
| | | |

**Status:**
CE   State (California) Endangered
CR   State Rare
CSC State Species of Special Concern
CT   State Threatened
CFP  State Fully Protected Species

FE   Federally Endangered
FSC  Federal Species of Concern
FT   Federally Threatened
CNPS List
1B   Plants considered rare, threatened, or endangered in California and elsewhere.
Plants considered rare, threatened, or endangered in CA, but more common elsewhere.
Plants which need more information.
Plants of limited distribution - a watch list.

**Exhibit C**
Interim Project Review Process and Flow Diagram

**PURPOSE**

The purpose of the Interim Review Process is to ensure that discretionary development/construction projects ("Interim Projects") approved or initiated within the Vernal Pool HCP Planning Area prior to the adoption of the HCP do not compromise the successful development and implementation of the HCP. The Interim Project Review Process can also facilitate FESA compliance for Interim Projects when required, as well as ensure that interim projects are not delayed solely due to preparation of the Vernal Pool HCP.  It is recognized that nothing in the HCP Planning Agreement nor compliance with the Interim Project Review Process precludes a property owner from seeking an individual permit and take authorization under existing federal law.

The Interim Review Process also ensures early review and consideration of proposed discretionary projects by the Service. With respect to discretionary projects which may have the potential to preclude long-term preservation planning or impact the viability of vernal pool resources, the Service's commit to meet with the City and/or project proponent at the earliest feasible point in the CEQA or NEPA process to review such projects. Early identification of potential impacts will assist in the preparation of environmental documents for the project and provide the opportunity to identify potential project alternatives and mitigation measures for consideration in compliance with Public Resources §21080.3(a).

The Interim Project Review Process is intended to allow for the concurrent processing of projects during preparation of the HCP to address planning issues, such as transportation, land use, site planning, etc. in addition to a project's potential take of vernal pool species and habitat.  This process is not intended to create an additional layer of project review nor to grant any additional authority to the Service. The final decision of whether to approve, modify, or deny a project remains in the hands of the lead agency pursuant to existing laws.

**DEFINITION OF INTERIM PROJECTS**

Interim Projects may include proposed development or construction projects, whether conducted by the City or requiring permits from the City, which are located in the Vernal Pool Planning Area and are considered discretionary as defined by CEQA Guidelines Article 20, §15357. Interim Projects shall be reported to the Service if they meet all of the following criteria:

- The proposed project is located within the Vernal Pool Planning Area;
- A determination has been made by the City that the proposed project is not exempt from CEQA;
- The project has the potential to adversely impact proposed vernal pool species/habitat within the Vernal Pool Planning Area; and
- The project represents one or more actions or is subject to one or more discretionary permits as defined in the Land Development Code.

## NOTIFICATION PROCESS

The City shall notify the Service of Interim Projects meeting the criteria described above as soon as possible after the City has reviewed the project application and determined it to be complete pursuant to Section 65943 of the Government Code. The following information shall be provided:

- Project Description;
- Project Location;
- Aerial Photo;
- Vegetation Map per the Sangis' GIS data; and
- List of potential sensitive species that may be found on-site.

The Service shall identify a lead person for project review and meeting attendance. The notification process for Interim Projects shall end upon completion of the Vernal Pool HCP or upon termination of the HCP Planning Agreement.

## COORDINATION ON INTERIM PROJECTS

Representatives from the City shall meet on an as needed basis with the Service to discuss and coordinate processing during the preparation of the Vernal Pool HCP. For purposes of CEQA, the project review meeting, and any related activities (site visits, follow-up correspondence, etc.) shall constitute a consultation pursuant to Public Resources §21080.3(a). If appropriate at the meeting, but otherwise in not more than 30 days following the meeting, the Service shall use their reasonable efforts to provide input to the lead agency (City of San Diego) as to whether the agency believes the project may potentially conflict with the conservation objectives of the HCP Planning Agreement.

The Service shall also indicate specific issues it believes should be addressed, suggest any studies that may be necessary to assess project impacts to specific vernal pool resources, and propose any mitigation measures or project alternatives that would help achieve the preliminary vernal pool conservation objectives and indicate whether they believe the project may potentially conflict with the objectives of the vernal pool HCP Planning Agreement.

The Interim Project Review is intended to facilitate cooperation among the City, the Service, and the project applicants to ensure timely review of projects which may have the potential to preclude long-term vernal pool preservation planning and to facilitate the resolution of issues which might affect the successful preparation of the HCP.

## ENJOINED AND NEW PROJECTS

Upon signing of the HCP Planning Agreement, the City will petition the Court to release any and all of the enjoined projects so that they may be processed concurrently with development of the Vernal Pool HCP and consistent with the Planning Agreement, including the Interim Project Review Process.

A.  The following activities would be allowed during preparation of the Vernal Pool HCP
- Review of technical studies;
- Biological surveys conducted in accordance with USFWS protocols;
- Activities that would benefit or restore vernal pool species and/or vernal pool habitat; and
- Projects where it is determined that there are no impacts to vernal pool resources.

B.  Projects that have been previously approved by the City of San Diego following a discretionary hearing

B.1. May request a Substantial Conformance Review (SCR) Process One from the City to determine consistency with the draft Vernal Pool HCP and the Planning Agreement if:

- On-site vernal pool resources would be protected and no "take" authorization is required;
- The approved development footprint and any offsite activities are outside the draft hardline preserve areas, consistent with the preliminary Vernal Pool Preserve Areas (to be developed as a priority task as part of the preparation of the HCP) ;
- Management and monitoring consistent with the draft Vernal Pool Management Plan is provided;
- Funding in-perpetuity for management/monitoring is provided;
- The project is consistent with the proposed ESL/wetland amendments; and,
- MSCP conservation/covenant easement is granted over any preserved on-site or off-site vernal pool habitat, consistent with the preliminary Vernal Pool Preserve Areas (to be developed as a priority task as part of the preparation of the HCP)

The SCR approval process would require findings prepared by the City to address the issues outlined above and presented to the Service for review.  If the SCR is approved by the City and the Service agrees that the project would not conflict with the conservation objectives of the HCP Planning Agreement and the VP HCP planning effort, the City may issue a grading permit.

B.2. If impacts to vernal pools and/or road ruts with fairy shrimp would occur; applicant must obtain "take" authorization from USFWS prior to issuance of any grading permits by the City.

C.  Projects that have not been previously approved by the City

C.1. Projects with on-site vernal pool resources that are being protected and no "take" authorization required may proceed through the City's discretionary process, including a discretionary hearing if it is consistent with the draft Vernal Pool HCP and Planning Agreement, including items listed below:

- Project is consistent with the preliminary Vernal Pool Preserve Areas  (to be

developed as a priority task as part of the preparation of the HCP);
- Provides management and monitoring consistent with the draft Vernal Pool Management Plan;
- Provides funding in perpetuity for management/monitoring;
- Consistent with the proposed ESL/wetland amendments; and,
- Requires MSCP conservation/covenant easement over any preserved on-site or off-site vernal pools/habitat.

The approval process would require findings prepared by the City to address the issues outlined above and presented to the Service for review. If the City and the Service agree that the project would not conflict with the conservation objectives of the HCP Planning Agreement and draft VP HCP, the City may issue a grading permit.

C.2. Projects with on-site vernal pools and/or road ruts with fairy shrimp impacts may proceed through the City's discretionary process, up to and including, release of the draft or revised draft environmental document for public review, if it is consistent with the draft Vernal Pool planning effort and Planning Agreement, including items listed below:

- Project is consistent with the preliminary Vernal Pool Preserve Areas (to be developed as a priority task as part of the preparation of the HCP);
- Provides management and monitoring consistent with the draft Vernal Pool Management Plan;
- Provides funding in-perpetuity for management/monitoring;
- Consistent with the proposed ESL/wetland amendments; and,
- Requires MSCP conservation/covenant easement over any preserved on-site or off-site vernal pools/habitat.

The project may proceed further to a public hearing and if approved will require take authorization prior to any grading or site disturbance, consistent with local, state and Federal law. In addition, the permit would include Special Conditions requiring a Substantial Conformance Review (Process 1) to assure consistency with the HCP prior to issuance of a grading permit, including the items listed above.

Under this process, those projects that had submitted at least one draft environmental impact report to the City for review at the time of enjoinment would be allowed to pursue individual take authorization under the Federal ESA . These projects are limited to Castlerock, St. Jerome's Church, and Candlelight East & West. Projects that were earlier in the development review process at the time of enjoinment or are submitted after January 1, 2010 may not pursue take authorization until completion of the HCP and the issuance of an ITP to the City or March 2012, whichever occurs first.

## PROCEDURES
Interim Project Review meetings will be scheduled on an as-needed basis and may be held in conjunction with existing MHPA Boundary Line Adjustment

Meetings.

- Meeting attendees for interim projects will include City and Service staff. Applicants and their representatives may be included at the discretion of the City and Service staff.
- The City will send the Service information listed above under "Notification Process."

At the interim project review meeting, the City and Service will have the opportunity to discuss the project, answer questions, and review the project design and proposed impacts (if any) as they relate to the Vernal Pool HCP planning effort, the Planning Agreement, and proposed Amendments to the Land Development Code, ESL regulations/wetlands (sections 143.0141 and 143.0150) and with any additional habitat conservation or take minimization and mitigation requirements identified by the Service.

At the interim project review meeting or within 30 days after the review meeting, the Service representatives shall use its reasonable effort to provide the following information to the City and project applicant:

- List of concerns related to negative impacts on the vernal pool resources which the Service believes could occur from the project as proposed, and the agency's assessment as to whether those impacts have the potential to be in conflict with the preliminary vernal pool conservation objectives in the HCP Planning Agreement; and
- List of any project alternatives, mitigation measures, or studies which the Service believes should be considered in the environmental review process.

The Service will retain the right to provide further comments during the formal public comment period or may choose to entirely waive their comments during the Interim Project Review Process and reserve them for the public comment period.

# HCP INTERIM PROJECT PROCESS



Page 6 of 6

1.  HCP Planning Agreement (PA) between City of San Diego and USFWS
    Signed on 4-20-10

RECORDING REQUESTED BY:

**THE CITY OF SAN DIEGO**

AND WHEN RECORDED MAIL TO:

**CITY CLERK
CITY OF SAN DIEGO
MAIL STATION 2A**

Originating Dept – DSD/LDR – M.S. 501

**Exhibit D**
Sample City of San Diego Conservation Easement

*(THIS SPACE FOR RECORDER'S USE ONLY)*

# GRANT DEED - CONSERVATION EASEMENT

J.O. NO: _____          ASSESSOR'S PARCEL NO: _____

PTS NO: _____          DWG NO: _____

NO DOCUMENT TAX DUE                                          NO FEE FOR GOVT. AGENCY
R & T CODE 11922                                                 GOVERNMENT CODE 27383

For valuable consideration, receipt of which is hereby acknowledged, _____

_____

HEREBY GRANT(S) to the City of San Diego, a municipal corporation, in the County of San Diego, State of California, a permanent easement for conservation purposes, together with the right of ingress and egress, over, under, along and across all that real property situated in the City of San Diego, County of San Diego, State of California, described as follows:

**See exhibit "A" attached hereto and exhibit "B" attached for illustration purposes**

THIS CONSERVATION EASEMENT DEED is made with reference to the following facts:

## R E C I T A L S

A.    Grantor is the sole owner in fee simple of certain real property in the City of San Diego, County of San Diego, State of California, which is more particularly described in exhibit "A" attached hereto and incorporates by this reference (The "Property");

B.    The Property possesses wildlife and habitat values of importance to the Grantee as well as the State of California, and the United States;

C.    Grantor has applied to the CITY OF SAN DIEGO and has been granted the right to develop a project in conformance with the following discretionary land use entitlements issued by the CITY OF SAN DIEGO: Permit No. _____;

D.    In connection with development of the Property, Grantor desires to obtain benefits associated with utilizing permits issued to the CITY OF SAN DIEGO by the United States Fish and Wildlife Service and the California Department of Fish and Game in connection with the Multiple Species Conservation Plan (MSCP) and therefore has agreed to design and implement development of the property in conformance with the MSCP;

E.    Development of the Property requires mitigation for impacts to sensitive habitats as further described in environmental document, No. _____ . The lands within the Property provide for compensatory mitigation for these impacts.

F.    This Conservation Easement shall impart notice to all persons to the extent afforded by the recording laws of the state of California regarding the restrictions affecting use of the environmentally sensitive lands preserved by this easement;

G.    When the Property contains sensitive biological resources this Conservation Easement shall be enforceable by the City, or jointly and severally by the City, the U.S. Fish and Wildlife Service, and the California Department of Fish and Game.

Page 1 of 4

## COVENANTS, TERMS, CONDITIONS AND RESTRICTIONS

In consideration of the above recitals and the mutual covenants, terms, conditions, and restrictions contained herein, and pursuant to California law, including Government Code Section 65870, et seq., Grantor hereby voluntarily conveys to Grantee a Conservation Easement in perpetuity over the Property.

1. Purpose. The purpose of this Conservation Easement is to ensure the Property will be retained forever in a natural condition and to prevent any development of the Property deemed to be environmentally sensitive lands or containing sensitive biological resources. Grantor intends that this Conservation Easement will confine the use of the Property to such activities, including without limitation, those involving the preservation of environmentally sensitive lands in a manner consistent with the purpose of this Conservation Easement.

2. Grantee's Rights. To accomplish the purposes of this Conservation Easement, Grantor hereby grants and conveys the following rights to Grantee by this Conservation Easement:

(a) To preserve and protect the environmentally sensitive lands and/or sensitive biological resources of the Property;

(b) To enter upon the Property at reasonable times in order to monitor Grantor's compliance with and to otherwise enforce the terms of this Conservation Easement and for scientific research and interpretive purposes by Grantee or its designees, provided that Grantee shall first notify and obtain consent from Grantor, which consent is not to be unreasonably withheld, and further provided that Grantee shall not unreasonably interfere with Grantor's use and quiet enjoyment of the Property;

(c) To prevent any activity on or use of the Property that is inconsistent with the purposes of this Conservation Easement and to require the restoration of such areas or features of the Property that may be damaged by any act, failure to act, or any use that is inconsistent with the purposes of this Conservation Easement at Grantor's sole expense;

(d) All mineral, air and water rights necessary to protect and to sustain the environmentally sensitive nature and sensitive biological resources of the Property; and

(e) All present and future development rights.

3. Prohibited Uses. Any activity on or use of the Property inconsistent with the purposes of this Conservation Easement is prohibited. Without limiting the generality of the foregoing, the following uses by Grantor, Grantor's agents, and third parties, are expressly prohibited:

(a) Un-seasonal watering, use of herbicides, rodenticides, or weed abatement activities, incompatible fire protection activities and any and all other uses which may adversely affect the purposes of this Conservation Easement;

(b) Use of off-road vehicles;

(c) Grazing or surface entry for exploration or extraction of minerals;

(d) Erecting of any building, billboard, sign;

(e) Depositing of soil, trash, ashes, garbage, waste, bio-solids or any other material;

(f) Excavating, dredging or removing of loam, gravel, soil, rock, sand or other material;

(g) Otherwise altering the general topography of the Property, including building of roads;

(h) Removing, destroying, or cutting of trees, shrubs or other vegetation, except as required by law for (1) fire breaks, (2) maintenance of existing foot trails or roads, or (3) prevention or treatment of disease.

4. Grantor's Duties. Grantor shall record this Conservation Easement against title to the Property with the County of San Diego and execute the Conservation easement in favor of the City of San Diego. In addition, Grantor shall undertake all reasonable actions to prevent the unlawful entry and trespass by persons whose activities may degrade or harm the environmentally sensitive nature of the Property.

5. Reserved Rights. Grantor reserves to itself, and to its personal representatives, heirs, successors, and assigns, all rights accruing from its ownership of the Property, including the right to engage in or to permit or invite others to engage in all uses of the Property that are consistent with the purposes of this Conservation Easement.

6. Grantee's Remedies. If Grantee determines that Grantor is in violation of the terms of this Conservation easement or that a violation is threatened, Grantee shall give written notice to Grantor of such violation and demand in writing the cure of such violation. If Grantor fails to cure the violation within thirty (30) calendar days after receipt of said written notice and demand from Grantee, or said cure reasonably requires more than thirty(30) calendar days to complete and Grantor fails to begin the cure within the thirty (30) calendar day period or fails to continue diligently to complete the cure, Grantee may bring an action at law or in equity in a court of competent jurisdiction to enforce compliance by Grantor with the terms of this Conservation Easement, to recover any damages to which Grantee may be entitled for violation by Grantor of the terms of this Conservation Easement, to enjoin the violation, ex parte as necessary, by temporary or permanent injunction without the necessity of proving either actual damages or the inadequacy of otherwise available legal remedies, or for other equitable relief, including, but not limited to, the restoration of the Property to the condition in which it existed prior to any such violation or injury. Without limiting Grantor's liability therefore, Grantee may apply any damages recovered to the cost of undertaking any corrective action on the Property.

If Grantee, in its sole discretion, determines that circumstances require immediate action to prevent or mitigate significant damage to the environmentally sensitive nature of the Property, Grantee may pursue its remedies under this paragraph without prior notice to Grantor or without waiting for the period provided for cure to expire. Grantee's rights under this paragraph apply equally to actual or threatened violations of the terms of this Conservation Easement. Grantor agrees that Grantee's remedies at law for any violation of the terms of this Conservation Easement are inadequate and that Grantee shall be entitled to the injunctive relief described in this section, both prohibitive and mandatory, in addition to such other relief to which Grantee may be entitled, including specific performance of the terms of this Conservation Easement, without the necessity of proving either actual damages or the inadequacy of otherwise available legal remedies. Grantee's remedies described in this section shall be cumulative and shall be in addition to all remedies now or hereafter existing at law or in equity, including but not limited to, the remedies set forth in California Government Code Section 65870, et seq., inclusive.

If at any time in the future Grantor or any subsequent transferee uses or threatens to use, such lands deemed to contain sensitive biological resources or lands that have been accepted as mitigation, for purposes inconsistent with this Conservation Easement, notwithstanding Government Code Section 65876, the City, the U.S. Fish and Wildlife Service, and the California Department of Fish and Game jointly and severally have as interested parties in any proceeding.

8.1     Costs of Enforcement. Any costs incurred by Grantee in enforcing the terms of this Conservation Easement against Grantor, including, but not limited to, costs of suit and attorneys' fees, and any costs of restoration necessitated by Grantor's violation or negligence under the terms of this Conservation easement shall be borne by Grantor.

8.2     Grantee's Discretion. Enforcement of the terms of this Conservation Easement by Grantee shall be at the discretion of Grantee, and any forbearance by Grantee to exercise its rights under this Conservation easement in the event of any breach of any term of this Conservation easement by Grantor shall not be deemed or construed to be a waiver by Grantee of such term or of any subsequent breach of the same or any other term of this Conservation Easement or of any of Grantee's rights under this Conservation Easement. No delay or omission by Grantee in the exercise of any right or remedy upon any breach by Grantor shall impair such right or remedy or be construed as a waiver.

8.3     Acts Beyond Grantor's Control. Nothing contained in this Conservation Easement shall be construed to entitle Grantee to bring any action against Grantor for any injury to or change in the Property resulting from causes beyond Grantor's control, including, without limitation, fire, flood, storm, and earth movement, or from any prudent action taken by Grantor under emergency conditions to prevent, abate, or mitigate significant injury to the Property resulting from such causes.

8.4     Department of Fish and Game Right of Enforcement. All rights and remedies conveyed to Grantee under this Conservation Easement Deed shall extend to and are enforceable by the California Department of Fish and Game when the Property either (1) contains sensitive biological resources, or (2) is land that has been accepted as mitigation.

8.5     U.S. Fish and Wildlife Service Right of Enforcement. All rights and remedies conveyed to Grantee under this Conservation Easement Deed shall extend to and are enforceable by the U.S. Fish and Wildlife Service when the Property either (1) contains sensitive biological resources, or (2) is land that has been accepted as mitigation.

7.      Access. This Conservation Easement does not convey a general right of access to the public.

8.      Costs and Liabilities.  Grantor retains all responsibilities and shall bear all costs and liabilities of any kind related to the ownership, operation, upkeep, and maintenance of the Property.

8.1     Taxes. Grantor shall pay before delinquency all taxes, assessments, fees, and charges of whatever description levied on or assessed against the Property by competent authority (collectively "taxes"), including any taxes imposed upon, or incurred as a result of, this Conservation Easement, and shall furnish Grantee with satisfactory evidence of payment upon request.

8.2     Hold Harmless. Grantor shall hold harmless, indemnify, and defend Grantee and its, directors, officers, employees, agents, contractors, and representatives (collectively "Indemnified Parties") from and against all liabilities, penalties, costs, losses, damages, expenses, causes of action, claims, demands, or judgments, including without limitation, reasonable attorneys' fees, arising from or in any way connected with: (1) injury to or the death of any person, or physical damages to any property, resulting from any act, omission, condition, or other matter related to or occurring on or about the Property, regardless of cause, unless due to the negligence of any of the Indemnified Parties; (2) the obligations specified in Sections 4, 8, and 8.1; and (3) the existence or administration of this Conservation easement.

9.      Subsequent Transfers. Grantor agrees to incorporate the terms of this Conservation Easement in any deed or other legal instrument by which Grantor divests itself of any interest in all or a portion of the Property, including, without limitation, a leasehold interest. Grantor further agrees to give written notice to Grantee of the intent to transfer of any interest at least fifteen (15) days prior to the date of such transfer. Grantee shall have the right to prevent subsequent transfers in which prospective subsequent claimants or transferees are not given notice of the covenants, terms, conditions and restrictions of this Conservation Easement. The failure of Grantor or Grantee to perform any act provided in this section shall not impair the validity of this Conservation Easement or limit its enforceability in any way.

10.     Notices. Any notice, demand, request, consent, approval, or communication that either party desires or is required to give to the other shall be in writing and be served personally or sent by first class mail, postage prepaid, addressed as follows:

To Grantor:     _____
                _____
                _____

To Grantee:     City of San Diego
                Mayor
                202 C Street
                San Diego, CA 92101

Or to such other address as either party shall designate by written notice to the other. Notice shall be deemed effective upon delivery in the case of personal delivery or, in the case of delivery by first class mail, five (5) days after deposit into the United States mail.

11.     Release of Covenant.  A hearing shall be held to consider any formal, written request directed to the City by any person requesting the release of this Conservation Easement, whether or not that person has title to the real property involved. The City shall record the release of this Conservation easement when it is determined that the restriction ensured by the Conservation easement is no longer necessary to achieve the land use goals of the City. In any instance where the Conservation Easement concerns sensitive biological resources, a determination by the City to release the Conservation Easement may be made only with the written concurrence of the U.S. Fish and Wildlife Service and the California Department of Fish and Game.

12.     Amendment. This Conservation Easement may be amended by Grantor and Grantee by mutual written agreement and where the Conservation Easement concerns sensitive biological resources, with the written concurrence of the U.S. Fish and Wildlife Service and the California Department of Fish and Game. Any such amendment shall be consistent with the purpose of this Conservation Easement and, except as provided in Section 11, shall not effect its perpetual duration. Any such amendment shall be recorded in the official records of San Diego County, State of California.

13. General Provisions.

(a) Controlling Law. The interpretation and performance of this Conservation Easement shall be governed by the laws of the State of California.

(b) Liberal Construction. Any general rule of construction to the contrary notwithstanding, this Conservation Easement shall be liberally construed in favor of the deed to affect the purpose of this Conservation Easement and the policy and purpose of Government Code Section 65870, et seq. If any provision in this instrument is found to be ambiguous, an interpretation consistent with the purposes of this Conservation Easement that would render the provision valid shall be favored over any interpretation that would render it invalid.

(c) Severability. If a court of competent jurisdiction voids or invalidates on its face any provision of this Conservation Easement Deed, such action shall not affect the remainder of this Conservation Easement Deed. If a court of competent jurisdiction voids or invalidates the application of any provision of this Conservation Easement Deed to a person or circumstance, such action shall not affect the application of the provision to other persons or circumstances.

(d) Entire Agreement. This instrument sets forth the entire agreement of the parties with respect to the Conservation easement and supersedes all prior discussions, negotiations, understandings, or agreements relating to the Conservation Easement. No alteration or variation of this instrument shall be valid or binding unless contained in an amendment in accordance with Section 12.

(e) No Forfeiture. Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

(f) Successors. The covenants, terms, conditions, and restrictions of this Conservation Easement Deed shall be binding upon, and inure to the benefit of, the parties hereto and their respective personal representatives, heirs, successors, and assigns and shall continue as a servitude running in perpetuity with the Property.

(g) Termination of Rights and Obligations. A party's rights and obligations under this Conservation Easement terminate upon transfer of the party's interest in the Conservation Easement or Property, except that liability for acts or omissions occurring prior to transfer shall survive transfer.

(h) Captions. The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon construction or interpretation.

(i) Counterparts. The parties may execute this instrument in two or more counterparts, which shall, in the aggregate, be signed by both parties; each counterpart shall be deemed an original instrument as against any party who has signed it. In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

IN WITNESS WHEREOF, Grantor and Grantee have entered into this Covenant of Easement the day and year first above written.

Date: _____

Grantor: (type or print) _____

By: (signature) _____
(type or print name)

_____

This is to certify that the interest in real property conveyed by this instrument to the City of San Diego, a municipal corporation, is hereby accepted by the undersigned officer on behalf of the City of San Diego, pursuant to authority conferred by the Municipal Code, and the grantee consents to recordation thereof by its duly authorized officer.

Date: _____

For City Engineer
By: _____

NOTE: NOTARY ACKNOWLEDGMENTS FOR ALL SIGNATURES MUST BE ATTACHED, PER CIVIL CODE SEC. 1180 ET. SEQ.

Printed on recycled paper. Visit our web site at www.sandiego.gov/development-services.
Upon request, this information is available in alternative formats for persons with disabilities.